IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

JAKE'S BAR AND GRILL, LLC, and
ANTONIO VITOLO,

        Plaintiffs,

   v.

ISABELLA CASILLAS GUZMAN,

        Defendant.

MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

## INTRODUCTION

Starting on Monday, May 3, 2021, the Small Business Administration (SBA), led by Defendant, began accepting applications for grants from the Restaurant Revitalization Fund. This fund, established by the American Rescue Plan Act of 2021 (ARPA), offers relief funds to restaurant owners who have been impacted by the economic uncertainties created by the COVID-19 pandemic.

But instead of administering this grant program with a neutral, first-come, first-serve process, ARPA establishes a priority period for women and certain minorities. Starting May 3, and continuing until May 24, SBA is evaluating and funding applications only from certain "priority" groups based on race and gender. Other restaurant owners—mostly white men—are being moved to the back of the line behind these preferred groups. On May 24, the priority period will end, and SBA will start evaluating applications from white male restaurant owners and will fund those

applications only to the extent there is money left in the limited fund. Yet Defendant has publicly represented that the fund will be insufficient to meet demand.

Antonio Vitolo owns Jake's Bar and Grill in Harriman, Tennessee. He applied immediately on May 3, 2021, but his application was queued behind other "priority" applicants because he was a white male. Every day that goes by without consideration, Vitolo is harmed. He is harmed because his application is not being treated on a first-come, first-serve basis like most other applications; instead, he is being subjected to intentional discrimination because he is a white male. If Vitolo were not a white male, then his application would be considered within the 21-day priority period. But because he is not, he waits, and by the time his turn comes, there may be no money left.

Plaintiffs respectfully request that this Court enter a temporary restraining order, as soon as possible, and then a preliminary injunction, prohibiting Defendant from paying out any grants from the Fund, *unless and until* Defendant begins processing applications and paying grants in the order that the applications were received, without regard to the race or gender of the applicant. Only an immediate injunction can avoid the irreparable harm that will occur if the fund is depleted before Plaintiffs' application is considered, as well as the daily indignity of being subjected to explicit, unconstitutional race and gender discrimination.

# FACTS

## I.    The Restaurant Revitalization Fund

In Section 5003 of ARPA, Congress created the Restaurant Revitalization Fund, which is a $28.6 billion fund to support restaurants. ARPA, § 5003(b)(2).[1] The law requires Defendant "to use amounts in the Fund to make grants" to restaurants impacted by "the uncertainty of current economic conditions." ARPA, § 5003(c)(2)(A)(i).

ARPA requires Defendant to impose race– and gender–based priorities while administering the fund. The law provides that during the "initial 21-day period in which the Administrator awards grants," Defendant is required to "prioritize grants to eligible entities that are small business concerns owned and controlled by women," veterans, or "socially and economically disadvantaged small business concerns." ARPA, § 5003(c)(3)(A).

ARPA incorporates the Small Business Act's definitions of the terms "socially disadvantaged" and "economically disadvantaged." ARPA, § 5003(c)(3)(A). "Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). "Economically

---

[1] ARPA is available on Congress's website at https://www.congress.gov/bill/117th-congress/house-bill/1319.

disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A).

In interpreting these definitions, SBA regulations further define "socially disadvantaged individuals" and "economically disadvantaged individuals" as those individuals who belong to certain racial and ethnic groups. 13 C.F.R. §§ 124.103, .104. Under these regulations, members of the following groups are presumed to be socially or economically disadvantaged: "Black Americans; Hispanic Americans; Native Americans (including Alaska Natives and Native Hawaiians); Asian Pacific Americans; or Subcontinent Asian Americans." *Id*.

White men do not qualify for the 21-day priority period, but other groups also do not. Defendant excludes many minorities from participation in the Restaurant Revitalization Fund's priority period. *See* 13 C.F.R. § 124.103. For example, Defendant grants a preference to some Asians, but not others. Individuals from (or whose ancestors are from) the following countries do not qualify for special treatment under the program: Afghanistan, Iran, Iraq, Turkey, Syria, Saudi Arabia, Jordan, Palestine, Yemen, Kuwait, U.A.E., Qatar, Lebanon, Mongolia, Kazakhstan, Turkmenistan, Tajikistan, Kyrgyzstan, or Uzbekistan. *Id*. Similarly, individuals from north Africa—Egypt, Libya, Algeria, Tunisia, and Morocco—are excluded from SBA's 21-day priority preference. *Id*.

4

In short, white men (and other disfavored minority groups) do not qualify under ARPA or SBA's regulations for priority treatment under Section 5003 of ARPA.

On April 27, 2021, Defendant announced the opening of the application period for the Restaurant Revitalization Fund. Dec. ¶8, Ex. 1.[2] According to this press release, "[f]or the first 21 days that the program is open, the SBA will prioritize funding applications from businesses owned and controlled by women, veterans, and socially and economically disadvantaged individuals." *Id*. The press release emphasizes that "[a]ll eligible applicants are encouraged to submit applications as soon as the portal opens." Dec. ¶8. This is because "[f]ollowing the 21 days, all eligible applications will be funded on a first-come, first-served basis." *Id*.

SBA also published an online handbook. Dec. ¶15 Ex. 7. This handbook confirms that women and certain minority restaurant owners will receive priority consideration, and that SBA will "only process and fund priority group applications during the first 21 days." *Id.*

## II.  Jake's Bar and Grill and Antonio Vitolo

Antonio ("Tony") Vitolo is a white male who owns and operates Jake's Bar and Grill, LLC, in Harriman, Roane County, Tennessee. Dec. ¶¶1, 2. Through the

---

[2] Attached to this memorandum is a sworn declaration of Plaintiff Antonio Vitolo. This declaration will be cited as "Dec. ¶ __." The declaration contains exhibits, which will be cited as "Ex. __."

restaurant, he supports his wife and children. Dec. ¶2. Vitolo's wife is Hispanic and she owns 50% of the restaurant. Dec. ¶2.

Vitolo has owned Jake's since 2018. *Id*. Like most restaurants, Jake's was hit hard by the COVID-19 pandemic: Vitolo closed the restaurant during weekdays and offered to-go orders on the weekends. Dec. ¶5. Vitolo estimates that he lost $35,000 in sales during the month of April 2020 alone. Dec. ¶6. He has also lost workers due to the economic uncertainty. Dec. ¶7.

On Monday, May 3, 2020, Vitolo applied for a grant from the Restaurant Revitalization Fund at SBA's web portal, restaurants.sba.gov; this was the first day that SBA allowed applications. Dec. ¶9.

As he filled out his application, Vitolo noticed a section called "Priority in Awarding Restaurant Revitalization Funds." Dec. ¶10. According to this section, Vitolo learned that "SBA will prioritize awarding funds to Applicants that are small business concerns at least 51 percent owned and controlled by individuals who are women, veterans, and/or socially and economically disadvantaged individuals." Dec. ¶10, Ex. 2.

SBA's grant application also included a long section describing who would qualify for these categories of special treatment. Dec. ¶11. This section explains that "socially and economically disadvantaged" restaurant owners must belong to the following racial groups: "Black Americans; Hispanic Americans; Native Americans

6

(including Alaska Natives and Native Hawaiians); Asian Pacific Americans; or Subcontinent Asian Americans." Dec. ¶11, Ex. 3.

Vitolo does not fit into any of these categories because he is not a woman, veteran, or socially disadvantaged. Dec. ¶¶ 1, 3. He would, however, qualify as "economically disadvantaged," but for his race. Dec. ¶17.

Vitolo truthfully filled out the application describing his race and gender. Dec. ¶12, Ex. 4. Upon completing his application, SBA notified Vitolo that his application was "under review" and that his "calculated award amount" was $104,590.20. Dec. ¶13, Ex. 5.

The next day, May 4, SBA emailed Vitolo confirming receipt of his application. Dec. ¶14. The email also confirmed that SBA would not process his application: "the SBA will focus their reviews on the priority applications that have been submitted. Applicants who have submitted a non-priority application will find their applications remain in a Review status while the priority applications are processed during the first 21 days." Dec. ¶14, Ex. 6.

On May 7, SBA again emailed Vitolo. Dec. ¶16. According to this email, SBA received 186,200 applications during the first 48 hours. Of these, 46,400 were from women and 30,800 were from non-white restaurant owners. SBA represented that it is still accepting applications. Dec. ¶16, Ex. 8.

In his declaration, Vitolo explained why he brought this lawsuit: "I do not want special treatment, but I just want to be treated equally under the law." Dec. ¶ 20.

7

Every day that goes by he is the subject of unconstitutional discrimination, having been moved to the back of the line because he is a white male. Dec. ¶21.

## ARGUMENT

## I.     Standard of Review

The purpose of a temporary restraining order "is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996).

In determining whether to grant a temporary restraining order or a preliminary injunction, the Court considers: (1) the likelihood of success on the merits; (2) irreparable harm absent injunctive relief; (3) substantial harm to others from the proposed injunction; and (4) the broader public interest." *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017) (*citing Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994)).

At the preliminary injunction stage, a plaintiff "need not prove his case in full." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (citations omitted). For purposes of a preliminary injunction, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).

8

The four factors above "are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.* (quoting *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)). But "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).

## II.  Plaintiffs Are Likely to Succeed on the Merits Because Defendant's Grant Program Unquestionably Includes Unconstitutional Race and Gender Discrimination.

A.   "A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979). This is because the Constitution forbids "discrimination by the general government . . . against any citizen because of his race." *Gibson v. State of Mississippi*, 162 U.S. 565, 591 (1896). When confronted with such a racial classification, "[a]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995). "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted).

9

Gender discrimination is likewise unconstitutional. Classifications based on gender "are in many settings unconstitutional." *Feeney,* 442 U.S. at 273 (collecting cases). When a plaintiff raises a claim of gender discrimination, government officials "must demonstrate an exceedingly persuasive justification for that action." *United States v. Virginia*, 518 U.S. 515, 531 (1996). "The burden of justification rests entirely" on the government to prove that "the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id*. at 532–33 (citations omitted). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*.

B.  In this case, the SBA has established a "priority" period benefit for certain categories of restaurant owners based on race and gender. During the first 21 days, SBA will only evaluat e and fund applications submitted by women or certain minorities. *See* Dec. ¶15, Ex. 7.[3]  SBA calls this the "priority period" during which it will only "process and fund" applications based on race and gender. Dec. ¶15, Ex. 7, pg 5.

---

[3] Although SBA will also consider applications from "veterans," such a policy does not insulate the entire program from constitutional scrutiny. *See, e.g., Feeney*, 442 U.S. at 281 (reviewing a veterans' preference for gender discrimination, although ultimately finding no evidence that the law "reflects a purpose to discriminate on the basis of sex.").

10

SBA is simply following the law: ARPA provides that during the "initial 21-day period in which the Administrator awards grants," Defendant is required to "prioritize grants to eligible entities that are small business concerns owned and controlled by women," veterans, or "socially and economically disadvantaged small business concerns." ARPA, § 5003(c)(3)(A). That last term, "socially and economically disadvantaged," means certain minorities (but not all, as described *supra*). *See* 15 U.S.C. § 637(a)(5) & (6)(A); 13 C.F.R. §§ 124.103, .104. Only members of the following groups are presumed to be socially or economically disadvantage: "Black Americans; Hispanic Americans; Native Americans (including Alaska Natives and Native Hawaiians); Asian Pacific Americans; or Subcontinent Asian Americans." *Id*. White men (and other specific racial groups) are not eligible for the priority period by virtue of their race and gender.

There is simply no doubt that Defendant's "priority period" constitutes race and gender discrimination.

C. Because the "priority period" of the Restaurant Revitalization Fund constitutes race and gender discrimination, the burden shifts to Defendant to justify this discrimination by meeting strict scrutiny in the case of the racial qualifications, *see Johnson*, 543 U.S. at 505, and intermediate scrutiny in the case of the gender qualification, *Virginia*, 518 U.S. at 531.

Defendant has made no public statement justifying these gender and racial classifications. Defendant, for example, has not identified past discrimination on the

11

part of SBA that Defendant hopes to remedy. Of course, an agency may "unquestionably" cure its own past discrimination with a narrowly tailored remedy. *United States v. Paradise*, 480 U.S. 149, 167 (1987). Before a government "may permissibly employ a racial or ethnic classification, however, it must make a finding based upon material factual evidence, that it has in the past discriminated against those classes it now favors." *Michigan Rd. Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583, 589 (6th Cir. 1987), *aff'd*, 489 U.S. 1061 (1989)

But an agency cannot simply wave a wand and say "past discrimination" – there must be more. For example, the Sixth Circuit requires evidence of recent, intentional, systemic discrimination against minorities to justify a racial preference in their favor. *See, e.g., Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993) (discrimination that occurred 14 years ago was too far removed to support a gender-based affirmative action program); *Michigan Rd. Builders Ass'n, Inc.*, 834 F.2d at 592–3 (invalidating racial preferences due to failure to show it was necessary to remedy the government's own "intentional discrimination" against minorities); *Middleton v. City of Flint*, 92 F.3d 396, 405 (6th Cir. 1996) (requiring proof of widespread discrimination, not just a few individual instances of discrimination, to justify race-based affirmative action).

But that does not seem to be what is happening here. None of SBA's public statements suggest it is attempting to fix a discriminatory SBA program.

12

Defendant may attempt to justify this "priority period" as a way to address "societal discrimination" or racial or gender inequities within the restaurant industry. This argument, however, will not survive constitutional scrutiny. *See Michigan Rd. Builders Ass'n, Inc.*, 834 F.2d at 590 (collecting cases). Since 1978, the Supreme Court has consistently rejected the notion that "societal discrimination" could "justify a classification that imposes disadvantages upon persons like respondent, who bears no responsibility for whatever harm the beneficiaries of the special admissions program are thought to have suffered." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 310 (1978). In other words, Plaintiffs should not be disadvantaged simply because of the government's generalized notions of "discrimination" or inequity. "To hold otherwise would be to convert a remedy heretofore reserved for violations of legal rights into a privilege that all institutions throughout the Nation could grant at their pleasure to whatever groups are perceived as victims of societal discrimination. That is a step we have never approved." *Id.* In overruling the Sixth Circuit, the Court wrote that "this Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Id.*

D. Even if SBA could come up with a compelling or substantial government interest, there is no evidence that Defendant's use of a "priority period" is narrowly

tailored or substantially related to achieving any justifiable goal. It is hard to imagine how a "priority period" of 21-days would be tailored in any way to address any alleged inequities or past discrimination. For example, Defendant cannot successfully argue that a neutral process would somehow disadvantage women and certain (but not all) minorities, such that a targeted 21-day "priority period" is the only way to level the playing field.

Moreover, at least in the racial context, narrow tailoring involves several factors, such as: "(a) the necessity for the relief and efficacy of alternative [race-neutral] measures, (b) the flexibility and duration of the relief, including the availability of waiver provisions, (c) the relationship of the numerical goals to the relevant labor market, and (d) the impact of the relief on the rights of third parties." *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality opinion). In this case, there is no evidence that SBA has included or even considered these hallmarks of a narrowly tailored remedy.

Next, a remedy is not narrowly tailored if it is overinclusive. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989). As the Court in *Croson* rightfully noted, if the law was narrowly tailored "to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this remedial relief with an Aleut citizen who moves to Richmond tomorrow?" *Id.* at 506. In this case, SBA cannot explain how its "priority period" is necessary to rectify a compelling governmental interest with regard to all of the groups designated as "socially and

14

economically disadvantaged," and whether some groups, such as Black Americans, must share this allegedly targeted benefit with other groups, such as Alaskan and Hawaiian natives. If evidence exists to justify a remedy for all "socially and economically disadvantaged" restaurant owners, Defendant has not shared it publicly.

On the other hand, a program is also not narrowly tailored if it is underinclusive. *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737 (6th Cir. 2000). In this case, if the "priority period" is truly aimed at rectifying discrimination against women and minorities, then this program is significantly underinclusive because SBA extends the "priority period" benefit to some minorities and not others. *See* 13 C.F.R. § 124.103. SBA's regulations pick and choose among Asian-Americans, offering a priority period to certain Asians from the Pacific region and the "subcontinent," but not others from northern and western Asia. *Id.* SBA cannot explain why it believes that Malaysian-Americans, for example, are socially disadvantaged while Syrian-Americans are not. *Id.*[4]

E. Given Defendant's inability to identify a government interest or precise tailoring needed to satisfy either strict or intermediate scrutiny in the face of race and gender discrimination, Plaintiffs have therefore made a strong showing that they

_____

[4] Under 13 C.F.R. § 124.103, SBA limits a 21-day "priority period" to citizens; non-citizens who own restaurants are ineligible for the benefit. For example, a Green Card holder from the Dominican Republic or Nigeria is not eligible for SBA's "priority period."

are likely to succeed on their equal-protection claim. Success on this prong of the test weighs strongly in favor of granting an injunction. "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, "the likelihood of success on the merits often will be the determinative factor." *Husted*, 697 F.3d at 436.

### III. Plaintiffs and Other Disfavored Applicants Are Irreparably Harmed By Being Pushed to the Back of the Line, Based Their Race and Gender, for Grants From a Limited Pot of Relief Funds.

There are two irreparable harms that warrant a temporary restraining order and preliminary injunction.

First, if this Court does not immediately halt all payments from the Restaurant Revitalization Fund (unless and until the blatantly unconstitutional race and gender preferences are eliminated), the limited available funds will be mostly, if not fully, depleted before the disfavored races and gender (largely white males) ever have a shot at this much-needed relief. Defendant has caused this problem by releasing funds on a first-come, first-serve basis (rather than dividing funds among all applicants) while simultaneously moving certain applicants to the back of the line based on their race and gender.

In ARPA § 5003, Congress appropriated a limited, $28.6 billion fund to provide relief to restaurant owners impacted by COVID pandemic, but then gave women and certain minorities a 21-day priority window to access these funds. ARPA, § 5003(b)(2)(A). To implement this program, the SBA is processing applications and awarding grants "in the order in which they are approved by the SBA," and will stop

16

when the "funds [are] exhaust[ed]."[5] Disfavored applicants (e.g., white males), are moved to the back of the line and will only be considered after any priority applicants who apply during the first 21 days. *Id*.

While $28.6 billion may sound like a lot of money, SBA employees have publicly represented that the funds will quickly run out. According to the New York Times, Defendant Guzman recently said, "We know that the $28.6 billion is not enough to meet the demand."[6] And during a recent webinar, another SBA employee said that there are "probably not going to be enough funds, in all likelihood, for the demand that's out there."[7]

During the first 48 hours the application was open, the SBA received 186,200 applications, including 97,600 from "priority" applicants. Dec. ¶16, Ex. 8. Applicants can receive up to $5 million per location ($10 million per applicant).[8] Yet if the 97,600 "priority" applicants—*from just the first 48 hours*—receive average grants of

---

[5] United States Small Business Association, *Restaurant Revitalization Fund*, (last visited May 10, 2021), https://www.sba.gov/funding-programs/loans/covid-19-relief-options/restaurant-revitalization-fund.

[6] Annie Karni, *More than 180,000 businesses applied to a new federal aid program in two days*, The New York Times (May 5, 2021), https://www.nytimes.com/2021/05/05/us/politics/biden-stimulus.html.

[7] Stacy Cowley, *Pandemic Relief Fund for Restaurants Is Open, but Cash Will Go Fast*, The New York Times (May 3, 2021), https://www.nytimes.com/2021/05/03/business/Restaurant-Revitalization-Fund-opening.html (quoting Patrick Kelley from a webinar available at https://www.youtube.com/watch?v=XGpQqHxT008).

[8] Restaurant Revitalization Fund, Small Business Association, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/restaurant-revitalization-fund

$300,000, well below the maximum, the entire fund will be exhausted before the agency considers any application from a disfavored applicant.

Plaintiffs applied on the very first day the application was open, Dec. ¶9, yet they were immediately told by SBA that their application would not be considered until after any priority applicants who apply in the first 21 days. Dec. ¶14, Ex. 6.

This Court can fully remedy the clear equal protection violation and ensure that all applicants receive an equal and fair shot at these critical relief funds, by immediately ordering SBA to cease disbursing any funds—unless and until it reprioritizes applicants without regard to their race or gender. Indeed, there is a relatively simply fix (for now). SBA can pause processing "priority" applications until it catches up on any earlier-filed applications from disfavored applicants who were moved to the back of the line based on their race and gender. Once caught up, the SBA can then continue processing all applications, without regard to race or gender, until the money runs out.

If this Court does not issue an immediate temporary restraining order and preliminary injunction, however, the harm will most likely become irreparable. The SBA is currently paying out grants to "priority" applicants, Dec. ¶ 22, and every day that goes by, the fund grows smaller and smaller. At some point, knowable only to Defendant, the remaining funds will be insufficient to catch up on earlier-filed applications from disfavored applicants that were pushed to the back of the line. And

18

damages—if they are even available[9]—are an unworkable remedy, since it may be impossible to sort out who would have received a grant before the funds ran out, had the government not discriminated based on race and gender. Moreover, once the funds are depleted, any monetary remedy would vastly increase the size of the appropriation. Unless this Court is prepared to order the government to pay out far more claims than it budgeted for, a temporary restraining order and preliminary injunction is the only viable remedy.

Even putting aside the irreparable harm from losing a fair shot at much-needed relief funds, the flagrant constitutional violation is itself an irreparable harm. Indeed, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Am. C.L. Union of Kentucky v. McCreary Cty., Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003) ("[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."); Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d. ed.) ("When an alleged deprivation of a constitutional right is involved … most

---

[9] "Federal constitutional claims for damages are cognizable only under *Bivens*." *Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016). And while the Supreme Court has recognized a *Bivens* claim for a certain type of equal protection claim, *Davis v. Passman*, 442 U.S. 228 (1979) (gender discrimination in federal employment), the Supreme Court has more recently explained that courts must be very reluctant to extend *Bivens* to any new "context"—where "context" does not mean a different constitutional provision, but simply a different type of case with any "meaningful" differences to the only three contexts where the Court has recognized a *Bivens* damages remedy. *Hernandez v. Mesa*, 140 S. Ct. 735, 741–50 (2020); *see also id.* at 750–53 (Thomas, J., and Gorsuch, J., concurring) (calling for *Bivens* and *Davis* to be overruled).

courts hold that no further showing of irreparable injury is necessary."). Plaintiffs, and tens of thousands of other applicants, are being treated differently by the government, based solely on their race and gender. Such unequal treatment "demeans us all." *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (Thomas, J., concurring in part and dissenting in part).

## IV. Granting an Injunction Will Not Cause Harm to Others; in Fact, It Will Remove Unconstitutional Classifications and Restore the Equal Protection of the Laws.

If an injunction is issued, and Defendant is ordered to treat all applicants on a first-come, first-serve basis, no one will be injured. Plaintiffs only seek equal treatment under the law, not special treatment. Even if some groups will lose "priority period" status, they are losing a status unconstitutionally granted to them by Defendant. "[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 274 F.3d 377, 400 (6th Cir. 2001).

In any event, those individuals currently in the "priority period" queue will still be treated equally under Plaintiffs' proposed remedy. If an injunction is granted, all applicants, regardless of race and gender, will be treated equally, as the Constitution requires.

20

## V. The Public Interest Will Be Served by an Injunction Because Such an Order Will Vindicate Clear Constitutional Rights.

As a final matter, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994). Indeed, "[t]he public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility Authority for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012). This case is no different: Plaintiffs seek the simple vindication of equal treatment under law. This is surely in the public interest.

## CONCLUSION

Plaintiffs respectfully request a temporary restraining order prohibiting Defendant from paying out any grants from the Restaurant Revitalization Fund, *unless* Defendant begins processing applications and paying grants in the order that the applications were received, without regard to the race or gender of the applicants.

Moreover, Plaintiffs respectfully request a preliminary injunction, requiring Defendant to process applications for grants from the Restaurant Revitalization Fund in the order that they were received, without regard to the race or gender of the applicant.

Dated May 11, 2021         WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg
rick@will-law.org

/s/ *Daniel P. Lennington*

Daniel P. Lennington *(pro hac vice pending)*
dan@will-law.org

Luke N. Berg *(pro hac vice pending)*
luke@will-law.org

330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455
Fax: (414)727-6385


*/s/ Matthew J. McClanahan*
Matthew J. McClanahan (BPR #036867)
McClanahan & Winston, PC
PO Box 51907
Knoxville, Tennessee 37950
Telephone: (865) 347-3921
Fax: (865) 444-0786
Email: matt@tennadvocate.com

*Attorneys for Plaintiffs*

22