| | |
|---|---|
| ANTONIO VITOLO and JAKE'S BAR AND GRILL, LLC, | Case No. 3:21-cv-176-TRM-DCP |
| | Chief Judge Travis R. McDonough |
| *Plaintiffs*, | |
| v. | Magistrate Judge Debra C. Poplin |
| ISABELLA CASILLAS GUZMAN, | |
| *Defendant*. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

### INTRODUCTION

In March 2021, Congress enacted the American Rescue Plan Act ("ARPA") as a continuation of the federal government's efforts to provide relief to American individuals and businesses suffering the economic and public health effects of the COVID-19 pandemic. In enacting this latest installment of COVID-19 relief, Congress aimed to provide much-needed support to America's restaurant industry. Congress was aware that the pandemic has had different effects on groups with different underlying characteristics—such as women, veterans, and individuals who are socially and economically disadvantaged—and thus aimed to target this crucial aid to small businesses owned by entrepreneurs who have experienced discrimination and who were not adequately served by earlier pandemic relief efforts. In particular, Section 5003 created and appropriated funds for a Restaurant Revitalization Fund ("RRF") to provide grants to small businesses in the restaurant industry. Section 5003 also provided that for the first twenty-one days that the government provided grants under this program, it should prioritize applications from small businesses that are at least 51% owned and controlled by women, veterans, or socially and economically disadvantaged individuals. The Small Business Administration ("SBA") is responsible for administering this program, and has already begun to accept applications and distribute funds consistent with this statutory mandate. While SBA

regulations and the application for the RRF presume that members of certain racial and ethnic groups are among those designated as socially disadvantaged, that category is not limited exclusively to members of those groups.

Plaintiffs now seek a temporary restraining order enjoining SBA's implementation of Section 5003, claiming that the law discriminates on the basis of race and gender. But Plaintiffs are unlikely to succeed on the merits of their claims. Section 5003's use of race and gender is constitutional because the race-based presumption is narrowly tailored to serve a compelling government interest, and the gender-based preference serves important governmental objectives and is substantially related to the achievement of those objectives. In any event, Plaintiff Vitolo is not irreparably harmed by the challenged race-based presumption because he has not established or even alleged that he is socially disadvantaged, and thus would not be entitled to receive funds during the priority period even if the race-based presumption were eliminated. Thus, Plaintiffs' TRO request should be denied.

## BACKGROUND

### I. The Federal Government's Early COVID-19 Relief Programs.

In January 2020, the first reported case of the novel coronavirus was identified in North America, ushering in a series of federal government actions intended to combat both the public health and economic consequences of the emerging pandemic, which continue to this day. SBA has been at the forefront of many of those efforts.

On March 6, 2020, Congress passed the Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020, which deemed the coronavirus a disaster for purposes of section 7(b)(2)(D) of the Small Business Act, allowing the SBA to make Economic Injury Disaster Loans ("EIDL") available to eligible small businesses in response to the coronavirus. *See* H.R. 6074, Pub. L. No. 116-123, 134 Stat. 146 (2020). On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which established the Paycheck Protection Program ("PPP"), provided $349 billion to fund the program, and provided funding for a new EIDL advance grant program. H.R. 748, Pub. L. No. 116-136, 134 Stat. 281 (2020). The PPP provides small businesses with SBA-backed loans that can be used to cover payroll (and certain other expenses)

during the COVID-19 crisis and are 100 percent forgivable if the money is used in accordance with the program requirements. The $349 billion in PPP funds were soon exhausted, and Congress enacted another law appropriating additional funding for the PPP, EIDL loans, and EIDL advance grants. Paycheck Protection Program and Health Care Enhancement Act, H.R. 266, Pub. L. No. 116-139, 134 Stat. 620 (2020). Congress has since continued to modify and extend the PPP program.

## II. Congress Focuses on Assistance to the Restaurant Industry, With an Emphasis on Minority- and Women-Owned Small Businesses.

Following the initial rush to implement COVID relief, Congress' attention turned to the particular impact of the COVID-19 pandemic and related shutdowns on the restaurant industry and on minority- and women-owned businesses in particular. The United States House of Representatives Committee on Small Business "held many hearings and forums . . . on a wide variety of subjects relevant to pandemic aid programs," including hearings that discussed lessons learned from prior COVID relief programs and the needs of small businesses, including restaurants. H.R. Rep. No. 117-7, at 457 (2021). Two relevant themes emerged during these hearings—first, that special support was needed for the restaurant industry (and the hospitality industry writ large), and second, that targeted relief was needed for minority- and women-owned businesses, many of whom the prior relief programs had failed to reach.

On June 17, 2020, the Committee on Small Business held a remote hearing entitled "Paycheck Protection Program: Loan Forgiveness and Other Challenges." *See* Memo. from N. Velázquez, Chairwoman, Comm. on Small Bus. to Members, Comm. on Small Bus. (June 17, 2020), https://smallbusiness.house.gov/uploadedfiles/06-17-20_hearing_memo.pdf. One topic of discussion at that hearing was "the impact the PPP has had on traditionally underserved businesses communities," including reports that "more needs to be done to ensure minority-owned businesses are fully able to access the program." *Id.* at 3.

On July 15, 2020, the Committee on Small Business held a full committee hearing entitled "Long-Lasting Solutions for a Small Business Recovery," which addressed "recovery efforts to stimulate small business growth following the Great Recession, barriers to recovery, and some of the

industries that have been disproportionately impacted by COVID-19." *See* Memo. from N. Velázquez, Chairwoman, H. Comm. on Small Bus. to Members, H. Comm. on Small Bus. (July 15, 2020), https://smallbusiness.house.gov/uploadedfiles/07-15-20_memo.pdf ("July 15, 2020 Memo."). At this hearing, the committee discussed efforts to shore up small businesses during the pandemic, with a particular focus on minority- and women-owned businesses. *See generally Long-Lasting Solutions for a Small Business Recovery: Hearing Before the H. Comm. on Small Bus.*, 116th Cong. (2020). In a memorandum released before the hearing, Chairwoman Nydia Velázquez stated that "[a]ny additional COVID-19 legislative packages should prioritize lending and relief to the smallest businesses, as well as underserved businesses, given that these businesses had trouble accessing or were denied PPP and EIDL loans and grants." *See* July 15, 2020 Memo. at 6.

Hearings on these topics continued into the following year. On February 4, 2021, the House Subcommittee on National Security, International Development, and Monetary Policy of the Committee on Financial Services held a hearing entitled "Supporting Small and Minority-Owned Businesses Through the Pandemic," which focused on "understand[ing] why aid to minority-owned businesses was delayed" and "helping to lay the groundwork for how [Congress] can do better going forward." *Supporting Small Bus. & Minority-Owned Bus. Through the Pandemic: Virtual Hearing Before the Subcomm. on Nat'l Sec., Int'l Dev., & Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 2-3 (2021) (statement of Rep. Jim A. Hines, Chairman, Subcomm. on Nat'l Sec., Int'l Dev. & Monetary Policy). That hearing examined the need for additional COVID-related assistance to small and minority-owned businesses. *See id.*

## III.     The Proposed RESTAURANTS Act

On June 15, 2020, Representative Earl Blumenauer introduced the RESTAURANTS Act, which proposed "[t]o establish a $120,000,000,000 Restaurant Revitalization Fund to provide structured relief to food service or drinking establishments through December 31, 2020." RESTAURANTS Act of 2020, H.R. 7197, 116th Cong. (2020).[1] The RESTAURANTS Act included

---

[1] The full title of the bill is the Real Economic Support That Acknowledges Unique Restaurant Assistance Needed To Survive Act of 2020.

a priority scheme whereby "[d]uring the initial 14-day period in which the Secretary awards grants under this section, the Secretary shall (1) prioritize awarding grants to marginalized and underrepresented communities, with a focus on women and minority-owned and operated eligible entities; and (2) only award grants to eligible entities with annual revenues of less than $1,500,000." *Id.* § 4(d). The RESTAURANTS Act did not expressly define "marginalized and underrepresented communities" or "women and minority-owned and operated . . . entities." *Id.* The RESTAURANTS Act was not enacted in the 116th Congress.

On February 4, 2021, Representative Blumenauer reintroduced the RESTAURANTS Act. RESTAURANTS Act of 2021, H.R. 793, 116th Cong. (2021). This version of the bill also provided for a fourteen-day priority period, this time instructing the Secretary to "prioritize awarding grants to marginalized and underrepresented communities, with a focus on women, veteran, and minority-owned and operated eligible entities" and to only award grants to eligible entities whose revenues were less than $1,500,000 in 2019. *Id.* § 4(d). The RESTAURANTS Act has not been enacted as a standalone law; however, many of its features were included in Section 5003 of the American Rescue Plan Act. *See* pages 5-8 (discussing Section 5003).

## IV. The American Rescue Plan Act and Restaurant Revitalization Fund

On March 11, 2021, Congress enacted ARPA, which provides widespread COVID-related relief to the American people and businesses, including restaurants. *See* American Rescue Plan Act, Pub. L. No. 117-2 (2021) ("ARPA"). ARPA "takes a multipronged approach to tackle the public health and economic crises resulting from the COVID-19 pandemic." H.R. Rep. No. 117-7 at 3 (2021). The House Report accompanying the bill makes clear that Congress was focused on the ways in which the nation's "most vulnerable communities are forced to bear the brunt of" both the coronavirus pandemic and the resultant economic crisis "as underlying health and economic inequities grow worse." *Id.* at 2. The House Report explained that "underlying racial, wealth, social, and gender disparities are exacerbated by the pandemic," that "[w]omen – especially mothers and women of color – are exiting the workforce at alarming rates," and that "eight out of ten minority-owned businesses are on the brink of closure." *Id.* at 2. The Act is intended to "provide crucial support for the hardest-

hit small businesses, especially those owned by entrepreneurs who have experienced systemic discrimination." *Id.* at 3.

As relevant here, Section 5003 of ARPA established the Restaurant Revitalization Fund and appropriated $28.6 billion to the fund for fiscal year 2021. ARPA § 5003(b)(1)-(2). Section 5003 includes a priority period for certain businesses. Specifically, Section 5003 instructs that in the first 21 days that grants are awarded through the Fund, the Small Business Administrator

> shall prioritize awarding grants to eligible entities that are small business concerns owned and controlled by women (as defined in section 3(n) of the Small Business Act (15 U.S.C. 632(n)), small business concerns owned and controlled by veterans (as defined in section 3(q) of such Act (15 U.S.C. 632(q))), or socially and economically disadvantaged small business concerns (as defined in section 8(a)(4)(A) of the Small Business Act (15 U.S.C. 637(a)(4)(A))).

ARPA § 5003(c)(3)(A). Under the relevant statute, a small business concern is "owned and controlled by women" if at least 51 percent of the business concern is owned by one or more women, and the management and daily business operations of the business are controlled by one or more women. 15 U.S.C. § 632(n). Similarly, a small business concern is "owned and controlled by veterans" if at least 51 percent of the business is owned by one or more veterans and the management and daily operations of the business are controlled by one or more veterans. *Id.* § 632(q)(3). Under Section 8(a) of the Small Business Act[2], a "socially and economically disadvantaged small business concern" is at least 51 owned by "one or more socially and economically disadvantaged individuals," "an economically disadvantaged Indian tribe," or "an economically disadvantaged Native Hawaiian organization," where the management and daily business operations are controlled by the same. *Id.* § 637(a)(4)(A)).

Section 8(a) defines "socially disadvantaged individuals" to include "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id.* § 637(5). The RRF application adopts this statutory

---

[2] Section 8(a) of the Small Business Act permits the federal government to limit the issuance of certain government contracts to certain small businesses owned and controlled by socially and economically disadvantaged individuals that participate in the Section 8(a) program. 15 U.S.C. § 637(1); *see also* 8(a) Business Development Program, U.S. Small Bus. Admin., https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.

definition, and its instructions further provide that individuals who are members of the following groups are "presumed to be socially disadvantaged: Black Americans, Hispanic Americans, Native Americans (including Alaska Natives and Native Hawaiians), Asian Pacific Americans, and Subcontinent Asian Americans."  Declaration of Anthony Vitolo ("Vitolo Decl."), ECF No. 12-3, Ex 3.  Those designated groups track the groups identified in SBA regulations related to Section 8(a).  *See* 13 C.F.R. § 124.103(b)(1).  Under those regulations, a presumption may be rebutted with "credible evidence to the contrary," *see id.* at § 124.103(b)(3), and individuals who are not members of one of these groups may demonstrate social disadvantage by submitting evidence that shows, by a preponderance of the evidence, that a distinguishing characteristic has contributed to substantial social disadvantage, which has limited their entry or advancement in the business world. *Id.* § 124.103(c)(1)-(2).  Thus, an individual's race may create a presumption that he or she is socially disadvantaged, but individuals who are not members of the enumerated groups may still be socially disadvantaged.

Section 8(a) defines "economically disadvantaged individuals" as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." *Id.* § 637(6)(A).  On the RRF application, the SBA states that in assessing economic disadvantage, it will look at an individual's net worth, average income over the past three years, and the fair market value of the individual's assets.[3]  Vitolo Decl., Ex. 3.  If an individual exceeds certain thresholds on any of those three metrics, he or she "will generally be deemed not to be economically disadvantaged."  *Id.*  This approach largely tracks SBA regulations related to Section 8(a).  13 C.F.R. §

---

[3] Specifically, "[i]n assessing economic disadvantage, SBA will look at whether the net worth of the individual claiming disadvantage is less than $750,000, excluding his or her ownership interest in the Applicant, primary personal residence, contingent liabilities, funds invested in an official retirement account, or income received from an S-corporation, LLC, or partnership if the individual provides documentation that the income was reinvested in the firm.  SBA will also look at whether the adjusted gross income of the individual averaged over the preceding three years exceeds $350,000. Income received from an S-corporation, LLC or partnership that is reinvested in the firm or used to pay taxes arising in the normal operations of the firm is excluded.  Finally, SBA will look at whether the fair market value of all the individual's assets (excluding his or her ownership interest in the Applicant, primary personal residence, or funds invested in an official retirement account) exceeds $6 million." Vitolo Decl., Ex. 3.

124.104(c). Because the priority period is open to "socially **and** economically disadvantaged" individuals, a restaurant owner who is presumptively socially disadvantaged must also be economically disadvantaged in order to participate in the priority period.

Shortly after ARPA's enactment, SBA prepared to administer the RRF. On May 3, 2021, SBA began accepting applications. The RRF application explains that "[i]n accordance with the American Rescue Plan Act of 2021, SBA will prioritize awarding funds to Applicants that are small business concerns at least 51 percent owned and controlled by individuals who are women, veterans, and/or socially and economically disadvantaged individuals." Decl. of Dianna L. Seaborn ("Seaborn Decl."), Ex. A at 1. Applicants are then asked to check a box if "[a]s of the date of this application, Applicant is a small business concern at least 51 percent owned and controlled by: one or more women; [v]eteran(s); [and/or] [s]ocially and economically disadvantaged individual(s)." *Id.* at 2. The application does not require that an individual be predetermined by SBA to qualify as a socially and economically disadvantaged individual. *Id.* The application does not ask whether an applicant is a member of a particular racial or ethnic group that is presumed to be socially disadvantaged. *Id.* The application does contain an optional request for each applicant's demographic information. Seaborn Decl., Ex B.

## V.    This Litigation

On May 12, 2021, Plaintiffs filed this action. *See* Compl., ECF No. 1. Plaintiffs allege that the priority period set out in Section 5003 unconstitutionally discriminates on the basis of race and sex, in violation of the Equal Protection and Due Process guarantees of the United States Constitution. Compl. ¶¶ 38-39. That same day, Plaintiffs filed a motion for a temporary restraining order (ECF. No. 12), a motion for a preliminary injunction (ECF No. 11), and a brief in support of both motions (ECF No. 12-2 ("Pls.' Br.")). Plaintiffs filed a supplemental brief later that evening (ECF No. 15). The Court ordered a hearing on the TRO motion for May 17, 2021.[4] Order, ECF No. 16.

---

[4] Although Plaintiffs filed only one brief in support of their request for both a temporary restraining order and preliminary injunction, the Court ordered a hearing only on the TRO motion. While the legal standard for TROs and preliminary injunctions overlap, Defendant respectfully requests that—

## LEGAL STANDARD

"A temporary restraining order is an extraordinary remedy." *Provectus Biopharmaceuticals, Inc. v. Dees*, No. 3:16-cv-222, 2016 WL 8738436 (Aug. 29, 2016) (quoting *Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705 710 (E.D. Mich. 2006)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The burden is on the party seeking the injunctive relief. *Thomas v. Schroer*, 116 F. Supp. 3d 869, 874 (W.D. Tenn. 2015); *see also Hartman v. Acton*, No. 2:20-cv-01952, 2020 WL 1932896, at *2 (S.D. Ohio Apr. 21, 2020) ("The 'burden of proving that the circumstances 'clearly demand' such an extraordinary remedy is a heavy one' since 'the party seeking 'the injunction must establish its case by clear and convincing evidence.'").

In determining whether to issue a temporary restraining order, the Court examines (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't.*, 305 F.3d 566, 573 (6th Cir. 2002). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "When a court considers the four factors as part of a constitutional challenge, 'the likelihood of success on the merits will often be the determinative factor.'" *Michigan Rest. & Lodging Ass'n v. Gordon*, No. 1:20-cv-1104, 2020 WL 6866649, at *1 (W.D. Mich. Nov. 20, 2020) (quoting *Thompson v. DeWine*, 976 F.3d 610, 615 (6th Cir. 2020)); *Obama for Am. v. Husted*, 697 F.3d 423,436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

## ARGUMENT

### I. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claim.

### A. The Government's Prioritization of Businesses Owned by "Socially and Economically Disadvantaged Individuals" Is Constitutional.

---

in the event the Court grants the requested TRO—the Court provide Defendant an opportunity to submit supplemental briefing in response to the motion for a preliminary injunction.

Although the statutory definition of "socially disadvantaged individual" cited in Section 5003 is race-neutral, SBA regulations and the RRF application include a presumption of social disadvantage that is race-conscious and subject to strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (holding that "all racial classifications" imposed by governmental actors "must be analyzed by the reviewing court under strict scrutiny"). Under strict scrutiny, "[w]hen race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). Although the test for strict scrutiny is rigorous, the Supreme Court has cautioned that it should not be interpreted as "strict in theory, but fatal in fact." *Adarand*, 515 U.S. at 237 (internal quotation marks omitted). "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id.*

i. **The Priority Application Period Serves a Compelling Government Interest.**

To survive strict scrutiny, the government must advance a compelling government interest and show a "strong basis in evidence supporting its conclusion that remedial action was necessary." *Associated Gen. Contractors of Ohio, Inc. v. Drabnik*, 214 F.3d 730, 735 (6th Cir. 2000) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 486-92 (1989)). Congress is not entitled to deference in its ultimate conclusion that race-based relief is necessary, but that "does not mean that Congress is entitled to no deference in its factfinding." *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1321 n.14 (Fed. Cir. 2001) (citing *Croson*, 488 U.S. at 500). After the government makes its initial showing, the burden shifts to the plaintiff to present "credible, particularized evidence" to rebut the government's "initial showing of a compelling interest." *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003)).

Governments have a compelling interest in "remedying the effects of past or present racial discrimination." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996); *United States v. Paradise*, 480 U.S. 149, 166 (1987) ("It is now well established that government bodies, including courts, may constitutionally

employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination."); *Associated Gen. Contractors*, 214 F.3d at 735 ("There is no question that remedying the effects of past discrimination constitutes a compelling governmental interest"). In particular, "[t]he federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effects of either public or private discrimination." *W. States Paving Co., Inc. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005). The government can meet its burden without conclusively proving the existence of racial discrimination in the past or present. *See DynaLantic Corp. v. U.S. Dep't of Defense*, 885 F. Supp. 2d 237, 250 (D.D.C. 2012) (citing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 292 (1986) (O'Connor, J., concurring)); *Concrete Works*, 321 F.3d at 958. Plaintiff suggests that the government can only have a compelling interest in remedying its own past discrimination, *see* Pls.' Br. at 12 (citing *Michigan Rd. Builders Ass'n v. Milliken*, 834 F.2d 583, 589 (6th Cir. 1987)), but "the government 'has a compelling interest in assuring that public dollars . . . do not serve to finance the evil of private prejudice." *Associated Gen. Contractors*, 214 F.3d at 734-35 (citing *Croson*, 488 U.S. at 492). And the Sixth Circuit has expressly held that a government may have a compelling interest where the state "was a passive participant in private industry's discriminatory practices." *Associated Gen. Contractors*, 214 F.3d at 735 (citing *Croson*, 488 U.S. at 486-92, 500). Moreover, the case law that Plaintiff relies upon predates the Supreme Court's decision in *Grutter v. Bollinger*, where the Court expressly noted that it "ha[d] never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination." 539 U.S. at 328 (holding that a law school "has a compelling interest in attaining a diverse student body").

Here, the government has a compelling interest in remedying the effects of past and present discrimination that led to socially and economically disadvantaged business owners having less access to capital and credit, including capital and credit provided through prior COVID relief efforts. The government likewise has a compelling interest in supporting small businesses owned by socially and economically disadvantaged small business owners who have borne an outsized burden of the economic harms of COVID-19 pandemic.

Congress has long sought to remedy past discrimination against socially and economically disadvantaged small business owners. As explained above, Section 5003 imports the term "socially and economically disadvantaged" from Section 8(a) of Small Business Act, which the SBA has further addressed through the relevant regulations. *See* ARPA § 5003(c)(3)(A) (citing 15 U.S.C. 637(a)(4)(A)); *see also* 13 C.F.R. § 124.103; 13 C.F.R. § 124.104. The legislative history of the Section 8(a) program and a significant body of post-enactment evidence supports the government's compelling interest in "breaking down barriers to minority business development created by discrimination and its lingering effects." *DynaLantic Corp.*, 885 F. Supp. 2d at 270 (D.D.C. 2012) (internal quotation marks omitted). For example, in 1972, the House Select Committee on Small Business issued a report addressing the problems confronting minority entrepreneurs, which recognized that minority small business owners experience racial and ethnic prejudice that leads to "almost insurmountable obstacles to business development." H.R. Rep. No. 92-1615, at 18-19 (1972). In 1975, another congressional report from the Subcommittee on Small Business Administration Oversight and Minority Enterprise of the House Committee on Small Business found that:

> [T]he effects of past inequities stemming from racial prejudice have not remained in the past. The Congress has recognized the reality that past discriminatory practices have, to some degree, adversely affected our present economic system . . . . These statistics are not the result of random chance. The presumption must be made that past discriminatory systems have resulted in present economic inequities. In order to right this situation, the Congress has formulated certain remedial programs designed to uplift those socially or economically disadvantaged persons to a level where they may effectively participate in the business mainstream of our economy.

H.R. Rep. No. 94-468, at 1-2 (1975)). In 1977, the House Committee on Small Business issued a report reviewing the SBA's Surety Bond Guarantee Program, which found that:

> The very basic problem disclosed by the testimony is that, over the years, there has developed a business system which has traditionally excluded measurable minority participation. In the past more than the present, this system of conducting business transactions overtly precluded minority input. Currently, we more often encounter a business system which is racially neutral on its face, but because of past overt social and economic discrimination is presently operating, in effect, to perpetuate these past inequities.

H.R. Rep. No. 94-1791, at 182 (1977).

When Congress codified the Section 8(a) program in 1978, it included the finding that

> many. . . persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control; [and] . . . that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, and other minorities.

Pub. L. No. 95-507 § 201 (1978). The Conference Report explained that these findings "[e]stablish the premise that many individuals are socially and economically disadvantaged as a result of being identified as members of a certain group" and thus in many cases, "status as a minority can be directly and unequivocally correlated with social disadvantagement . . . regardless of the individual, personal qualities of that minority person." H.R Rep. No. 95-1714, at 20-21 (1978)).

In the 1980s, Congress revisited the Section 8(a) program and concluded that disparities still existed between minority and non-minority businesses and that such disparities were "not the result of random chance." H.R. Rep. No. 100-460, at 18 (1987). A 1987 House Report explained that "discrimination and the present effects of past discrimination have hurt socially and economically disadvantaged individuals in their entrepreneurial endeavors" and that "[i]t is a legitimate purpose of government to correct the imbalance caused by discrimination." *Id.* Over the past three decades, further evidence has shown that race-based denial of access to capital and credit has not diminished. *See DynaLantic*, 885 F. Supp. 2d at 257-62 (summarizing evidence of barriers to minority business formation from the 1990s and 2000s). Because Section 8(a) addresses government contracting, much of this evidence focuses on the ways in which discrimination has prevented minority-owned businesses from competing for government contracts. But many of the Congressional findings go beyond that context and address larger problems for minority-owned small businesses in general.

It is against this backdrop that Congress decided to create a priority period for RRF applicants owned by "socially and economically disadvantaged individuals." ARPA § 5003(c)(3)(A). But Congress was not acting based solely on historical information about the hurdles faced by socially and economically disadvantaged individuals. Over the past year, Congress as a whole (and the House Committee on Small Business in particular) recognized that COVID-19 has had a particularly devastating impact on small businesses owned by minorities and women, and that prior COVID relief efforts have not always successfully reached these businesses due to financial disparities rooted in

racial discrimination, particularly in the lending industry. As the House Committee on the Budget explained in the House Report on ARPA, Congress recognized that "underlying racial, wealth, social, and gender disparities are exacerbated by the pandemic," that "[w]omen – especially mothers and women of color – are exiting the workforce at alarming rates," and that "eight out of ten minority-owned businesses are on the brink of closure." H.R. Rep. 117-7, at 2 (2021). ARPA intended to remedy that issue in part by "provid[ing] crucial support for the hardest-hit small businesses, especially those owned by entrepreneurs who have experienced systemic discrimination." *Id.* at 3.

Congress has consistently stressed its desire to provide this kind of support to the hardest-hit small businesses. For example, during the June 17, 2020 Committee on Small Business hearing on PPP loans, the committee heard testimony from Ashley C. Harrington, the Federal Advocacy Director and Senior Counsel of the Center for Responsible Lending. Ms. Harrington testified regarding a number of ways in which structural limitations of the PPP program harmed minority-owned businesses. *See Paycheck Protection Program: Loan Forgiveness & Other Challenges: Hearing Before the H. Comm. on Small Bus.*, 116 Cong. 10 (June 17, 2020) (statement of Ashley C. Harrington, Fed. Advocacy Dir. & Sr. Counsel, Ctr. for Responsible Lending). In her written testimony, Ms. Harrington explained that "[b]usinesses headed by people of color are less likely to have employees, have fewer employees when they do, and have less revenue compared to white-owned businesses" because of "structural inequities resulting from less wealth compared to whites who were able to accumulate wealth with the support of public policies," and that having fewer employees or lower revenue made PPP loans to those businesses less lucrative for lenders. *Id.* at 59 (written statement of Ashley C. Harrington, Fed. Advocacy Dir. & Sr. Counsel, Ctr. for Responsible Lending). She also explained that certain features of the PPP program ensured that "businesses with existing conventional lending relationships were more likely to access PPP funds quickly and efficiently," and that racial minorities are less likely to have such relationships with lenders due to "pre-existing disparities in access to capital." *Id.* at 59-60. Ms. Harrington cited a study which showed that when Black and Hispanic individuals went to apply for loans, they "were required to produce more documentation to support their loan application and received less information about fees, and less friendly service when visiting a small business lender."

*Id.* at 60 (citing *Disinvestment, Discouragement and Inequality in Small Business Lending*, Nat'l Community Reinvestment Coalition (2019), https://ncrc.org/wp-content/uploads/2019/09/NCRC-Small-Business-Research-FINAL.pdf). Ms. Harrington ended her written remarks by imploring the Committee that "[w]e cannot allow federal policies and investments to continue the centuries old practice of excluding people of color." *Id.* at 72.

During a July 15, 2020 hearing, the Committee on Small Business once again heard about the particular impact of the COVID-19 pandemic on minority- and women-owned businesses. Prior to the hearing, Committee Chairwoman Velázquez issued a memorandum explaining that "[t]he COVID-19 public health and economic crisis has disproportionally affected Black, Hispanic, and Asian-owned businesses, in addition to women-owned businesses" and that "minority-owned and women-owned businesses were particularly vulnerable to COVID-19, given their concentration in personal services firms, lower cash reserves, and less access to credit." *See* July 15, 2020 Memo. at 4-5 (citing Robert W. Fairlie, *The Impact of COVID-19 on Small Business Owners: Evidence of Early-Stage Losses from the April 2020 Current Population Survey*, NBER (June 2020), https://www.nber.org/papers/w27309). Witnesses at the hearing also testified about the outsized impact of the pandemic on minority-owned businesses. *See Long-Lasting Solutions for A Small Business Recovery: Hearing Before the Comm. on Small Bus.*, 116 Cong. 6 (2020) (statement of Brett Palmer, Pres., Small Bus. Investor All.) (discussing the "catastrophic failure of minority-owned small businesses" including estimates that "while 22 percent of small businesses" overall, "32 percent of Hispanic-owned small businesses and up to 41-percent of Black-owned businesses" are now out of business); *see also id.* at 10 (statement of Dr. Lisa D. Cook, Prof. of Economics, Michigan State Univ.) (discussing how "[f]orty-one percent of African American businesses reported being closed compared to 35 percent overall" and that one study "reports that 45 percent of Black and Latino businesses will close by the end of the year without more relief."). During that hearing, witnesses explained that this discrepancy was due in part to minority business owners' difficulties in accessing capital. Brett Palmer, President of the Small Business Investor Alliance, emphasized the "[u]nderrepresentation by women and minorities in both funds and in small businesses accessing capital." *Id.* at 6 (statement of Brett Palmer).

Mr. Palmer further noted that "[t]he amount of startup capital that a Black entrepreneur has versus a White entrepreneur is about 1/36th." *Id.* at 16. One study included in the hearing record confirmed that "[g]ender and race influence small business owners' ability to access credit." *Id.* at 55 (Brown, Kenyon, Robinson, *Filling the U.S. Small Business Funding Gap* (Feb. 2020)). The study acknowledges a number of reasons why that might be true, including (1) that "[m]inorities, on average, have a lower household net worth than whites, which directly affects loan size and increases the rate of loan denial"; (2) that minority business owners typically have lower credit scores; (3) that women and minorities are disproportionately more likely to not apply for credit due to fear of credit denial; and (4) that women and minority investment professionals are underrepresented in the venture capital and private equity industry, which leads to less investment in diverse companies. *Id* at 55-56. Dr. Lisa Cook, a professor of economics at Michigan State University, noted that in many cases, minority-owned businesses struggled to access earlier COVID relief funding, such as PPP loans, "due to the heavy reliance on large banks, with whom they have had historically poor relationships." *Id.* at 10 (statement of Dr. Lisa D. Cook).

Other testimony supported the conclusion that racial minorities' struggles to access capital and credit are rooted in historic and present-day discrimination. In connection with the February 4, 2021 subcommittee hearing on pandemic relief for small and minority-owned businesses, researchers from the Brookings Institute submitted written testimony addressing "long-standing structural racial disparities in small business ownership and performance." *Supporting Small Bus. & Minority-Owned Bus. Through the Pandemic: Virtual Hearing Before the Subcomm. on Nat'l Sec., Int'l Dev., & Monetary Policy of the H. Comm. on Fin. Servs.*, 117th Cong. 60 (Feb. 4, 2021) (written testimony of Sifan Liu, Sci. Res. Analyst, & Joseph Parilla, Fellow, Brookings Metro. Policy Program). Specifically, the testimony highlighted studies showing that "the playing field is uneven for entrepreneurs of color on key factors, including consumer perceptions, access to finance, and social capital." *Id.* For example, the Federal Reserve's 2020 Small Business Credit Survey shows that large banks "approve around 67% of loans sought by white small-business owners, 43% of those sought by Latino or Hispanic small-business owners, and just 29% of those sought by Black small-business owners." *Id.* (citing 2020 Small Business Credit

Survey, https://www.fedsmallbusiness.org/survey/2020/report-on-employer-firms). The testimony further explained that "[b]ecause the enduring impact of structural racism compounds over generations, minority entrepreneurs also have less exposure to business ownership within their families, and lower levels of family wealth to draw from as startup capital or collateral." *Id.*

At that same subcommittee hearing, the Center for Responsible Lending submitted a written statement addressing "overtly discriminatory practices by lenders" and "facially neutral practices with disparate effects" that make it more difficult for minority-owned businesses to access capital than white-owned businesses. *Id.* at 70 (statement for the record of Ctr. for Responsible Lending). The Center for Responsible Lending specifically recommended that a certain amount of "small business relief dollars should be allocated for the purpose of supporting small minority-, women-, and veteran-owned businesses that have been neglected or otherwise underserved by the original Paycheck Protection Program, the Economic Injury Disaster Loan program, or any other federal assistance program," and that access to that grant program should be limited to "those that qualify as 'socially and economically disadvantaged' individuals as defined in the Small Business Act." *Id.* at 71.

ii. **The Priority Period Is Narrowly Tailored to Achieve the Government's Compelling Interest.**

Once the government has identified a compelling interest, the court's attention turns to whether "the means chosen to accomplish the [government's] asserted purpose [are] specifically and narrowly framed to accomplish that purpose." *Grutter*, 539 U.S. at 333.

In order to assess whether the RRF priority period is narrowly tailored, it is important to understand how the SBA defines "socially and economically disadvantaged." Plaintiff asserts that the "SBA has treated [him] differently because of [his] race," and suggests that he is not eligible for the priority period because he is white. Vitolo Decl. ¶ 18. But that claim is based on a misunderstanding of the definition of "socially disadvantaged individuals." Section 8(a) of the Small Business Act—and thus Section 5003 of ARPA, which adopts this definition—defines that term to include "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(5). That definition appears

in the SBA's online guide to the Restaurant Revitalization Fund, which Plaintiff purports to have reviewed and relied upon. *See* Vitolo Decl. ¶ 15 & Ex. 7. SBA's regulations similarly state that "socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities" where "[t]he social disadvantage . . . stem[s] from circumstances beyond their control." 13 C.F.R. § 124.103(a). SBA's Restaurant Revitalization Fund Program Guide cites those regulations. *See* Program Guide at 22 (Apr. 28, 2021), *available at* https://www.sba.gov/sites/default/files/2021-04/Restaurant%20Revitalization%20Fund%20Program%20Guide%20as%20of%204.28.21-508_0.pdf.

Neither of these definitions categorically excludes white men like the plaintiff. The SBA regulations (and the RRF application) do include a race-conscious *presumption* that certain individuals are socially disadvantaged, including Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and Subcontinent Asian Americans. 13 C.F.R. § 124.103(b)(1). That presumption may be "overcome with credible evidence to the contrary." *Id.* § 124.103(b)(3). Moreover, the regulations expressly contemplate that an individual who is not a member of one of these groups could still be "socially disadvantaged." *See id.* § 124.103(c). To qualify as "socially disadvantaged" without the presumption, for purposes of the Section 8(a) program, an individual must point to "[a]t least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged." *Id.* § 124.103(c)(2)(i). The individual's social disadvantage "must be rooted in treatment which he or she was experienced in American society," "must be chronic and substantial," and "must have negatively impacted . . . his or her entry into or advancement in the business world." *Id.* § 124.103(c)(2)(ii)-(iv). Thus, contrary to plaintiff's assertion, a white man *could* be eligible for priority status as a "socially disadvantaged" individual.

Because the regulations were initially written to apply to the Section 8(a) program, which involves a more detailed application and approval process, they contemplate a process by which an individual claiming to be "socially disadvantaged" would present corroborating evidence, *see id.* § 123.103(c); however, the RRF application does not require any evidence of an individual's socially disadvantaged status or a predetermination by SBA that the applicant would qualify for such status. Instead, applicants are asked to check a box that states whether the applicant is "a small business concern at least 51 percent owned and controlled by" one or more women; veteran(s); and/or socially and economically disadvantaged individuals. Seaborn Decl., Ex. A; *see also* Vitolo Decl., Ex 3 ("To be eligible for priority in awarding Restaurant Revitalization Funds, Applicants must self-certify that they meet the definition of any of the following priority Applicants"). Thus, a socially disadvantaged individual could self-certify to that status *regardless of his or her race*, if he or she otherwise met the qualifications.[5]

The Supreme Court has identified several factors that are relevant in determining whether a racial classification is narrowly tailored, including "the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171.

"Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative," though it does "require serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339; *see also Adarand*, 515 U.S. at 237-38 (courts must inquire "whether there was

---

[5] Plaintiff contends that his application was "pushed to the back of the queue" because he disclosed on the application that his race was "white" and his gender was "male." *See* Compl. ¶ 21. But Plaintiff disclosed that demographic information in a separate section of the application, which indicated that such information was optional. *See* Seaborn Decl., Ex. B. The paper version of the RRF application makes clear that such information is "[o]ptional," "collected for program reporting purpose only," "voluntary," and "will have no bearing on the application decision." SBA Form 2172 at 11, https://www.sba.gov/sites/default/files/2021-04/SBA%20Form%203172%20RRF%20Application%204.20.21-508.pdf. In other words, Plaintiff's demographic information was not used to determine whether he belonged to a priority group—that determination was based on the checkbox earlier in the application, which he declined to check.

any consideration of the use of race-neutral means" to achieve goal). As an initial matter, Section 5003 does not exist in a vacuum; rather, it was developed in the shadow of a year-long effort to provide relief to small businesses suffering amidst the COVID-19 pandemic. As noted during various Congressional hearings throughout 2020 and 2021, many of the government's earlier race-neutral relief programs did not reach minority-owned businesses, particularly during the first few days of those programs. *See* pages 13-17. As a result, minority-owned business were often shut out of those relief programs altogether. Section 5003's priority period is an effort to remedy this problem.

The RRF priority period is also "appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate.'" *Adarand*, 515 U.S. at 238 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 513 (1980) (Powell, J., concurring)). The priority period runs for the first twenty-one days of the program, ensuring that women and socially and economically disadvantaged business owners have an opportunity to access available funding; however, after twenty-one days, any business is eligible to receive funding. Thus, this is a short duration program that will not outlast the discriminatory effects it is designed to eliminate. Moreover, Congress only appropriated $28.6 billion to fund the RRF; if Congress wishes to provide more money to the fund, it will need to appropriate additional funds (and in the process, evaluate whether imposition of a new priority period is appropriate). *Cf. W. States*, 407 F.3d at 994 (finding that a program complies with this requirement "because it is subject to periodic reauthorization by Congress"); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 972 (8th Cir. 2003) (same).

The RRF priority period includes a number of provisions designed to provide flexibility and minimize the burden on non-minority restaurant owners. As explained above, a white male restaurant owner can still qualify for the priority period if he indicates that he is socially and economically disadvantaged. And the net worth, income, and asset limitations "ensure that wealthy minorities who have not encountered discriminatory impediments do not receive an unwarranted windfall" through the RRF priority period. *W. States*, 407 F.3d at 995 (addressing net worth limitations in context of similar minority preference program set forth in U.S. Department of Transportation regulations); *Sherbrooke Turf*, 345 F.3d 964 at 972 (same).

Plaintiffs specifically challenge the racial presumption as overinclusive because it includes a large number of minority groups and as underinclusive because it fails to include other minority groups (namely certain Asian-Americans). But the priority period is not overinclusive. First, it is not available to all "socially disadvantaged" business owners, but only those business owners who are also "economically disadvantaged," and thus it is narrowly tailored to reach those business owners who are experiencing economic effects of discrimination. Additionally, as explained above, the presumption of social disadvantage set forth in SBA regulations is rebuttable, so a member of one of the specified minority groups who is not actually socially disadvantaged would not qualify for the priority period. 13 C.F.R. § 124.103(b)(3). Nor is the category of "socially disadvantaged" and "economically disadvantaged" individuals underinclusive. Plaintiff's sole argument on this point is that the "SBA's regulations pick and choose among Asian-Americans," Pls.' Br. at 15, but that argument misunderstands the definition of "socially disadvantaged," which is not so limited. It is true that SBA regulations contain a rebuttable presumption that certain Asian-Americans are socially disadvantaged, including "Asian Pacific Americans" and "Subcontinent Asian Americans." 13 C.F.R. § 124.103(b)(1). But the regulations also provide that "[a]n individual who is not a member of one of the groups presumed to be socially disadvantaged" can establish "individual social disadvantage" by a preponderance of the evidence. *Id.* § 124.103(c)(1). And as explained above, to be considered for the priority group in the RRF application process, an applicant need only self-certify that he is "eligible for priority in awarding grants" by virtue of being "a small business concern at least 51 percent owned and controlled by" one or more women; veteran(s); and/or socially and economically disadvantaged individuals.[6]

---

[6] Moreover, the regulation also provides that "[r]epresentatives of an identifiable group whose members believe that the group has suffered chronic racial or ethnic prejudice or cultural bias may petition SBA to be included as a presumptively socially disadvantaged group under paragraph (b)(1) of this section." 13 C.F.R. § 124.103(d)(1). Although it is admittedly unlikely that a group could have petitioned SBA to be included in the time between the enactment of the American Rescue Plan Act and the opening of RRF applications on May 3, 2021, the availability of this process demonstrates that the SBA has made significant efforts to ensure that the rebuttable presumption available more generally in its programs applies to groups that have "suffered chronic racial or ethnic prejudice or cultural bias." *Id.*

**B. The Government's Prioritization of Women-Owned Businesses Is Constitutional.**

Plaintiffs also challenge Section 5003's prioritization of women-owned businesses, *see* Pls.' Br. 11, but that too is constitutional. At the outset, classifications based on gender are subject to intermediate scrutiny, meaning that the challenged classification must "serve[] important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 33 (1996) (internal quotation marks omitted).

In this case, Section 5003's prioritization of women-owned businesses serves the important governmental objective of assisting with the economic recovery of women-owned businesses, which were "disproportionately affected" by the COVID-19 pandemic for many of the same reasons as minority-owned businesses—namely, "their concentration in personal services firms, lower cash reserves, and less access to credit." July 15, 2020 Memo. at 4-5. In enacting this gender preference, Congress did not rely on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533. Instead, it relied on actual data regarding the impact of the COVID-19 pandemic on women-owned businesses. For example, a pre-hearing memorandum from the Chairwoman of the Committee on Small Business highlighted that women-owned businesses have "struggled to receive pandemic relief from the Federal government." July 15, 2020 Memo. at 5; *see also id.* (noting that "one-in-four (23%) women-owned businesses were shut out of the PPP loan application process" and that of women who were able to apply for a PPP loan, "women asked for 40 percent less than the average small business owner").

Moreover, Plaintiffs offer no argument that a priority period for women-owned businesses is not "substantially related to the achievement of [that] objective[]." *Virginia*, 518 U.S. at 533. Nor can they, because prioritizing women-owned businesses is indisputably related to the goal of assisting those underserved businesses with their pandemic recovery.

**II. Because the RRF Priority Periods Are Constitutional, Plaintiffs Will Not Suffer Irreparable Injury.**

Plaintiffs are not likely to succeed on the merits of their claim because Section 5003 is constitutional and Plaintiffs' constitutional rights are not impaired in the absence of an injunction;

therefore, there is no presumption of irreparable injury. *Cf. Obama for Am.*, 697 F.3d at 436 ("When constitutional rights are threatened or impaired, irreparable injury is presumed.").

By the same token, Plaintiffs cannot be injured by not receiving funds to which they are not entitled. Because the priority period is constitutional, Plaintiffs are not injured in the event that they are unable to receive RRF funds because of the existence of the priority period for economically and socially disadvantaged small businesses. Moreover, Plaintiff Vitolo is not injured because he has not established or even alleged that he is socially disadvantaged, and thus would not be entitled to receive funds during the priority period even if the race-based presumption were eliminated.

## III. The Balance of the Equities and the Public Interest Weigh Against the Requested Injunction.

Because Plaintiffs are not likely to succeed on the merits of their constitutional claim, an injunction will not prevent a violation of their constitutional rights. Although the Sixth Circuit has held that "[i]t is always in the public interest to prevent violation of a party's constitutional rights," *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 274 F.3d 377, 400 (6th Cir. 2001), that does not mean that any plaintiff alleging a constitutional violation is entitled to a temporary restraining order.

Moreover, the public interest would be harmed by the requested TRO, which would delay the disbursement of much-needed funds to struggling restaurants at a critical moment in the COVID-19 recovery. The House Report on ARPA, issued nearly three months ago, explained that "[a]lmost eleven months after shutdown orders and social distancing guidelines were implemented across our country, small businesses are still struggling to stay open, retain workers, and remain viable." H.R. Rep. No. 117-7, at 457 (2021). Critically, the report stated that in the wake of "full or partial shutdowns," "many restaurants may not survive." *Id.* at 457. The report cited a study by the New York Restaurant Association which reported that "54 percent of all New York restaurateurs are in danger of closing permanently if another federal relief package is not passed." *Id.* Delaying this much-needed aid could further threaten the viability of restaurants who are desperately counting on the RRF to stay afloat at this critical time.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order should be denied.

Dated: May 17, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

LESLEY FARBY
Assistant Branch Director

s/ *Alexandra R. Saslaw*
ALEXANDRA R. SASLAW
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Phone: (202) 514-4520
alexandra.r.saslaw@usdoj.gov

*Attorneys for Defendants*