# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| ANTONIO VITOLO and JAKE'S BAR AND GRILL, LLC, | ) ) ) | Case No. 3:21-cv-176 |
| *Plaintiffs*, | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Debra C. Poplin |
| ISABELLA CASILLAS GUZMAN | ) ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION

Before the Court is a motion for temporary restraining order filed by Plaintiffs Antonio Vitolo and Jake's Bar and Grill, LLC (Doc. 12). For the following reasons, the Court **DENIES** Plaintiffs' motion.

## I.     BACKGROUND

### A.  The COVID-19 Pandemic and Early Federal Relief Efforts

In February and March 2020, portions of the United States economy ground to a halt as an emergent coronavirus began to cause severe sickness and death on a wide scale, especially among older individuals and those with preexisting conditions. Many state and local governments issued stay-at-home orders, directed restaurants and other customer-facing businesses to shut down, and severely restricted social gatherings to slow the person-to-person spread of the virus. The sudden and severe drop in consumer economic activity reverberated through the economy, harming many consumer-facing businesses and permanently shuttering some. Real gross domestic product in the second quarter of 2020 dropped a staggering 31.4%,

by far the most severe quarterly contraction ever recorded. *Table 1.1.1 Percent Change from Preceding Period in Real Gross Domestic Product*, U.S. BUREAU OF ECONOMIC ANALYSIS (last revised Apr. 29, 2021), available at https://apps.bea.gov/iTable/index_nipa.cfm.

Faced with twin public-health and economic crises, Congress reacted with extraordinary stimulus spending aimed at both controlling the virus and containing its economic fallout. On March 27, 2020, § 1102 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") created the Paycheck Protection Program ("PPP"), a $349 billion federally guaranteed loan program for businesses distressed by the pandemic. Pub. L. No. 116-136, 134 Stat. 281 (2020). Although federal funds guaranteed the PPP loans, they were administered by commercial lenders. *Id.* On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act appropriated an additional $310 billion to the fund. Pub. L. No. 116-139, 134 Stat. 620 (2020).

The PPP loans were not administered equally to all kinds of businesses, however. Congressional investigation revealed that minority-owned and women-owned businesses had more difficulty accessing PPP funds relative to other kinds of business. *See, e.g.*, *Supporting Small and Minority-Owned Businesses Through the Pandemic*, at 60–62 (Feb. 4, 2021) (footnotes and emphases removed), available at https://www.congress.gov/117/chrg/CHRG-117hhrg43965/CHRG-117hhrg43965.pdf (analysis noting that black-owned businesses were more likely to be denied PPP loans than white-owned businesses with similar application profiles due to outright lending discrimination, and that funds were more quickly disbursed to businesses in predominantly white neighborhoods). This was due in significant part to the lack of historical relationships between commercial lenders and minority-owned and women-owned businesses. *See, e.g.*, *Long-Lasting Solutions for a Small Business Recovery: Hearing Before the Committee*

2

*on Small Business*, at 72 (July 15, 2020), available at

https://www.congress.gov/116/chrg/CHRG-116hhrg41297/CHRG-116hhrg41297.pdf (written

testimony of Dr. Lisa Cook, an economist, explaining that minority-owned businesses had

greater difficulty accessing PPP credit due to the PPP's "heavy reliance on large banks, with

whom [minority-owned businesses] have had historically poor relationships"). The historical

lack of access to credit also meant that minority-owned and women-owned businesses tended to

be in more financially precarious situations entering the pandemic, rendering them less able to

weather an extended economic contraction of the sort COVID-19 unleashed. *Id.* at 9–10 (Dr.

Cook explaining that prior to the pandemic, "27 percent of small White firms report[ed] that they

were at risk or in distress" while "49 percent of small Hispanic firms and 57 percent of small

Black firms reported being at risk or distressed").

### B. The Restaurant Revitalization Fund

Against this backdrop, on March 11, 2021, the President signed the American Rescue

Plan Act of 2021 (the "ARPA"). H.R. 1319, 117th Cong. (2021). As part of the ARPA,

Congress appropriated $28,600,000,000 to a "Restaurant Revitalization Fund" and tasked the

Administrator of the Small Business Administration with disbursing funds to restaurants and

other eligible entities that suffered COVID-19 pandemic-related revenue losses. *See id.* § 5003.

Under the ARPA, the Administrator "shall award grants to eligible entities in the order in which

applications are received by the Administrator," except that

> [d]uring the initial 21-day period in which the Administrator awards grants . . . ,
> the Administrator shall prioritize awarding grants to eligible entities that are small
> business concerns owned and controlled by women (as defined in section 3(n) of
> the Small Business Act (15 U.S.C. 632(n))), small business concerns owned and
> controlled by veterans (as defined in section 3(q) of such Act (15 U.S.C. 632(q))),
> or socially and economically disadvantaged small business concerns (as defined
> in section 8(a)(4)(A) of the Small Business Act (15 U.S.C. 637(a)(4)(A))).

*Id*. § 5003(c)(1), (3).

3

Title 15, United States Code, Section 632(n) provides that a small business concern is "owned and controlled by women" if:

> (1) at least 51 percent of small business concern is owned by one or more women, or in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and (2) the management and daily business operations of the business are controlled by one or more women.

Similarly, 15 U.S.C. § 637(a)(4)(A) provides:

> the term "socially and economically disadvantaged small business concern" means any small business concern which meets the requirements of subparagraph (B) and--
>
> > (i) which is at least 51 per centum unconditionally owned by--
> >
> > > (I) one or more socially and economically disadvantaged individuals,
> > >
> > > (II) an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe), or
> > >
> > > (III) an economically disadvantaged Native Hawaiian organization, or
> >
> > (ii) in the case of any publicly owned business, at least 51 per centum of the stock of which is unconditionally owned by--
> >
> > > (I) one or more socially and economically disadvantaged individuals,
> > >
> > > (II) an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe), or
> > >
> > > (III) an economically disadvantaged Native Hawaiian organization.

15 U.S.C § 637(a)(5) defines "socially disadvantaged individuals" as individuals "who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." Federal regulations promulgated by the Small Business Administration further state that there is a rebuttable presumption that the following individuals are socially disadvantaged:

> Black Americans; Hispanic Americans; Native Americans (Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian Tribe); Asian Pacific Americans (persons with origins from Burma, Thailand,

4

> Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal); and members of other groups designated from time to time by SBA according to procedures set forth at paragraph (d) of this section.

13 C.F.R. § 124.103. Thus, while the SBA has created a regulatory presumption that certain individuals are socially disadvantaged, nothing precludes other individuals who "have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities" from being defined as socially disadvantaged.

"[E]conomically disadvantaged individuals" are defined as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). "In determining diminished capital and credit opportunities, [the Small Business Administration] will examine factors relating to the personal financial condition of any individual claiming disadvantaged status, including income for the past three years . . . personal net worth, and the fair market value of all assets, whether encumbered or not." 13 C.F.R. § 124.04(c).

On April 27, 2021, the Small Business Administration announced that it would open the application period for the Restaurant Revitalization Fund on May 3, 2021. (Doc. 12-3, at 2, 6–9.) The Small Business Administration announcement also stated, consistent with the ARPA, that "[f]or the first 21 days that the program is open, the SBA will prioritize funding applications from businesses owned and controlled by women, veterans, and socially and economically disadvantaged individuals." (*Id.*)

## C. Antonio Vitolo and Jake's Bar and Grill

Antonio Vitolo is a white male who owns and operates Jake's Bar and Grill, LLC in Harriman, Tennessee. (Doc. 12-3, at 1.) Beginning in March 2020, the effects of the COVID-19 pandemic caused Vitolo to close his restaurant on weekdays and only offer to-go orders on weekends. (*Id.*) As a result, sales declined significantly during the pandemic, with gross receipts in 2020 $104,590.20 less than gross receipts in 2019. (*Id.* at 2.)

Vitolo applied for a grant from the Restaurant Revitalization Fund through the Small Business Administration on May 3, 2021, the first day of the application period. (*Id.*) According to Vitolo, the application included a section entitled "Priority in Awarding Restaurant Revitalization Funds" and included instructions for priority applications. (*Id.* at 2, 10.) Vitolo's application also asked him to identify his race and gender, and he selected "white" and "male." (*Id.* at 3, 12.) The application also allowed applicants to self-certify that the business concern at issue is at least 51% owned by individuals who are "socially and economically disadvantaged," although Vitolo did not so certify.[1] (*Id.* at 10.) After completing his application, the Small Business Administration notified him that his application was "under review" and that his "calculated award amount" was $104,590.20. (*Id.* at 3, 13.) The next day, the Small Business Administration emailed Vitolo and notified him that "[a]pplicants who have submitted a non-priority application will find their application remain in a Review status while priority applications are processed during the first 21 days." (*Id.* at 3, 14–15.) On May 7, 2021, the Small Business Administration again emailed Vitolo and noted that in the first two days of the

---

[1] At the TRO hearing, Vitolo's counsel indicated that he does not have any basis for asserting that he is socially and economically disadvantaged, with or without the SBA's race-based, rebuttable presumption. Accordingly, even if the regulatory presumption were removed, Vitolo apparently has no argument that he is entitled to priority consideration under the plain text of § 5003 of the ARPA.

application window, it received: (1) 186,200 applications from restaurants, bars, and other eligible businesses; (2) 97,600 applications from restaurants, bars, and other eligible businesses controlled by women, veterans, and socially and economically disadvantaged individuals; and (3) 61,700 applications from businesses with under $500,000 in annual pre-pandemic revenue. (*Id*. at 3, 30–31.)

On May 12, 2021, Vitolo and Jake's Bar and Grill, LLC initiated the present action against Defendant Isabella Casillas Guzman, the Administrator of the Small Business Administration. (Doc. 1.) In their complaint, Vitolo and Jake's Bar and Grill assert that the ARPA's twenty-one-day priority period violates the United States Constitution's equal protection clause and due process clause because it impermissibly grants benefits and priority consideration based on race and gender classifications. (*Id*. at 8–9.) Based on allegations in the complaint and averments made in Vitolo's sworn declaration dated May 11, 2021, Vitolo and Jake's Bar and Grill request that the Court enter: (1) a temporary restraining order prohibiting the Small Business Administration from paying out grants from the Restaurant Revitalization Fund, unless it processes applications in the order they were received without regard to the race or gender of the applicant; (2) a temporary injunction requiring the Small Business Administration to process applications and pay grants in the order received regardless of race or gender; (3) a declaratory judgment that race- and gender-based classifications under § 5003 of the ARPA are unconstitutional; and (4) an order permanently enjoining the Small Business Administration from applying race- and gender-based classifications in determining eligibility and priority for grants under § 5003 of the ARPA. (*Id*. at 9–10.)

## II. STANDARD OF LAW

The purpose of a temporary restraining order ("TRO") is to preserve and maintain the status quo for a very short period of time "so that a reasoned resolution of a dispute may be had." *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). The Court may only issue a TRO without written or oral notice to the adverse party or his attorney where the party seeking the TRO demonstrates it has fulfilled the following requirements:

> (a) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (b) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b). The court must also require the movant to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

When reviewing motions for TROs, courts must consider the following: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without an injunction; (3) whether granting the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting the injunction. *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Am. Imaging Servs., Inc. v. Eagle-Picher Indus.*, Inc., 963 F.2d 855, 858 (6th Cir. 1992)); *Midwest Retailer Associated, Ltd. v. City of Toledo*, 563 F. Supp. 2d 796, 802 (N.D. Ohio 2008) ("The same standard generally applies to the issuance of temporary restraining orders and preliminary injunctions."). In the constitutional context, the last three factors often hinge on the first. *Cf. Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014) ("In cases implicating the First Amendment, the other three factors often hinge on this first factor."). These considerations are factors to be balanced; they are not prerequisites that must each be satisfied before relief may issue. *Eagle-Picher*, 963 F.2d at 859. Nor are they

8

"rigid and unbending requirements"; rather, "[t]hese factors simply guide the discretion of the court." *Id*. The party seeking injunctive relief bears the burden of justifying such relief. *Id*.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

#### i. *Equal Protection Under the Law*

The Fifth Amendment to the United States Constitution provides that no person may be "deprived of life, liberty, or property, without due process of law." "The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013); *see also Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Ctr. for Bio-Ethical Reform v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("The Fifth Amendment, of course, does not itself contain a guarantee of equal protection, but instead incorporates, as against the federal government, the Equal Protection Clause of the Fourteenth Amendment."). Courts therefore "evaluate equal protection claims against the federal government under the Fifth Amendment just as [they] would evaluate equal protection claims against state and local governments under the Fourteenth Amendment." *Ctr. for Bio-Ethical Reform*, 648 F.3d at 379; *see also Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); U.S. Const. amend. XIV ("No State shall . . . deny to any person within its jurisdiction equal protection of the laws."). Equal protection prevents the government from "making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010).

9

The level of scrutiny a government-sponsored distinction receives depends on the nature of the distinction. Certain classifications are subject to strict scrutiny—meaning they are constitutional "only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Other classifications are subject to intermediate scrutiny, which requires that the challenged action further an important government interest by means substantially related to that interest. *See Craig v. Boren*, 429 U.S. 190, 197 (1976). Classifications that are not subject to a higher level of scrutiny receive rational-basis review, which is satisfied if the government's actions are rationally related to a legitimate government interest. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). In light of these varying standards, the Court will address Plaintiffs' likelihood of success with respect to the race- and gender-based distinctions in the SBA program separately.

## ii. *Historical Treatment of Race-Based Affirmative-Action Measures*

In 1978, the U.S. Supreme Court decided *Regents of University of California v. Bakke*, 438 U.S. 265 (1978). *Bakke* was brought by a white male after the Medical School of the University of California at Davis twice denied him admission. 438 U.S. at 269–76. The Medical School had two separate admissions programs—a general-admissions program and a special-admissions program designed to increase minority representation among the admitted students. *Id.* The plaintiff, who was only considered for admission through the general-admissions

program, challenged the legality of the special-admissions program under § 601 of Title VI of the Civil Rights Act of 1964. *See id* at 277–78. Section 601 provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.[2] A plurality of justices determined that the special-admission program was unlawful, either under Title VI or the Equal Protection Clause, but no specific standard of review obtained majority support. *See Bakke*, 438 U.S. at 290–91 (advocating for the application of strict scrutiny to racial classifications); *id.* at 369 (Brennan, J. concurring in the judgment and dissenting in part) (advocating for the application of intermediate scrutiny); *id.* at 408–09 (Stevens, J. concurring in part) (declining to reach the constitutional issue).

Shortly after *Bakke*, the Supreme Court decided *Fullilove v. Klutznick*, 448 U.S. 448 (1980). *Fullilove* examined the constitutionality of the "minority business enterprise" (or "MBE") provision of the Public Works Employment Act of 1977, which required that at least ten percent of grants for goods and services related to local public-works projects be awarded to minority-owned businesses. 448 U.S. at 453–54. Six justices held that the MBE provision was constitutional. *Id.* at 491–92. The plurality opinion concluded that "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees," but adopted no particular level of scrutiny. *Id.* ("This opinion does not adopt, either expressly or implicitly, the formulas articulated in such

---

[2] Five justices concluded that this provision "must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Bakke*, 438 U.S. at 287. Of these, Justice Powell, who delivered the opinion of the Court, determined that the program violated the Equal Protection Clause, while the other four justices would have upheld the program. The remaining four justices concluded that the program violated Title VI without reaching the equal-protection issue.

Case 3:21-cv-00176-TRM-DCP   Document 24   Filed 05/19/21   Page 11 of 30   PageID #: 195

cases as [*Bakke*]" but "our analysis demonstrates that the MBE opinion would survive judicial review under either 'test' articulated in the several *Bakke* opinions.").

In *Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986), a four-justice plurality applied strict scrutiny to a school district's layoff system that limited the number of minority teachers that could be laid off in connection with the percentage of minority students attending the school. 476 U.S. at 270–74. The plurality rejected the argument that "remedy[ing] societal discrimination by providing 'role models' for minority schoolchildren" was a compelling interest supporting the policy, holding that the policy "allow[ed] the Board to engage in discriminatory hiring and layoff practices long past the point required by any legitimate remedial purpose." *Id.* at 275–76.

In 1989, a majority of justices agreed with *Wygant* that race-based classifications by state and local governments are subject to strict scrutiny under the Fourteenth Amendment. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94 (1989). In *Croson*, the Supreme Court reviewed a "Minority Business Utilization Plan" adopted by the Richmond City Council, which "required prime contractors to whom the city awarded construction contracts to subcontract at least 30% of the dollar amount of the contract" to minority-owned businesses. 488 U.S. at 477–78. A majority of justices declared the program unconstitutional, holding that generalized past societal discrimination, absent specific "identified discrimination," is not a compelling interest to support state-sponsored racial preferences. *Id.* at 505–06. The majority also concluded that the thirty-percent quota was not narrowly tailored to its purported remedial purpose. *Id.* at 507 ("[T]he 30% quota cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing.").

Case 3:21-cv-00176-TRM-DCP   Document 24   Filed 05/19/21   Page 12 of 30   PageID #: 196

Following *Croson*, a four-justice plurality applied intermediate scrutiny to Federal

Communications Commission policies aimed at increasing broadcasting diversity, holding that:

> benign race-conscious measures mandated by Congress—even if those measures
> are not "remedial" in the sense of being designed to compensate victims of past
> governmental or societal discrimination—are constitutionally permissible to the
> extent that they serve important governmental objectives within the power of
> Congress and are substantially related to achievement of those objectives.

*Metro Broad., Inc. v. F.C.C.*, 497 U.S. 547, 564–65 (1990).

However, not long thereafter, *Metro Broadcasting* was overruled by *Adarand*

*Constructors, Inc. v. Pena.  Adarand* concerned a prime contract between a private contractor

and the U.S. Department of Transportation's Central Federal Lands Highway Divisions.  515

U.S. at 205.  The contract provided that the contractor would receive additional compensation if

it hired subcontractors operated by "socially and economically disadvantaged individuals."  *Id.*

The *Adarand* plurality held that all racial classifications—state or federal, invidious or benign—

are subject to strict scrutiny and remanded for further proceedings under that standard.  *Id.* at 224

("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to

the Constitution justify any racial classification subjecting that person to unequal treatment under

the strictest judicial scrutiny.").

Cases since *Adarand* have not strayed from the strict-scrutiny standard of review.

Instead, affirmative-action cases—in the Supreme Court and in lower courts—have focused on

ascertaining which governmental interests are sufficiently compelling to support racial

classifications and whether the challenged measures are narrowly tailored to the interests they

seek to promote.

### iii.   *Whether the SBA's Grant-Distribution Policy Is Likely to Withstand Strict Scrutiny*

Although § 5003 of the ARPA does not itself use a facially race-based prioritization system, the Small Business Administration's regulations use race as a basis to establish a presumption that an applicant is socially and economically disadvantaged. *See* 13 C.F.R. § 124.103. The parties agree that this system is subject to strict scrutiny. *See Adarand*, 515 U.S. at 212–13. Accordingly, whether Plaintiffs are likely to succeed on the merits of their race-based equal-protection claims turns on whether Defendant has a compelling government interest in using a race-based classification, and whether that classification is narrowly tailored to that interest.

a.   Compelling Government Interest

To satisfy the compelling-interest prong, the government must both identify a compelling interest and provide evidentiary support concerning the need for the proposed remedial action. *See Croson*, 488 U.S. at 498–504; *see also Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (citing *Croson* for the proposition that the government must establish either that it "discriminated in the past" or "was a passive participant in private industry's discriminatory practices"). Though the burden remains on the challenger to ultimately demonstrate the unconstitutionality the program, without evidence that the remedial action is warranted, it is immensely difficult for reviewing courts to determine whether the program is justified. *Wygant*, 476 U.S. at 277–78.

Here, the Government asserts that it has a compelling interest in "remedying the effect of past or present racial discrimination" as related to the formation and stability of minority-owned businesses. (Doc. 18, at 10.) Indeed, over the past year, Congress has gathered myriad evidence suggesting that small businesses owned by minorities (including restaurants, which have a disproportionately high rate of minority ownership) have suffered more severely than other kinds

14

of businesses during the COVID-19 pandemic, and that the Government's early attempts at general economic stimulus—*i.e.*, the Paycheck Protection Program ("PPP")—disproportionately failed to help those businesses directly because of historical discrimination patterns. For example, one congressional committee received the following testimony:

> Since the start of the crisis, business owners of color had been especially and unfairly hard hit. Active black- and Latino-owned businesses have declined by 41 percent and 32 percent respectively. Asian American-owned business owners dropped by 26 percent. By comparison, active white business owners declined by 17 percent. These business owners of color are from the same communities that were the most adversely affected by the Great Recession, and unfortunately, they are the ones most likely to have been underserved by the PPP.

> This program disadvantages the smallest businesses. Businesses owned by people of color on average have fewer employees than white-owned businesses. [The Center for Responsible Lending]'s analysis of the latest government study shows that for 95 percent of black-owned businesses, and 91 percent of Latino-owned businesses, the owner is the only current employee as compared with 78 percent of white-owned businesses. These businesses are the least likely to be served by the PPP.

> Business owners of color are less likely than white owners to have a relationship with a commercial lender. This puts them at a sharp disadvantage, especially during the first-come, first-served opening round of PPP, which caused serious fair lending concerns.

> Businesses of color have historically lacked access to SBA loans and credit generally. A recent study found steep reductions in SBA 7(a) lending to black businesses between 2008 and 2016. In 2018 and 2019, only 5 percent of all SBA 7(a) loans were made to black-owned businesses, and only 9 percent were made to Latino-owned businesses.

*Paycheck Protection Program: Loan Forgiveness & Other Challenges: Hearing Before the House Committee on Small Business*, at 10–11 (June 17, 2020), available at https://www.congress.gov/116/chrg/CHRG-116hhrg41293/CHRG-116hhrg41293.pdf (testimony of Ashley Harrington); *see also id.* at 18 ("I think historically communities, individuals and business owners of color have lacked access to credit through traditional means, even through the SBA, which is a government guaranteed program."); *id.* at 58 (Harrington testifying in

writing that commercial lenders administering the PPP prioritize lending to businesses with more

employees, while minority-owned businesses tend to have fewer employees, thereby

systematically directing PPP funds away from minority-owned businesses); *id.* at 74–92

(Harrington written statement explaining how the PPP disproportionately failed to assist

minority-owned businesses).  Similarly, Dr. Lisa Cook, an economist from Michigan State

University, testified before the same committee during a different hearing:

> Prior to the pandemic, most small firms reported being in good shape and 73 reported that their financial health was good or stable. Nonetheless, the financial health of small firms varied greatly, depending on the race or ethnicity of the owner. Compared to 27 percent of small White firms reporting that they were at risk or in distress, 49 percent of small Hispanic firms and 57 percent of small Black firms reported being at risk or distressed. Black and Hispanic firms were less prepared to weather an adverse shock like this pandemic.
>
> According to the Federal Reserve, distressed firms are three times more likely to close relative to healthy firms due to a 2-month revenue shock. Further, the concentration of small minority-owned firms in certain sectors makes them more vulnerable in the wake of COVID-19. These sectors in which many small minority-owned firms are overrepresented are accommodation and food services, personal and laundry services, and retail.
>
> . . .
>
> The burden of small business closures is also unevenly distributed. Forty-one percent of African American businesses reported being closed compared to 35 percent overall.
>
> In the only survey providing demographic data on PPP loan recipients, the Color of Change reports that 45 percent of Black and Latino businesses will close by the end of the year without more relief. Minority-owned businesses also report not being able to access PPP loans due to the heavy reliance on large banks, with whom they have had historically poor relationships.

*Long-Lasting Solutions for a Small Business Recovery: Hearing Before the Committee on Small*

*Business*, at 9–10 (July 15, 2020), available at https://www.congress.gov/116/chrg/CHRG-

116hhrg41297/CHRG-116hhrg41297.pdf; *see also id.* at 55–57 (academic study detailing higher

loan denial rates, and concomitant lack of access to necessary credit, for minority- and woman-

owned businesses); *id.* at 71 (written testimony of Dr. Lisa Cook explaining that before the pandemic, 27% of white-owned businesses were financially "at risk" or "in distress," compared to 49% of small Hispanic-owned firms and 57% of small black-owned firms, meaning that minority-owned firms were more exposed to an adverse economic shock, and were especially vulnerable to COVID-19 because they are "overrepresented [in] accommodation and food services, personal and laundry services, and retail"); *id.* at 72 (written testimony of Dr. Lisa Cook explaining that minority-owned businesses had greater difficulty accessing PPP credit due to the PPP's "heavy reliance on large banks, with whom [minority-owned businesses] have had historically poor relationships").  In a hearing before the Subcommittee on National Security, International Development and Monetary Policy of the House Committee on Financial Services, a submission by analysts Sifan Liu and Joseph Parilla explained:

> The near-term pressures from the COVID-19 recession have intersected with a second crisis that is longer-standing and equally damaging: the racial disparities in business ownership that undermine the nation 's economic dynamism and exacerbate wealth inequities. Below, we review three unique challenges that minority-owned small businesses currently face.

> The first challenge is the continuous and long-standing structural racial disparities in small business ownership and performance. Nationally, people of color represent about 40% of the population, but only 20% of the nation's 5.6 million business owners with employees. Minority-owned small businesses also have fewer employees, lower profit margins, and higher failure rates. Importantly, these trends represent structural impediments to starting and scaling businesses, and do not reflect the inherent entrepreneurial abilities or interests of different groups. Several studies indicate that the playing field is uneven for entrepreneurs of color on key factors, including consumer perceptions, access to finance, and social capital. A Brookings analysis found that businesses located in majority-Black neighborhoods receive lower Yelp ratings, and earn less revenue than businesses with similar quality ratings in other neighborhoods. The Federal Reserve's 2020 Small Business Credit Survey shows that large banks approve around 67% of loans sought by white small-business owners, 43% of those sought by Latino or Hispanic small-business owners, and just 29% of those sought by Black small-business owners. Because the enduring impact of structural racism compounds over generations, minority entrepreneurs also have less exposure to business ownership within their families, and lower levels of family wealth to draw from as startup capital or collateral.

. . .

This second challenge is the acute economic disruptions induced by COVID-19 that disproportionately affected minority-owned businesses. These long-standing structural impediments have consequences on the financial health of minority-owned businesses, putting them in a more vulnerable position during economic downturns. Minority-owned small businesses are more likely to operate in retail services, accommodation and food services, and personal care services industries that rely on foot traffic, which were hit hardest from a nationwide lockdown. In addition, COVID-19 infection rates are higher in communities of color, which coincides with minority-owned business locations. Federal Reserve Bank of New York found that among the counties with highest share of Black-owned businesses, two-thirds were among the top 50 COVID-affected areas in July 2020.

. . .

The third challenge is the delay and failure in getting federal small business relief to communities of color. While we do not have definitively reliable data on the demographics of PPP loan recipients, a range of evidence strongly suggests that access to PPP was not equal. A matched-pair test conducted in April found that Black business owners in Washington, DC were more likely to be denied PPP loans compared to white business owners with similar application profiles due to outright lending discrimination. Brookings research shows that small businesses in majority-white neighborhoods received PPP loans much more quickly than small businesses in majority-Black and majority-Latino or Hispanic neighborhoods.

. . .

A new NBER report released last month indicates that the second tranche of PPP reached small businesses in underserved and majority-minority communities, but these delays are likely costly to businesses in those communities that operate on very short cash buffers.

*Supporting Small and Minority-Owned Businesses Through the Pandemic*, at 60–62 (Feb. 4, 2021) (footnotes and emphases removed), available at https://www.congress.gov/117/chrg/CHRG-117hhrg43965/CHRG-117hhrg43965.pdf. These excerpts are nowhere near exhaustive but demonstrate the sort of evidence on which Congress based § 5003 of the ARPA.

   To the extent that Plaintiffs argue that evidence racial disparity or disparate impact alone is not enough to support a compelling government interest, Congress also

heard evidence that racial bias plays a direct role in these disparities. For example, the prepared statement Everett K. Sands, which was presented at the February 4, 2021 hearing, stated:

> A study conducted and published in 2020 by the National Community Reinvestment Coalition - part of a series of 'matched pair mystery shopping' studies of bias in small business lending conducted by NCRC since 2017 - found racial bias by several Washington, D.C. banks in PPP lending, with white candidates receiving more favorable treatment than similarly-qualified Black candidates in 43% of tests, as evidenced by differences in:
>
> - levels of encouragement in applying for a loan (including, in 44% of tests that exhibited bias, discouragement of the Black candidate from applying at all, alongside encouragement of the white candidate to apply for more one or more loan products);
>
> - products offered;
>
> - information provided by the bank representative.

*Id.* at 54.

At this preliminary stage, the record before the Court supports a finding that the Government has a compelling interest in remediating past racial discrimination against minority-owned restaurants through § 5003 the ARPA and in ensuring public relief funds are not perpetuating the legacy of that discrimination. At the very least, Congress had evidence before it suggesting that its initial COVID-relief program, the PPP, disproportionately failed to reach minority-owned businesses due (at least in part) to historical lack of relationships between banks and minority-owned businesses, itself a symptom of historical lending discrimination. *Croson*, 488 U.S. at 492 ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars drawn from the tax contributions of all citizens do not serve to finance the evil of private prejudice."); *cf. Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1169 (10th Cir. 2000) ("The government's evidence is particularly striking in the area of the race-based denial of access to capital, without which the formation of minority

19

subcontracting enterprises is stymied."); *DynaLantic Corp v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 258–262 (D.D.C. 2012) (rejecting facial challenge to the Small Business Administration's § 8(a) program in part because "the government [had] presented significant evidence on race-based denial of access to capital and credit"). Put another way, the PPP—a government-sponsored COVID-19 relief program—was stymied in reaching minority-owned businesses because historical patterns of discrimination are reflected in the present lack of relationships between minority-owned businesses and banks. This same phenomenon caused minority-owned businesses to enter the pandemic with more financial precarity, and therefore to falter at disproportionately higher rates as the pandemic has unfolded. The Government has a compelling interest in remediating the present effects of historical discrimination on these minority-owned businesses, especially to the extent that the PPP disproportionately failed those businesses because of factors clearly related to that history. Plaintiff has not rebutted this initial showing of a compelling interest, and therefore has not shown a likelihood of success on the merits in this respect.

b. Narrow Tailoring

"Even in the limited circumstance when drawing racial distinctions is permissible to further a compelling state interest, government is still 'constrained in how it may pursue that end: [T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose.'" *Grutter v. Bollinger*, 529 U.S. 306, 333 (2003) (quoting *Shaw v. Hunt*, 517 U.S. 899, 908 (1996)) (alterations in original). This requirement is aimed at ensuring "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* (quoting *Croson*, 488 U.S. at 493) (alteration in original).

Section 5003 of the ARPA is a one-time grant program with a finite amount of money that prioritizes small restaurants owned by women and socially and economically disadvantaged individuals because Congress had evidence before it showing that those businesses were inadequately protected by earlier COVID-19 financial relief programs. While individuals from certain racial minorities are rebuttably presumed to be "socially and economically disadvantaged" for purposes of § 5003, Defendant correctly points out that the presumption does not exclude individuals like Vitolo from being prioritized, and that the prioritization does not mean individuals like Vitolo cannot receive relief under this program. Section 5003 is therefore time-limited, fund-limited, not absolutely constrained by race during the priority period, and not constrained to the priority period.[3] And while Plaintiffs asserted during the TRO hearing that the SBA is using race as an absolute basis for identifying "socially and economically disadvantaged" individuals, that assertion relies essentially on speculation rather than competent evidence about the SBA's processing system. The Court therefore cannot conclude on the record before it that Plaintiffs are likely to show that Defendant's implementation of § 5003 is not narrowly tailored to the compelling interest at hand.

In support of Plaintiffs' motion, they argue that the priority period is not narrowly tailored to achieving a compelling interest because it does not address "any alleged inequities or past discrimination." (Doc. 12-2, at 13–14.) However, the Court has already addressed the inequities that were present in the past relief programs. At the hearing, Plaintiffs argued that a better alternative would have been to prioritize applicants who did not receive PPP funds or

---

[3] Plaintiffs assert that funds may run out before the program even begins to process non-priority applications. While this is certainly unfortunate, Congress cannot reasonably have been expected to predict with precision the level of demand for funds nor how the demand would break down between priority and non-priority applications.

applicants who had "a weaker income statement" or "a weaker balance sheet." (Doc. 22, at 11–12.) But "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," only "serious, good faith consideration of workable race-neutral alternatives" to promote the stated interest. *Grutter v. Bollinger*, 529 U.S. at 333 (citing *Croson*, 488 U.S. at 507; *Wygant*, 476 U.S. at 280 n.6). The Government received evidence that the race-neutral PPP was tainted by lingering effects of past discrimination and current racial bias. Accordingly, the race-neutral approach that the Government found to be tainted did not further its compelling interest in ensuring that public funds were not disbursed in a manner that perpetuated racial discrimination. Indeed, the Government not only considered but actually used race-neutral alternatives during prior COVID-19 relief attempts. It was precisely the failure of those race-neutral programs to reach all small businesses equitably that appears to have motivated the priority period at issue here.

Finally, Plaintiffs argue that the priority period is simultaneously overinclusive and underinclusive based on the racial, ethnic, and cultural groups that are presumed to be "socially disadvantaged." (Doc. 12-2, at 14–15.) However, the race-based presumption is just that: a presumption. Counsel for the Government explained at the hearing, consistent with other evidence before the Court, that any individual who felt they met § 5003's broader definition of "socially and economically disadvantaged" was free to check that box on the application. (Doc. 22, at 24 ("[E]ssentially all that needs to be done is that you need to self-certify that you fit within that standard on the application, . . . you check that box").) For the sake of prioritization, there is no distinction between those who were presumptively disadvantaged and those who self-certified as such. Accordingly, the priority period is not underinclusive in a way that defeats narrow tailoring.

Further, the priority period is not overinclusive. Prior to enacting the priority period, the Government considered evidence relative to minority-business owners generally as well as data pertaining to specific groups. It is also important to note that the Restaurant Revitalization Fund is a *national* relief program. As such it is distinguishable from other *regional* programs that the Supreme Court found to be overinclusive. *See, e.g.*, *Croson*, 488 U.S. at 506. The inclusion in the presumption, for example, of Alaskan and Hawaiian natives is quite logical for a program that offers relief funds to restaurants in Alaska and Hawaii. This is not like the racial classification in *Croson*, which was premised on the interest of compensating Black contractors for past discrimination in Richmond, Virginia, but would have extended remedial relief to "an Aleut citizen who moves to Richmond tomorrow." *Id.* Here, any narrowly tailored racial classification must necessarily account for the national scale of prior and present COVID-19 programs.

### iv. *Historical Treatment of Gender-Based Classifications*

The Supreme Court has historically declined to review sex- or gender-based classifications under strict scrutiny. For decades, women were not considered a protected class for equal-protection purposes. *See, e.g.*, *Bradwell v. People of State of Illinois*, 83 U.S. 130, 131 (1873) (holding that Illinois's policy refusing to license women as attorneys did not violate the Fourteenth Amendment because, "[i]f we were to admit [women], we should be exercising the authority conferred upon us in a manner which, we are fully satisfied, was never contemplated by the legislature"). However, in 1971, the Supreme Court held, for the first time, that a statute favoring males over females violated the Equal Protection Clause. *See Reed v. Reed*, 404 U.S. 71, 77 (1971). In *Reed*, the Court unanimously struck down an Idaho statute mandating that male relatives were to be preferred over female relatives as estate administrators. *Id.* at 76–77.

Case 3:21-cv-00176-TRM-DCP   Document 24   Filed 05/19/21   Page 23 of 30   PageID #: 207

In deciding the case, the Court applied the lowest level of scrutiny applicable to equal-protection challenges: rational-basis review. *Id.* The *Reed* court determined that the Idaho statute could not withstand even this low-level of scrutiny, because it did not "bear[] a rational relationship to [the] state objective that it sought to be advanced." *Id.* at 75–76 ("A classification [based on sex] 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation[.]'" (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920))).

The Supreme Court's next opportunity to examine the appropriate standard of review for sex-based distinctions resulted in a fractured plurality opinion. *See Frontiero v. Richardson*, 411 U.S. 677 (1973). Eight justices agreed that a federal statute which assumed spouses of male uniformed-service members were dependents for quarters allowances and benefits but required proof of dependence for female members' spouses violated equal protection. *See id.* at 678–79. A four-justice plurality applied strict-scrutiny to the classification, while a three-justice concurrence urged the application of rational-basis review under *Reed*. *See id.* at 691–92 (Powell, J., concurring) ("In my view, we can and should decide this case on the authority of *Reed* and reserve for the future any expansion of its rationale.").

Not long after *Frontiero*, the Supreme Court decided *Craig v. Boren*. The majority in *Craig* applied an intermediate level of scrutiny to an Oklahoma statute allowing females to purchase 3.2% beer at age 18 but requiring males to reach age 21 before purchasing. 429 U.S. at 197–98. The Court held, "[t]o withstand constitutional challenge, . . . classifications by gender must serve important governmental objective and must be substantially related to achievement of those objectives," and struck down the Oklahoma statute under this standard. *Id.* at 197–204.

Since *Craig*, this intermediate scrutiny has continued to govern equal-protection challenges to classifications based on sex.

a. Important Governmental Interest

"[A] gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982) (citing *Schlesinger v. Ballard*, 419 U.S. 498 (1975)); *see also Califano v. Webster*, 430 U.S. 313, 318 ("Reduction of the disparity in economic condition between men and women caused by the long history of discrimination against women has been recognized as such an important governmental interest.").

> Sex classifications may be used to compensate women "for particular economic disabilities [they have] suffered," [*Califano*, 430 U.S. at 320], to "promot[e] equal employment opportunity," *see California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 289 (1987), [and] to advance full development of the talent and capacities of our Nation's people. But such classifications may not be used, as they once were, *see* [*Goesaert v. Cleary*, 335 U.S. 464, 467 (1948)], to create or perpetuate the legal, social, and economic inferiority of women.

*United States v. Virginia*, 518 U.S. 515, 533–34 (1996).

However, remedying past discrimination cannot serve as an important governmental interest when there is no empirical evidence of discrimination within the field being legislated. *See Hogan*, 458 U.S. at 728; *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme."). "[A] State can evoke a compensatory purpose to justify an otherwise discriminatory classification only if members of the gender benefited by the classification actually suffer a disadvantage related to the classification." *Hogan*, 458 U.S. at 728. Under this framework, the Supreme Court has upheld pro-women policies in areas where women had historically been discriminated against and has struck down such policies in fields from which women had not historically been excluded.

*Compare Califano*, 430 U.S. at 318 (upholding provision of the Social Security Act that awarded more favorable retirement benefits to female employees because they had been "unfairly hindered from earning as much as men") *and Schlesinger*, 419 U.S. at 508 (upholding longer tenure prior to mandatory discharge for female line officers in the Navy because they "had less opportunity for promotion than did their male counterparts"), *with Hogan*, 458 U.S.at 729–30 (holding a nursing school's policy of admitting only women unconstitutional because the school "made no showing that women lacked opportunities to obtain training in the field of nursing or to attain positions of leadership in that field") *and Weinberger*, 420 U.S. at 648–48 (striking down a provision of the Social Security Act that provided benefits to a widow with minor children but not a widower with minor children because it was based upon stereotypes related to work and childcare rather than a legitimate attempt to compensate women for economic difficulties).

As with the strict-scrutiny analysis above, Congress had before it evidence showing that woman-owned businesses suffered historical discrimination that exposed them to greater risks from an economic shock like COVID-19, and that they received less benefit from earlier federal COVID-19 relief programs. *See, e.g.*, *Long-Lasting Solutions for a Small Business Recovery: Hearing Before the Committee on Small Business*, at 55 (July 15, 2020), available at https://www.congress.gov/116/chrg/CHRG-116hhrg41297/CHRG-116hhrg41297.pdf (academic study noting that "female-owned companies are less likely to receive private investment"); *Supporting Small and Minority-Owned Businesses Through the Pandemic*, at 35 (Feb. 4, 2021), available at https://www.congress.gov/117/chrg/CHRG-117hhrg43965/CHRG-117hhrg43965.pdf (prepared statement of Nneka Brown-Massey noting survey results showing that "[w]omen-owned businesses had to wait longer, and in some cases were 10 times less likely to hear in a couple days from their lenders compared to their male counterparts" when seeking

relief from earlier federal COVID-19 relief programs); *id.* (noting that women were "twice as likely . . . to not receive what they applied for" relative to male applicants, meaning they were forced to reduce pay and make other financial sacrifices at a higher rate). Accordingly, Defendant has identified an important governmental interest in protecting women-owned businesses from the disproportionately adverse effects of the pandemic and failure of earlier federal relief programs. The Court therefore cannot conclude that Plaintiffs are likely to succeed on their gender-based equal-protection challenge in this respect.

b.  Substantial Relation

To be constitutional, the particular measure including a gender distinction must also be substantially related to the important interest it purports to advance. "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Hogan*, 458 U.S. at 726. For example, the Supreme Court held that the Social Security policy of benefitting widows with young children but not widowers with young children was not substantially related to compensating women for economic difficulties because the policy did not award benefits to widows without minor children until they reached the age of 60 or suffered a disability. *Weinberger*, 420 U.S. at 651–52. Similarly, in *Hogan*, the Supreme Court held that a nursing school's female-only admissions policy was not substantially related to the goal of "compensate[ing] for discrimination against women" because it was rooted in outdated gender stereotypes rather than empirical data about access to training. 458 U.S. at 727–30 ("Rather than compensate for discriminatory barriers faced by women, MUW's policy of excluding males from admission to

Case 3:21-cv-00176-TRM-DCP   Document 24   Filed 05/19/21   Page 27 of 30   PageID #: 211

the School of Nursing tends to perpetuate the stereotyped view of nursing as an exclusively woman's job.").

By contrast, the statute allowing female naval line officers longer tenures before mandatory discharge was substantially related to the interest in providing female officers with "fair and equitable career advancement programs," because the statute only applied to certain groups officers in which men and women were not similarly situated with respect to opportunities for promotion. *Schlesinger*, 419 U.S. at 508–09 ("The complete rationality of this legislative classification is underscored by the fact that in corps where male and female lieutenants are similarly situated, Congress has not differentiated between them with respect to tenure.")

Here, as above, § 5003 of the ARPA is a one-time grant program with a finite amount of money that prioritizes small restaurants owned by veterans, women, and socially and economically disadvantaged individuals because Congress had evidence before it showing that those businesses were disproportionately exposed to harm from the COVID-19 pandemic and inadequately protected by earlier COVID-19 financial relief programs. The prioritization of women-owned businesses under § 5003 is substantially related to the problem Congress sought to remedy because it is directly aimed at ameliorating the funding gap between women-owned and man-owned businesses that has caused the former to suffer from the COVID-19 pandemic at disproportionately higher rates. Accordingly, on the record before it, the Court cannot conclude that Plaintiffs are likely to succeed on the merits of their gender-based equal-protection claim.

### B. Irreparable Harm

"[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."

*Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  However, the Court has not concluded that Plaintiffs' constitutional rights are likely being violated.  Accordingly, Plaintiffs are likely not suffering any legally impermissible irreparable harm.

### C.  Harm to Others

Were the Court to enjoin distributions under § 5003 of the ARPA, others would certainly suffer harm, as these COVID-19 relief grants—which are intended to benefit businesses that have suffered disproportionate harm—would be even further delayed.

### D.  Public Interest

In the constitutional context, whether an injunction serves the public interest is inextricably intertwined with whether the plaintiff has shown a likelihood of success on the merits.  *Cf. Liberty Coins*, 748 F.3d at 690 ("[T]he determination of where the public interest lies [ ] is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks and citation omitted)).  Plaintiff has not demonstrated a likelihood of success on the merits.  The Court therefore cannot conclude that the public interest would be served by enjoining disbursement of funds under § 5003 of the ARPA.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiffs' motion for temporary restraining order (Doc. 12) is **DENIED**.  Plaintiffs are **ORDERED** to inform the Court on or before **May 21, 2021**, whether they wish to persist in their motion for a preliminary injunction (Doc. 11).  If so, the Court will likely order expedited briefing and another hearing.

29

**SO ORDERED**.

/s/ *Travis R. McDonough*

**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**