UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| ANTONIO VITOLO and JAKE'S BAR AND GRILL, LLC, <br><br>*Plaintiffs*, <br>v. <br><br>ISABELLA CASILLAS GUZMAN, <br><br>*Defendant*. | Case No. 3:21-cv-176-TRM-DCP <br><br>Chief Judge Travis R. McDonough <br><br>Magistrate Judge Debra C. Poplin |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Section 5003 of the American Rescue Plan Act ("ARPA") created the Restaurant Revitalization Fund ("RRF") to provide much-needed aid to one of the hardest-hit industries struggling with the public health and economic crises stemming from the COVID-19 pandemic. In enacting Section 5003, Congress provided for a twenty-one day "priority period," during which the Small Business Administration ("SBA") would prioritize applications from businesses owned or controlled by women, veterans, and socially and economically disadvantaged individuals. Plaintiffs seek to enjoin the SBA from implementing that priority period because it offers applicants priority based on gender and (in some, but not all cases) race. But not all race- and gender-conscious programs are inherently unconstitutional. Rather, race-conscious programs must serve a compelling government interest and be narrowly-tailored to further that interest, and gender-conscious programs must further an important government interest by means substantially related to that interest. As this Court already determined in denying Plaintiffs' motion for a temporary restraining order, the RRF priority period meets those standards. *See* Mem. Op. at 20-21, 28, ECF No. 24. Plaintiffs have not advanced any new information that would call this conclusion into question, and therefore the Court should also deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

The facts underlying this action are set out in detail in Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order, and in this Court's opinion denying Plaintiffs' motion. *See* Defs.' Opp. to Pls.' Mot. for Temporary Restraining Order at 2-8 ("Defs.' Opp."), ECF No. 18; Mem. Op. at 1-7.

On May 20, 2021, this Court issued a text order directing Defendant to respond to Plaintiffs' motion for preliminary injunction by May 21, 2021. *See* Text Order, ECF No. 29. Plaintiffs filed only one brief in support of both their motion for a temporary restraining order and their motion for a preliminary injunction. *See* Pls.' Mem. in Support of Mot. for Temporary Restraining Order and Preliminary Injunction ("Pls.' Mem.", ECF No. 12-2). Defendant filed an opposition to Plaintiffs' motion for a temporary restraining order and requested that "in the event the Court grant[ed] the TRO," Defendant be allowed an opportunity to submit supplemental briefing in response to the motion for a preliminary injunction. Defs.' Opp. at 8 n.4.

Because Plaintiffs have not yet responded to Defendant's opposition or this Court's opinion denying the temporary restraining order, much of Defendant's prior briefing remains relevant and responsive to Plaintiffs' motion. Thus, Defendant continues to stand on its initial briefing before this Court, which demonstrates that Plaintiffs are unlikely to succeed on the merits of their claim, and thus not entitled to injunctive relief. *See generally* Defs.' Opp.; *see also* Mem. Op. at 20-21, 28. In this supplemental brief, Defendant primarily responds to issues raised in the TRO hearing, in the Court's opinion, and in Plaintiffs' post-hearing filings.[1] Defendant also addresses standing and the scope of the relief requested at the preliminary injunction stage.

---

[1] Defendant recognizes that because of the expedited schedule in this case, Plaintiffs have not yet had the opportunity to respond in writing to the arguments raised in Defendant's brief or to this Court's opinion denying the TRO motion. Plaintiffs have requested that the Court provide "a short period for Plaintiffs to file a reply" in support of their motion for a preliminary injunction. *See* Pls.' Response Regarding Pending Preliminary Injunction Mot. at 1 ("Pls.' Response"), ECF No. 28. Defendant respectfully requests that, to the extent Plaintiffs are permitted to file a reply, and to the extent that reply raises new arguments beyond those included in its initial brief, Defendant be permitted to respond to those arguments in a short supplemental brief.

## LEGAL STANDARD

In determining whether to grant a preliminary injunction, the court considers "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012)). A preliminary injunction is an "extraordinary and drastic" remedy, "never awarded as of right." *Id.* (quoting *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 453 (6th Cir. 2014)). Accordingly, "[t]he party seeking a preliminary injunction bears the burden of justifying such relief." *Id.* (quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)).

## ARGUMENT

### I. Plaintiffs Have Not Shown That They Are Likely To Succeed On The Merits Of Their Claim.

In order to prevail on a motion for preliminary injunction, Plaintiffs must demonstrate that they are likely to succeed on the merits of their claim. Plaintiffs have not made that showing here. As an initial matter, Plaintiffs lack standing to challenge the race-conscious presumption regarding "socially and economically disadvantaged" individuals because Plaintiffs acknowledge that Vitolo is not socially disadvantaged even under the race-neutral statutory definition of that term. *See* Mem. Op. at 6 n.1. Further, in denying Plaintiffs' motion for a temporary restraining order, this Court determined that Plaintiffs had not demonstrated a likelihood of success on the merits of their equal-protection claims, and thus that injunctive relief was not appropriate. *See* Mem. Op. at 29. Nothing

---

Plaintiffs also requested that this Court "rule on the preliminary injunction motion on the merits, without another hearing." *See* Pls.' Response at 1. Defendant takes no position on whether a hearing is necessary, and Defendant stands ready to participate in a hearing to the extent it would be beneficial to the Court. However, Defendant believes that an opportunity to respond to any reply brief would be particularly beneficial in the event that the Court declines to hold a hearing because otherwise Defendant will not have any opportunity to respond to new arguments that might be raised in Plaintiffs' brief.

has changed since the Court entered its order that would disturb that conclusion. Accordingly, Plaintiffs have not shown that they are likely to succeed on the merits of their claim.

### A. Plaintiffs Lack Standing to Challenge Section 5003's Prioritization of "Socially and Economically Disadvantaged" Individuals.

Whether plaintiffs have standing to sue is a threshold jurisdictional question. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101 (1998); *Mason v. Adams Cnty. Recorder*, 901 F.3d 753, 756 (6th Cir. 2018). Article III, Section 2 of the Constitution limits federal judicial power to cases and controversies. *See Steel Co.*, 523 U.S. at 102. The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). Strict enforcement of standing requirements is particularly important where, as here, a court is asked to rule on the constitutionality of action by the executive and legislative branches. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473-74 (1982).

It is well-settled that the "irreducible constitutional minimum of standing" contains three requirements: (1) the plaintiff must have suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan,* 504 U.S. at 560). The plaintiff bears the burden of establishing these elements. *Spokeo*, 136 S. Ct. at 1547. At the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element. *Id.* at 1547.

Plaintiff Vitolo asserts he is injured because his application cannot be processed during the priority period required by Section 5003. But Plaintiff fails to allege that his injury is traceable to the race-conscious presumption in the SBA regulations or that elimination of the presumption would redress his injuries. That is because, regardless of the race-conscious presumption at issue in this case, Plaintiff has not alleged that he is otherwise socially disadvantaged. And as this Court explained in its recent opinion, "[e]ven if the regulatory presumption were removed, Vitolo apparently has no argument that he is entitled to priority consideration under the plain text of" Section 5003. Mem. Op. at 6 n.1.

4
Case 3:21-cv-00176-TRM-DCP   Document 30   Filed 05/21/21   Page 4 of 15   PageID #: 229

The Sixth Circuit, and numerous other circuits, have held that discrimination cannot be the cause of injury to a plaintiff who would not have obtained the desired benefit even in the absence of discrimination. *See Stefanovic v. Univ. of Tenn.*, 173 F.3d 856, 1999 WL 196570, at *4 (6th Cir. 1999) (affirming dismissal of equal protection claim for lack of standing where the plaintiff failed to demonstrate a direct relationship between the existence of a gender-conscious program and the decision not to hire him because the university had separate, nondiscriminatory reasons for not hiring him); *see also Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590 (10th Cir. 1996) (plaintiffs lacked standing to challenge rental of gender-segregated student apartments because as non-students they would not have qualified to rent the student apartments even absent the alleged discrimination); *Donaghy v. City of Omaha*, 933 F.2d 1448, 1455 (8th Cir. 1991) (white applicant for promotion to police lieutenant had standing to challenge promotion of minority officers out of rank only after he would have ranked high enough to be considered for promotion if strict rank order had been followed); *Doherty v. Rutgers Sch. of Law-Newark*, 651 F.2d 893, 899-902 (3d Cir. 1981) (unsuccessful white applicant for admission to law school lacked standing to challenge minority admissions program because he was not qualified for admission even in the absence of the minority admissions program). In those circumstances, "[t]he discrimination does not deprive the person of the ability to compete because he or she is disqualified from competing for other, legitimate reasons." *Wilson*, 98 F.3d at 593. And "[a] favorable decision on the discrimination claim could not redress the injury because the person would still be disqualified from competing." *Id.*

Plaintiff Vitolo alleges that he is "not a member of any racial or ethnic groups identified in 13 C.F.R. § 124.103 or any other group identified by Defendant as [presumptively] 'socially disadvantaged' or 'economically disadvantaged.'" Compl. ¶ 17. Plaintiff Vitolo does not allege that he is otherwise socially disadvantaged as defined by the statute. Thus, Plaintiff fails to allege, much less establish, that, even in the absence of the race-based presumption, he qualifies as a "socially disadvantaged" individual. Plaintiff therefore lacks standing to challenge the race-based presumption. Plaintiff likewise fails to establish that his alleged injury would be redressed by the relief he seeks. While Plaintiff seeks an order requiring SBA to "process applications for grants from the Restaurant

5

Revitalization Fund in the order that they were received, without regard to the race or gender of the applicant," Pls.' Mot., ECF No. 11, he fails to establish that he would qualify for prioritization even in the absence of a racially-conscious presumption (and thus even if applications were processed "without regard to the race . . . of the applicant").

Accordingly, Plaintiffs have not established standing for purposes of their race-based equal-protection claim, and thus are unlikely to succeed on the merits of that claim.

**B. The Priority Period for Businesses Owned by "Socially and Economically Disadvantaged" Individuals Is Constitutional.**

Plaintiffs contend that Section 5003 is unconstitutional because the definition of "socially disadvantaged individual" used by the SBA in administering the Restaurant Revitalization Fund includes a race-conscious presumption, but "[w]hen race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). Here, the Court has already found that the government has advanced a compelling government interest and shown a strong basis in evidence supporting its conclusion that race-conscious remedial action was necessary. Mem. Op. at 19-20. And to date, Plaintiff has not offered any rebuttal of this initial showing of a compelling interest. *Id.* at 20.

    **1. As this court has already recognized, the priority period advances a compelling governmental interest and there is a strong basis in evidence supporting the conclusion that remedial action was necessary.**

Plaintiffs' primary argument is that the priority period cannot be justified by reference to systemic or societal discrimination. *See* Pls.' Mem. at 13; *see also* Pls.' Emergency Mot. for an Injunction Pending Appeal at 3, ECF No. 23 ("Pls.' Emergency Mot."). But, as this Court recently found, Congress did not rely solely on allegations of broad societal or structural racism in enacting Section 5003. Rather, it relied on specific evidence that (1) "small businesses owned by minorities (including restaurants, which have a disproportionately high rate of minority ownership) have suffered more severely than other kinds of businesses during the COVID-19 pandemic," and (2) "that the Government's early attempts at general economic stimulus—*i.e.*, the Paycheck Protection Program

("PPP")—disproportionately failed to help those businesses directly because of historical discrimination patterns." Mem. Op. at 14-15. Upon consideration of that evidence, Congress determined that it could not be a "passive participant" in the lending industry's discriminatory practices or otherwise allow public funding to "'serve to finance the evil of private prejudice.'" *Associated Gen. Contractors of Ohio, Inc. v. Drabnik*, 214 F.3d 730, 735 (6th Cir. 2000) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 486-92 (1989)).

As this Court recognized in denying Plaintiffs' request for a temporary restraining order, Defendant has already provided ample evidence to support its "compelling interest in remediating the present effects of historical discrimination on these minority-owned businesses, especially to the extent that the PPP disproportionately failed those businesses because of factors clearly related to that history." Mem. Op. at 20; *see* Defs.' Opp. at 13-17 (discussing evidence before Congress).

And there is even more evidence that demonstrates that throughout 2020 and into 2021, Congress was preoccupied with understanding and resolving this lack of access to PPP loans. For example, on July 9, 2020, the House Committee on Financial Services' Subcommittee on Diversity and Inclusion held a hearing addressing challenges faced by women and minority-owned businesses in attempting to access capital and financial services during the pandemic. *See Access Denied: Challenges for Women- and Minority-Owned Businesses Accessing Capital and Financial Services During the Pandemic: Virtual Hearing Before the H. Subcomm. on Diversity & Inclusion of the Comm. on Fin. Servs.*, 116th Cong. (2020) ("Access Denied Hearing"). The subcommittee's chairwoman, Representative Joyce Beatty, opened the hearing by addressing the struggles that women- and minority-owned businesses face during the pandemic, and she expressly called out an analysis that found that "only 1 in 10 African-American and Latinx-owned businesses received the requested funds" through the first round of PPP funding. *See id.* at 2. At the same hearing, the President and CEO of the U.S. Black Chambers, Incorporated, testified that SBA and Treasury records showed that of more than 650,000 PPP loans of amounts above $150,000, only 143 loans went to Black-owned businesses. *Id.* at 6 (statement of Ron Busby, Sr., Pres. & CEO, U.S. Black Chambers, Inc.). He further testified that 90 percent of his organization's members "reported that they have found far less of what they asked for, or none at all." *Id.* Another

witness testified that "[w]hile the bipartisan CARES Act got money out the door quickly and helped many small businesses, the distribution channels of the first tranche of the funding underscored how the traditional financial system leaves many small businesses behind, particularly women- and minority-owned businesses." *Id.* at 9 (statement of Karen Kerrigan, Pres. & CEO, SBE Council).

After listening to witness testimony, one Congressman remarked that the hearing had "shined a light on" something the committee already knew, "which is that the PPP program is not perfect" and "it just didn't hit our minority communities in a way that maybe we would want." *Id.* at 22 (question from Rep. Gonzalez). Thus, he explained that as Congress goes forward, "retooling it or having a different program probably makes the most sense frankly." *Id.* Another representative explained that "[w]hile this crisis is unprecedented, the disparities revealed in our economic system and subsequent Federal response are unfortunately very familiar," by which she meant that "Black Americans have historically been locked out of large-scale government intervention and investment" and that Congress "must not repeat exclusionary policies of past Federal responses." *Id.* at 26 (question from Rep. Pressley). She also noted that "[f]rom the onset, experts estimated that up to 95 percent of Black women business owners would be left out of the [PPP]." *Id.* at 27.

Congress also heard testimony that these disparities in access to capital and credit are due not just to system or societal discrimination, but discrimination in the lending industry. For example, in the July 9, 2020 hearing, one witness testified that "closed financial networks" and "longstanding institutional biases . . . work against the efforts of women and minority entrepreneurs who need capital to start up, operate, and grow their businesses." Access Denied Hearing at 9 (statement of Karen Kerrigan, Pres. & CEO, SBE Council). Her written statement further explained that "[m]inority and women-owned business owners who lack relationships with banks or other financial institutions participating in PPP lacked early access to the program." *Id.* at 78. On February 24, 2021, the House Committee on Financial Services' Subcommittee on Oversight and Investigation held a hearing entitled "How Invidious Discrimination Hurts: An Examination of Lending Discrimination and Its Long-Term Economic Impacts on Borrowers of Color," which focused on "examin[ing] invidious discrimination, its modern manifestations, and its lasting intergenerational effects." Memo. from Fin.

Servs. Comm. Majority Staff to Members, Comm. on Fin. Servs. (Feb. 19, 2021), https://www.congress.gov/117/meeting/house/111236/documents/HHRG-117-BA09-20210224-SD002-U1.pdf. Witnesses at the hearing were tasked with "address[ing] barriers to asset building, including current and previous public policies and implicit and explicit discrimination." *Id.* That hearing included testimony from an analyst at the Congressional Research Service, who identified "[r]acial, ethic, or other disparities" in access to financial services and stated that "[o]ne factor influencing these disparities is likely the intergenerational effects of discrimination." Cheryl Cooper, *How Invidious Discrimination Works and Hurts: An Examination of Lending Discrimination and Its Long-Term Economic Impacts on Borrowers of Color*, Cong. Res. Serv. (Feb 24, 2021), https://www.congress.gov/117/meeting/house/111236/witnesses/HHRG-117-BA09-Wstate-CooperC-20210224.pdf; *see also id.* at 3 (noting that "discrimination, such as violations in fair lending laws, can also prevent consumers from accessing financial services").

Again, this testimony supports the conclusion that many socially and economically disadvantaged individuals lack ongoing relationships with banks and financial services because of racial and ethnic discrimination—and, as explained above, that lack of relationships led to their being shut out of early rounds of COVID relief.

### 2. To date, Plaintiffs have made no effort to rebut Defendant's initial showing of a compelling interest.

Once the government makes an initial showing of compelling interest, the burden shifts to the plaintiff to present "credible, particularized evidence" to rebut the government's "initial showing of a compelling interest." *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003)); *see also Aiken v. City of Memphis*, 37 F.3d 1155, 1163 (6th Cir. 1994) (relying on statistical evidence of disparities to infer discrimination and thus compelling interest where "plaintiffs have not offered any evidence to rebut the inference of discrimination that arises from the[] statistics"). Plaintiffs have presented no such evidence. At the TRO hearing, when asked directly about the government's evidence that minority- and women-owned businesses were unable to access PPP funds because of the present effects of historical discrimination in the lending industry, Plaintiffs resorted to their same

9

arguments that mere disparities in outcome and allegations of societal discrimination could not support a race-conscious program.[2] *See also* Pls.' Emergency Mot. at 2-3 (raising these same arguments). But as this Court has already recognized, it is simply untrue that the government is relying solely on disparate impact—rather, the record demonstrates that "Congress . . . heard evidence that racial bias plays a direct role in these disparities." Mem. Op. at 19. And, as explained above, Congress sought to remedy more than just societal discrimination; instead, it sought to remedy the specific legacy of historical discrimination in the financial services industry that prevented prior federal COVID relief efforts from reaching the particular types of small business owners targeted by the priority period for the Restaurant Revitalization Fund. Because Plaintiffs have not put forth any credible, particularized evidence to rebut the government's showing of a compelling interest, they have not demonstrated a likelihood of success on the merits, and their motion for preliminary injunction should be denied.

### 3. As this Court has already recognized, the priority period is narrowly tailored to achieve this compelling government interest.

"When race-based action is necessary to further a compelling governmental interest," as it is here, "such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). In this case, Defendant has demonstrated that "the means chosen to accomplish the [government's] asserted purpose"—namely, the inclusion of a priority period for socially and economically disadvantaged individuals—is "specifically and narrowly framed to accomplish that purpose." *Id.* at 333. As this Court found in denying the TRO motion, the priority period at issue in this case meets that criteria. *See* Mem. Op. at 20-23 (discussing narrow tailoring).

At the TRO hearing and in a subsequent motion before this Court, Plaintiffs argued that the priority period is not narrowly tailored because the government failed to consider race-neutral

---

[2] At the TRO hearing, Plaintiffs' counsel also argued that the government's evidence was too general and that the government failed to consider race-neutral alternatives, but those arguments go to narrow tailoring rather than the existence of a compelling government interest. *See* pages 10-12 (discussing narrow tailoring).

10

Case 3:21-cv-00176-TRM-DCP   Document 30   Filed 05/21/21   Page 10 of 15   PageID #: 235

alternatives. Pls.' Emergency Mot. at 3. In particular, Plaintiffs questioned why the government did not instead create a priority "for those who had not participated in earlier relief programs or who are in a weaker financial position" rather than a priority for socially and economically disadvantaged individuals. *Id.* But simply proposing certain race-neutral alternatives does not demonstrate that a race-conscious scheme is not narrowly tailored. The Supreme Court is clear that "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," but only "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339. In this case, the government not only *considered* race-neutral alternatives—it actually implemented them. And it was precisely the gaps left by those race-neutral programs that led the government to conclude that a priority period was necessary. *See* Mem. Op. at 22. Moreover, Section 5003 does contain limitations based on prior access to federal relief—it provides that "the pandemic-related revenue losses for an eligible entity" (*i.e.*, the grant amount that the entity may claim from the RRF) "shall be reduced by any amounts received from" the Paycheck Protection Program in 2020 or 2021. American Rescue Plan Act § 5003(a)(7), Pub. L. No. 117-2 (2021) ("ARPA"); *see also Cross-program eligibility on SBA COVID-19 relief options*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/covid-19-relief-options/cross-program-eligibility-sba-covid-19-relief-options. And Section 5003 expressly excludes any business that "has a pending application for or has received a grant under section 324 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act," which provided grants for "shuttered venue operators." ARPA § 5003(a)(4)(C)(III). These requirements do not go to priority, but rather to overall eligibility and the extent of aid available. They ensure that small businesses that were able to access prior COVID relief do not receive a windfall, regardless of whether they are owned by socially and economically disadvantaged individuals.

As the Court explained, the priority period is "time-limited, fund-limited, not absolutely constrained by race during the priority period, and not absolutely constrained to the priority period." Mem. Op. at 21; *see also* Defs.' Opp. at 17-21 (explaining how priority period is narrowly tailored to achieve compelling interest). It is neither overinclusive nor underinclusive (Mem. Op. at 22-23), and Plaintiffs' arguments to the contrary rest on a misunderstanding of the race-conscious *presumption* that

certain individuals are socially and economically disadvantaged. "[T]he race-based presumption is just that: a presumption," and individuals who are socially and economically disadvantaged for reasons other than their racial identity are still included in the priority period. Mem. Op. at 22.

### C. The Priority Period for Women-Owned Businesses Is Constitutional.

Plaintiffs also argue that Section 5003 is unconstitutional because it includes a priority period for women-owned businesses. *See* Pls.' Mem. at 11. But of course, the mere fact that a statute takes gender into account does not render it unconstitutional. Rather, such classifications are permissible insofar as they "serve an important governmental objective" and are "substantially related to the achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976). As this Court has already recognized in denying the TRO, Section 5003 meets this standard.

#### 1. As this Court has already recognized, the priority period for women-owned businesses serves an important governmental objective.

It is well-established that "[r]eduction of the disparity in economic condition between men and women caused by the long history of discrimination against women" can serve as an important governmental interest. *Califano v. Webster*, 430 U.S. 313, 317 (1977). Plaintiffs have taken the position that a mere disparity in economic condition or access to funding is insufficient to establish an important governmental interest. But that is not all that exists here. Rather, the Court has already found that "Congress had before it evidence showing that women-owned businesses suffered historical discrimination that exposed them to greater risks from an economic shock like COVID-19, and that they received less benefit from earlier COVID-19 relief programs" and thus concluded that there is "an important governmental interest in protecting women-owned businesses from the disproportionately adverse effects of the pandemic and failure of earlier federal relief programs." Mem. Op. at 26-27. Again, Plaintiffs have offered nothing to rebut that conclusion, and the Court's analysis should stand.

#### 2. The priority period is substantially related to the achievement of that objective.

Because prioritizing women-owned businesses serves an important governmental interest, it is constitutional so long as it is substantially related to the achievement of that objective. Plaintiffs

offer no real argument on this point. First, they contend that "Defendant cannot successfully argue that a neutral process would somehow disadvantage women," Pls.' Mem. at 14, but there is indeed evidence that in the past, neutral processes *have* disadvantaged women. *See* Mem. Op. at 26-28. Next, they argue that the government cannot show that "a targeted 21-day 'priority period' is *the only way* to level the playing field." Pls.' Mem at 14 (emphasis added). But there is no requirement that a gender-based classification be "the only way" to achieve the government's interest. Indeed, that is not even the standard for racial classifications subject to strict scrutiny. *See Grutter*, 539 U.S. at 339 (explaining that narrow tailoring under strict scrutiny "does not require exhaustion of every conceivable race-neutral alternative"). Plaintiffs offer no authority for their claim that such a requirement exists under intermediate scrutiny.

This Court is correct that "[t]he prioritization of women-owned businesses under § 5003 is substantially related to the problem Congress sought to remedy because it is directly aimed at ameliorating the funding gap between women-owned and man-owned businesses that has caused the former to suffer from the COVID-19 pandemic at disproportionately higher rates." Mem. Op. at 28. As such, Plaintiffs are not likely to succeed on the merits of their claim and the preliminary injunction should be denied.

## II. The Remaining Preliminary Injunction Factors Weigh Against A Preliminary Injunction.

Both parties agree that "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). If there is no constitutional violation, then there is no legally impermissible harm to the plaintiffs, third parties, or the public interest. *See* Mem. Op. at 28-29. That is exactly the case here. *Id.* Because Plaintiffs have not demonstrated that their constitutional rights are being violated, they have not shown that an injunction is needed to halt that violation. *Cf. Obama for Am.*, 697 F.3d at 436 ("When constitutional rights are threatened or impaired, irreparable injury is presumed"); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 274 F.3d 377, 400 (6th Cir. 2001) ("[I]t

13

is always in the public interest to prevent violation of a party's constitutional rights."). To hold otherwise would be to allow a plaintiff to obtain a preliminary injunction merely by alleging a constitutional violation, regardless of the strength of those allegations.

And the stakes here are high. The Restaurant Revitalization Fund is aimed at providing grants to some of the hardest-hit members of a struggling industry in the midst of an ongoing public health and economic crisis. *See, e.g.*, H.R. Rep. No. 117-7, at 2 (2021) (explaining that "eight out of ten minority-owned businesses are on the brink of closure"); *id.* at 457 (discussing struggles faced by small businesses, including restaurants). Plaintiffs insist that under their proposed injunction, "no one will be injured" because "all applicants, regardless of race and gender, will be treated equally." Pls.' Mem. at 20. But that argument presupposes that the priority period is unconstitutional. *Id.* Because the priority period is constitutional, Plaintiffs' proposed injunction would eliminate the priority period aimed at remedying the disparities created by prior race-neutral COVID relief programs—thus perpetuating the very problems that the priority period seeks to solve.

## III. Any Injunctive Relief Should Be Tailored To The Injury Plaintiffs Have Alleged.

For the foregoing reasons (as well as those set out in Defendant's prior briefing), the Court should not grant a preliminary injunction in this case. But even if the Court were inclined to grant a preliminary injunction, it should not grant the broad relief requested by Plaintiffs. Article III requires that injunctive relief "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Equitable principles likewise require that an injunction be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Whole Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The injunctive relief that plaintiffs seek flouts these principles. Plaintiffs ask for a preliminary injunction "requiring Defendant to process applications for grants from the Restaurant Revitalization Fund in the order they were received, without regard to the race of gender of the applicant," Pls.' Mot. for Preliminary Injunction, ECF No. 11; Pls.' Mem. at 21, but that remedy bears no relation to the injuries plaintiffs claim. Plaintiffs allege harm from the possibility that they will not be able to obtain the RRF grant money they requested

because the funds might run out before the SBA processes their application. That harm could be fully addressed without depriving other restauranteurs of critically-needed funds by requiring SBA to set aside the amount that plaintiffs requested ($104,590.20), and to hold those funds until the termination of this litigation.

Plaintiffs give no indication why broader relief is necessary, and the Court should deny their request for overbroad injunctive relief, and indeed any injunctive relief whatsoever.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be denied.

Dated: May 21, 2021

                                                        Respectfully submitted,

                                                       BRIAN M. BOYNTON
                                                       Acting Assistant Attorney General
                                                       Civil Division

                                                       LESLEY FARBY
                                                       Assistant Branch Director

                                                       *s/ Alexandra R. Saslaw*
                                                       ALEXANDRA R. SASLAW
                                                       Trial Attorney
                                                       United States Department of Justice
                                                       Civil Division, Federal Programs Branch
                                                       P.O. Box 883
                                                       Washington, DC 20044
                                                       Phone: (202) 514-4520
                                                       alexandra.r.saslaw@usdoj.gov

                                                       *Attorneys for Defendants*