IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

JAKE'S BAR AND GRILL, LLC, and
ANTONIO VITOLO,

        Plaintiffs,

    v.                        Case No: 3:21cv176-TRM-DCP

ISABELLA CASILLAS GUZMAN,

        Defendant.

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

The United States Supreme Court has established three guidelines for the assessment of government actions based on race.

First, the Court has made clear that **remedying societal discrimination does not justify race-conscious government action**. *See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731 (2007) ("The sweep of the mandate claimed by the district is contrary to our rulings that remedying past societal discrimination does not justify race-conscious government action."); *Shaw v. Hunt*, 517 U. S. 899, 909–910 (1996) ("[A]n effort to alleviate the effects of societal discrimination is not a compelling interest"); *City of Richmond v. J.A. Croson Co.* 488 U.S. 469, 498–99 (1989); *Wygant v. Jackson Board of Education*, 476 U. S. 267, 276 (1986) (plurality opinion); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 310 (1978).

Second, the Court has made clear that **achieving racial balance in the allocation of government benefits by eliminating racial disparities is not a compelling interest**. *Parents Involved*, 551 U.S. at 723; *Croson*, 488 U.S. at 495 (plurality opinion of O'Connor, J.).

Third, while the elimination of certain types of discrimination may be compelling, the government must point to "identified discrimination" "with some specificity" and "with a strong basis in evidence." *Shaw,* 517 U. S. at 909–10 (citation omitted). In other words, a "**generalized assertion of past discrimination in a particular industry or region is not adequate because it provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy**." *Id*. at 910.

Defendant's evidence supporting the racial classification at issue here runs afoul of these guidelines. This evidence is either (1) allegations of historical societal discrimination; (2) current statistical disparities based on race and gender; or (3) generalized claims of "discrimination" or "bias" within the lending industry. No court has upheld such broad and generalized claims as sufficient to support race or gender preferences, and no court has found that such non-specific and unfocused evidence would allow a legislature to determine how much and what kind of preference would be appropriate. In short, these justifications cannot survive any form of judicial scrutiny. Defendant can point to no program as extensive as this one upheld on evidence like that offered here.

2

Now, Defendant claims for the first time that Plaintiffs lack standing. But as explained more thoroughly below, the Supreme Court has repeatedly found standing where a governmental benefit places an applicant on unequal footing based on race or gender. Unequal footing is exactly what is going on here: if Antonio Vitolo was black or a woman, for example, then he would have been eligible for an automatic preference allowing him to receive a grant of more than $104,000. Yet because he is not, he does not get the benefit. This is plainly a constitutional harm capable of redress by this Court.

As a final matter, Defendant asks this Court to issue an injunction only applying to Plaintiffs. But as shown below, such a move would unnecessarily waste judicial resources, cause future emergency motions, waste precious time, and likely cause irreparable harm. What's more, the Sixth Circuit has already endorsed preliminary injunctions that provide relief to non-plaintiffs.

Given the clear nature of this equal-protection violation, and the rapid depletion of the Restaurant Revitalization Fund (RRF), Plaintiffs respectfully requests that this motion be granted immediately without a further hearing. If the Court is not inclined to grant this motion, then Plaintiffs respectfully request the Court to act with all haste, so that its order could be immediately appealed and consolidated with the pending appeal already at the Sixth Circuit.

## ARGUMENT

## I.     Plaintiffs Have Standing

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). A plaintiff seeking to invoke a federal court's jurisdiction must demonstrate three things to establish standing under Article III. First, he must show that he has suffered an "injury-in-fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, the plaintiff must show a causal connection between the asserted injury-in-fact and the challenged action of the defendant. *Id*. Third, the plaintiff must show that it is likely rather than speculative that "the injury will be redressed by a favorable decision." *Id*. at 561 (citations omitted).

Here, Plaintiffs have suffered an injury-in-fact caused by the race and gender preferences in Section 5003 of the American Rescue Plan Act of 2021 (ARPA). A favorable decision by this Court would fully redress this injury.

According to the undisputed evidence (Doc. 12-2:6), Plaintiffs applied on May 3rd for a grant from the RRF. Plaintiffs' application was designated "non-priority" because Vitolo is not a woman, a veteran, or socially and economically disadvantaged (on account of his race). Plaintiffs, therefore, are ineligible for the race-based and gender-based priority period, which, given the first-come, first-serve structure of the program and limited funds, amounts to a *de facto* denial of a government benefit.

4

Defendant now argues that Plaintiffs do not have standing because Vitolo is not socially disadvantaged, so even if the race-based presumption were eliminated, he still would not be entitled to priority consideration. But even if there was some way for a white male to convince Small Business Administration (SBA) that he is "social disadvantaged," the racial preference would remain. SBA *has* created an explicit presumption that advantages some racial groups and not others. If Vitolo was a Black American (or any of the other races listed in SBA's regulation), then he would be "socially and economically disadvantaged" automatically under the law and receive the race-based preference. But he is not, so he is ineligible for the race-based preference and a grant from the RRF (since the fund will run out of money paying out applications submitted by women and certain minorities).

Eliminating that preference would redress Plaintiffs' race-based injury because eliminating it would reduce the number of other applicants who received priority treatment, moving Plaintiffs up in the first-come, first-serve queue, even if they would not qualify, giving them a better (and equal) shot at recovering from the limited fund. This is a concrete harm arising under the equal-protection doctrine. *See, e.g., Fisher v. Univ. of Texas at Austin,* 570 U.S. 297, 307 (2013); *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003). "Of course, a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered. The relevant injury in such cases is 'the inability

5

to compete on an equal footing.'" *Texas v. Lesage*, 528 U.S. 18, 21 (1999). As re-stated by the Sixth Circuit, if Plaintiffs "allege some kind of on-going constitutional violation and seek forward-looking relief to level the playing field, then the plaintiffs need only show that the racial preference hinders their ability to 'compete on an equal footing.'" *Aiken v. Hackett*, 281 F.3d 516, 519 (6th Cir. 2002). Critically, the Sixth Circuit explained that the fact that "plaintiffs would not have received the benefit even absent the preference is irrelevant to an Equal Protection analysis." *Id*. Thus, Defendants' argument—that Plaintiffs would not be socially disadvantaged even without the preference—is "irrelevant" according to the Sixth Circuit.

In addition, Plaintiffs challenge not just SBA's regulation (which explicitly names certain racial groups and creates a presumption applicable to them), *but also* ARPA's priority for "socially disadvantaged" individuals, which is defined in such a way that it grants a preference based on race. ARPA § 5003(c)(3)(A) (incorporating 15 U.S.C. § 637(a)(5) ("Socially disadvantaged individuals are those who have been subjected to *racial or ethnic prejudice* or cultural bias because of their *identity as a member of a group without regard to their individual qualities*."). In other words, even if SBA's presumption were eliminated, then the priority treatment for socially disadvantaged individuals would be unconstitutional for all the same reasons. Although ARPA does not explicitly name certain racial groups, its definition clearly applies to some racial groups and not others. So even if there was some way that members of some other racial groups could find a way to convince SBA that they too

are socially disadvantaged, the racial and ethnic preference would remain. Even without the regulatory presumption, ARPA itself explicitly conditions priority treatment on one's membership in such a "group" and excludes reliance on a person's "individual qualities."

Finally, Defendant's standing argument is obviously inapplicable to the gender discrimination inherent in ARPA. The text of ARPA itself gives priority to women and not to men. Vitolo is a man, so he unquestionably has standing to challenge the priority for women.

## II. The Restaurant Revitalization Fund's Race-Based Priority Period Is Not Narrowly Tailored To Advance A Compelling Government Interest.

A. "Any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995). "Under strict scrutiny, the government has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted). This is because the right to be free from racial discrimination is an individual right. Our Constitution has nothing to say about racial or group parity—whether called "equity" or anything else. What it protects is an individual right to be free from discrimination. *Adarand*, 515 U.S. at 218; *Croson,* 488 U.S. at 493–94 As Justice Scalia famously put it, from a

7

constitutional perspective, "[i]ndividuals who have been wronged by unlawful racial discrimination should be made whole; but under our Constitution there can be no such thing as either a creditor or a debtor race. That concept is alien to the Constitution's focus upon the individual. *Adarand,* 515 U.S. at 239 (Scalia, J., concurring in part and concurring in the judgment).

As noted earlier, in *Shaw v. Hunt*, 517 U.S. 899 (1996), the Supreme Court explained that the government must point to "identified discrimination" "with some specificity" and "with a strong basis in evidence." *Id.* at 909–10 (citation omitted). In other words, a "generalized assertion of past discrimination in a particular industry or region is not adequate because it provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at 910. In short, "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Id.* (citing *Wygant*, 476 U.S. at 274–75, 276, 288).

Over several decades, the Supreme Court has repeatedly and frequently reaffirmed this basic principle that remedying past societal discrimination does not justify race-conscious government action. *See, e.g., Parents Involved,* 551 U.S. at 731; *Bakke*, 438 U.S. at 310. And so has the Sixth Circuit. *See, e.g., Michigan Rd. Builders Ass'n, Inc.*, 834 F.2d at 590 (collecting cases).

As explained above, the Supreme Court has consistently rejected claims that compensating for racial disparities in income, wealth, or participation in government programs is a compelling interest to support explicit racial preferences. "Allowing

racial balancing as a compelling end in itself would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved." *Parents Involved*, 551 U.S. at 730.

B. While there is arguably some uncertainty as to just what type of past discrimination can justify a compelling interest that might support some form of race-based remedy, it is quite clear that what the government has to offer here does not come close. Subject to the Court's admonitions about societal discrimination or racial disparities being insufficient and the need for individual, particularized, and focused evidence of past discrimination, a race-based program that is narrowly tailored might survive if the government can prove "either that the state itself discriminated in the past or was a passive participant in private industry's discriminatory practices." *Associated General Contractors of Ohio v. Drabik,* 214 F.3d 730, 735 (6th Cir. 2000)

But even if it is available (the Supreme Court has not made this clear), the "passive participant" justification is not met, as the government suggests here, by an argument that past discrimination gives the government license to seek racial balance in order to compensate for it. To the contrary and as the Seventh Circuit has explained, "[i]f prime contractors on County projects were discriminating against minorities and this was known to the County, whose funding of the contracts thus knowingly perpetuated the discrimination, the County might be deemed sufficiently complicit (*a kind of joint tortfeasor, coconspirator, or aider and abettor*) to be entitled

9

to take remedial action." *Builders Assoc. of Greater Chicago v. County of Cook*, 256 F.3d 642, 645 (7th Cir. 2001) (emphasis supplied), citing *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 91 F.3d 586, 601 (3d Cir.1996); *Concrete Works of Colorado, Inc. v. City & County of Denver*, 36 F.3d 1513, 1529–30 (10th Cir. 1994).

Here, the government does not concede that it was anything like a "joint tortfeasor, coconspirator, or aider and abettor" in discrimination in the restaurant industry or in the distribution of COVID relief. But Defendant has not identified, "with particularity," the precise "system of racial exclusion practiced by elements of the [relevant] industry" and how it passively participated in that system. *Croson*, 488 U.S. at 492. As discussed *infra*, Defendant merely cites racial disparities within the banking industry and has not proven that a race-neutral alternative would force SBA to participate within an intentionally discriminatory system as discussed in *Croson*.

For this reason alone, the gender and race-based preference at issue here cannot survive strict scrutiny.

C. Even were this not so, the evidence offered here is of the type that the Supreme Court has made clear does not establish a compelling interest. Defendant claims the government has a compelling interest in imposing a race-based priority period because small businesses owned by minorities "have suffered more severely than other kinds of businesses during the COVID-19 pandemic," and because Congress's earlier attempts to provide relief "disproportionately failed to help those

10

businesses directly because of historical discrimination patterns." Doc. 30:7. To support this stated interest, Defendant relies primarily on three types of evidence: statistical disparities on access to capital and participation in prior programs, allegations, "historical discrimination" and (some) "discrimination in the lending industry" affecting small businesses in general. Doc. 30:7–8.

First, evidence of statistical disparities among the races does little work. While gross statistical disparity focused on a particular actor or process might be evidence (if not proof) of discrimination, the disparities cited by the Defendant are indistinct from societal discrimination. For example, Defendant cites statistics recounting racial disparities in businesses that received Paycheck Protection Program (PPP) funding. Doc. 30:7. But the government has no compelling interest in achieving group, including racial, parity in the distribution of government benefits. As noted above, evidence of statistical disparities among racial groups is not the type of specific and concrete evidence that can support a compelling government interest. As explained by the Sixth Circuit in *Associated Gen. Contractors of Ohio, Inc.*, 214 F.3d 730, "statistical disparity in the proportion of contracts awarded to a particular group, standing alone," is not a compelling government interest. *Id.* at 735. The government "cannot rely on mere speculation, or legislative pronouncements, of past discrimination." *Id.* Specifically, the Sixth Circuit has criticized reliance on evidence that "focused on a mere underrepresentation"; "such evidence of mere statistical disparities has been firmly rejected as insufficient by the Supreme court." *Id.* at 736*;*

11

*see also Croson*, 488 U.S. at 503 ("The mere fact that black membership in these trade organizations is low, standing alone, cannot establish a prima facie case of discrimination.").

The case is not made stronger by evidence that minority businesses are likely to fail or have lower revenue, fewer assets, or worse credit. While disparities in loan approval rates and the amount of capital one brings to a business or receipt of PPP funds may or may not be the product of societal discrimination or even discrimination in the lending industry, the government has not identified the existent of or extent of discrimination in the restaurant industry, much less discrimination in which it has participated.

Second, the "evidence before Congress" of "historical discrimination" cited by Defendant (Doc. 30:7) is not "strong evidence" of recent intentional discrimination "with specificity" relevant to the restaurant industry. *Shaw*, 517 U.S. at 909. This evidence (mostly from the 1970s) is no different than the type of evidence that was found wanting in cases like *Wygant, Croson, Adarand, Shaw* and *Parents Involved*. Long-standing structural problems may warrant a government response, but the Supreme Court has made clear that they do not justify a race-based response.

Third, Defendant claims it has a compelling interest to address "present effects of historical discrimination in the lending industry." Doc. 30:9. But Defendant does not point to evidence of recent intentional discrimination by banks against restaurant owners. For example, Defendant cites one witness's testimony that there are merely

12

"longstanding institutional biases" and "intergenerational effects of discrimination." But a closer examination reveals the "evidence" of this discrimination is simply a description of racial disparities, or, at best, societal discrimination. It is therefore insufficient to support a claim of a compelling government interest. As the Supreme Court noted in *Parents Involved*, the government must provide evidence of "*intentional* discrimination." *Parents Involved,* 551 U.S. at 720 (emphasis supplied). And the evidence must be *recent*, not simply present impacts of discrimination from decades ago. *See, e.g., Michigan Rd. Builders Ass'n, Inc.*, 834 F.2d at 592–3 (invalidating racial preferences due to failure to show it was necessary to remedy the government's own "intentional discrimination" against minorities).

D. Even if the government could come up with a compelling government interest to support its race-based preference, there is no evidence that Defendant's use of a "priority period" is narrowly tailored. Narrow tailoring means that, even where remedying past discrimination justifies a race-based measure, the remedial program can discriminate no more than necessary. *Shaw*, 517 U.S. at 909–10; *Adarand*, 515 U.S. at 224, 235, 237–38; *Builders Association of Greater Chicago,* 256 F.3d at 244. In this case, the racial preference—the degree of supposedly "remedial" racial discrimination—is near absolute. Within the universe of economically disadvantaged small businesses (a group which includes Plaintiffs), all minority and female-owned businesses are given a priority over all businesses owned by white males. This is not altered by the fact that the presumptive priority is rebuttable—

SBA asks for no information that would rebut the presumption, intends to make no effort to evaluate the applicability of the presumption in any case, and does not explain what would rebut the presumption that a person who is black is not a member of group that has been subject to discrimination. Nor is it altered by the theoretical possibility that a white male might be able to convince SBA that he is socially disadvantaged. The preference remains. He must prove his social disadvantaged. Women and members of the preferred racial groups do not. Even were there discrimination sufficient to establish a compelling interest, there is no basis to conclude that is most be almost absolute.

Narrow tailoring also involves the government evaluating the "efficacy of alternative [race-neutral] measures." *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality opinion). But Defendant has not considered any race-neutral alternatives. As stated above, Defendant argued that minorities received less from the PPP than others (a disparity that could have any number of explanations besides intentional discrimination). Even if this is true, then Congress could enact a simple race-neutral alternative: provide RRF grants first to those restaurants that did not get a PPP loan (or whatever other program Congress believes inadequately served minorities). This race-neutral alternative would have fully addressed Defendant's concern that Congress has underserved minorities and women with its past programs.

14

Defendant rejects this alternative, however, claiming instead that the government is not required to exhaust every conceivable race-neutral option. True, but this is not a rational basis case. The requirement of necessity and narrow tailoring requires that a readily available race-neutral alternative—help those who have not yet been helped—cannot be dismissed with a wave of the hand. This race-neutral alternative requires little imagination or administrative effort.

Instead, Defendant alleges that it *has* tried several race-neutral alternatives, such as the PPP program and the CARES Act. Defendant claims that it is precisely the failure of "race-neutral programs that led the government to conclude that a priority period was necessary." Doc. 30:11. In other words, Defendant claims that the *only way* to help minority-owned restaurant owners is to *intentionally discriminate* against white restaurant owners. Such an argument cannot withstand any level of scrutiny as it would have "no logical stopping point" and justify any type of future discrimination against a majority racial group. *Croson*, 488 U.S. at 498 (quoting *Wygant*) ("A generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. It 'has no logical stopping point.'")

Next, a remedy is not narrowly tailored if it is overinclusive. *Croson*, 488 U.S. at 506. In this case, SBA cannot explain how its "priority period" is necessary to rectify a compelling governmental interest with regard to all of the groups designated as "socially and economically disadvantaged," and whether some groups, such as

15

Black Americans, must share this allegedly targeted benefit with other groups, such as Alaskan and Hawaiian natives. *O'Donnell Const. Co. v. D.C.*, 963 F.2d 420, 427 (D.C. Cir. 1992) ("'random inclusion of racial groups' for which there is no evidence of past discrimination in the construction industry raises doubts about the remedial nature of the Act's program"). On the other hand, a program is also not narrowly tailored if it is underinclusive. *Drabik*, 214 F.3d at 737. SBA's regulations pick and choose among Asian-Americans, offering a priority period to certain Asians from the Pacific region and the "subcontinent," but not others from northern and western Asia. See 13 C.F.R. § 124.103. SBA cannot explain why it believes that Malaysian-Americans, for example, are socially disadvantaged while Syrian-Americans are not. *Id*.

Defendant attempts to counter Plaintiffs' over/underinclusive argument by saying the RRF program merely offers a *presumption* and people can opt-in or opt-out based on substantial evidence. The argument seems to be, literally, "it's just a presumption." *See* Doc. 30:12 (quoting the Court that, the racial preference is "just … a presumption.") But it is the precisely the *presumption* that is the offending racial classification and causes the constitutional injury. Opting in or opting out (Plaintiffs are unaware of a racial group that would opt-out of a racial preference) does not save an unconstitutional racial preference from scrutiny. In fact, Defendant cites no cases suggesting that an opt-in/opt-out provision of a racial preference makes the racial preference narrowly tailored.

16

In sum, because the racial classification is not narrowly tailored to support a compelling government interest, it must therefore be enjoined.

## III. The Government's Gender Preference Cannot Meet Intermediate Scrutiny

"Laws granting or denying benefits on the basis of the sex . . . differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee." *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1689 (2017). To succeed, Defendant must offer an "exceedingly persuasive justification" for the gender-based preference. *United States v. Virginia*, 518 U.S. 515, 555–556 (1996). Defendant must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 533. Moreover, "the classification must substantially serve an important governmental interest *today*," *Sessions*, 137 S.Ct. at 1690 (emphasis in original), for "in interpreting the [e]qual [p]rotection [guarantee], [we have] recognized that new insights and societal understandings can reveal unjustified inequality ... that once passed unnoticed and unchallenged." *Obergefell v. Hodges*, 135 S.Ct. 2584, 2603 (2015).

Defendant offers the same justification for the gender discrimination that it offers for race discrimination: "women-owned businesses suffered historical discrimination." Doc. 30:12. In fact, Defendant's evidence of gender discrimination is even more general and less specific than the evidence of racial discrimination. Doc.

17

30:12. This generalized claim of "discrimination" is inadequate for at least two reasons. First, as explained above, evidence of discrimination must be *recent,* not merely "historical." *See, e.g., Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir. 1993) (discrimination that occurred 14 years ago was too far removed to support a gender-based affirmative action program). Second, merely waving the wand of "historical discrimination" does not override the Constitution's command of gender neutrality because there is "no logical stopping point" to the remedy available. *Cf. Croson*, 488 U.S. at 498. As the Supreme Court noted, "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975). The Supreme Court has "rejected attempts to justify gender classifications as compensation for past discrimination against women." *Califano v. Webster*, 430 U.S. 313, 317 (1977) (collecting cases).

For these reasons, and for all the reasons stated *supra* relating to the government's interest in racial preferences, and its failure to tailor the remedy, the gender-based preference must also fail.

## IV. The Remaining Preliminary Injunction Factors Favor Plaintiffs

In addition to likelihood of success on the merits, the Court will also consider irreparable injury absent an injunction, harm to others from an injunction, if any, and the public interest. *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). These factors likewise favor Plaintiffs.

18

In its brief, Defendant does not seriously rebut Plaintiffs' claim of irreparable harm or any of the other remaining equitable factors. Defendant merely rests on her assertion that the program is constitutional, and therefore there is no need for an injunction.

Therefore, for all the reasons stated in Plaintiffs' opening brief and those explained at the TRO hearing, all the remaining factors, especially irreparable harm, weigh in Plaintiffs' favor. *Am. C.L. Union of Kentucky v. McCreary Cty., Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003); Wright & Miller, 11A Fed. Prac. & Proc. § 2948.1 (3d. ed.) ("When an alleged deprivation of a constitutional right is involved … most courts hold that no further showing of irreparable injury is necessary."); *see G & V Lounge Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights."); *see also Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("no substantial harm can be shown in the enjoinment of an unconstitutional policy.")

## V.     Limiting Any Relief To A Single Plaintiff Would Thwart Constitutional Rights And Lead To A Waste Of Judicial Resources

Defendant finally suggests this Court should limit its injunction to only Plaintiffs. In other words, if the Court finds that the finds Defendant is violating the Constitution and that ARPA § 5003 is unconstitutional, then the injunction should only apply to Plaintiffs' application, while the other thousands of similarly situated

19

applicants endure the harm Plaintiffs have avoided. But this tactic would simply create more emergencies in this case, as Plaintiffs would then likely amend the complaint to add more plaintiffs (who are standing by) as well as seek emergency class certification under Rule 23. Then Plaintiffs would be right back at this point, with days lost, asking for the very same relief. Such an effort is not necessary and would be a waste of judicial resources, especially when time is of the essence to prevent an obvious violation of constitutional rights.

Furthermore, the Sixth Circuit has already endorsed injunctions against governmental officials even if the injunction would benefit individuals who are not plaintiffs. *Washington v. Reno*, 35 F.3d 1093, 1103–04 (6th Cir. 1994). This authority for this type of injunction is longstanding. *Wirtz v. Baldor Elec. Co.*, 337 F.2d 518, 535 (D.C. Cir. 1963) ("we conclude that if one or more of the plaintiffs-appellees is or are found to have standing to sue, the District Court should enjoin the effectiveness of the Secretary's determination with respect to the entire industry."). And courts continue to issue such injunctions, which have been upheld by the Court of Appeals *See, e.g., Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73, 75 (D.C. Cir. 2016) (based on a challenge from a single insurance company, D.C. Circuit affirmed a permanent injunction invalidating ACA regulations prohibiting people from purchasing "stand-alone fixed indemnity plans"). Likewise, courts have granted broad injunctions in cases very similar to this one. *E.g., O'Donnell Const. Co. v. D.C.*, 762 F. Supp. 354, 356 (D.D.C. 1991) (individual plaintiff seeking an injunction

"enjoining the District from using or enforcing race-based quotas and set-asides in the awarding of road construction contracts and subcontracts."); *O'Donnell,* 963 F.2d at 429 (reversing the district court and ordering the Court to "enter a preliminary injunction").

An immediate injunction, therefore, should be ordered, preventing Defendant from implementing race-based or gender-based preferences in the RRF.

## CONCLUSION

Plaintiffs respectfully request a preliminary injunction, requiring Defendant to process applications for grants from the RRF in the order that they were received, without regard to the race or gender of the applicant. Plaintiff further respectfully requests that this motion either be granted as soon as possible. If the Court is not inclined to grant this preliminary injunction, then Plaintiffs respectfully request that such a denial be placed on the docket immediately so that Plaintiffs can file a notice of appeal and consolidate that appeal with the current appeal at the Sixth Circuit.

Dated May 24, 2021

WISCONSIN INSTITUTE FOR LAW & LIBERTY
Rick Esenberg
rick@will-law.org

*/s/ Daniel P. Lennington*
Daniel P. Lennington
dan@will-law.org
Luke N. Berg
luke@will-law.org
330 E. Kilbourn Ave., Suite 725
Milwaukee, WI 53202
Phone: (414) 727-9455 Fax: (414)727-6385
*Attorneys for Plaintiffs Appearing Pro Hac Vice*

21