# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>Deborah S. Hunt<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed:  May 27, 2021

Mr. Luke N. Berg
Mr. Rick Esenberg
Mr. Daniel P. Lennington
Wisconsin Institute for Law and Liberty
330 E. Kilbourn Avenue, Suite 725
Milwaukee, WI 53202

Ms. Marleigh D. Dover
Ms. Alexandra Rachel Saslaw
Mr. Jack Starcher
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Mr. Matthew Janson McClanahan
156 Walker Hill Street
Crossville, TN 38555

Re:  Case Nos. 21-5517/21-5528, *Antonio Vitolo, et al v. Isabella Guzman*
Originating Case No. : 3:21-cv-00176

Dear Counsel,

The court today announced a decision in the above-styled cases.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. John L. Medearis

Enclosures

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0120p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

ANTONIO VITOLO; JAKE'S BAR AND GRILL, LLC,

       *Plaintiffs-Appellants*,

  *v.*

ISABELLA CASILLAS GUZMAN, Administrator of the Small Business Administration,

       *Defendant-Appellee.*

> Nos. 21-5517/5528

On Emergency Motion for Injunction Pending Appeal and to Expedite Appeal.

United States District Court for the Eastern District of Tennessee at Knoxville; No. 3:21-cv-00176—Travis Randall McDonough, District Judge.

Decided and Filed:  May 27, 2021

Before:  NORRIS, DONALD, and THAPAR, Circuit Judges.

---

### COUNSEL

**ON MOTIONS AND REPLY:**  Daniel P. Lennington, WISCONSIN INSTITUTE FOR LAW & LIBERTY, Milwaukee, Wisconsin, for Appellants.  **ON RESPONSE:**  Marleigh D. Dover, Jack Starcher, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

  THAPAR, J., delivered the opinion of the court in which NORRIS, J., joined.  DONALD, J. (pp. 16–27), delivered a separate dissenting opinion.

---

### OPINION

---

  THAPAR, Circuit Judge.  This case is about whether the government can allocate limited coronavirus relief funds based on the race and sex of the applicants.  We hold that it cannot.

Thus, we enjoin the government from using these unconstitutional criteria when processing Antonio Vitolo's application.

I.

As part of the most recent coronavirus relief bill (the American Rescue Plan Act of 2021), Congress allocated nearly $29 billion for grants to help restaurant owners meet payroll and other expenses. Pub. L. No. 117-2, § 5003(b)(2)(A), (c) (Restaurant Revitalization Fund). The fund was created to aid small privately owned restaurants, not large chains. *Id.* § 5003(a)(4)(C). The Small Business Administration, a federal agency, processes the applications and distributes the funds. During the application process, restaurant owners must certify to the agency that the grant is necessary to support ongoing operations. *Id.* § 5003(c)(2)(A).

The key to getting a grant is to get in the queue before the money runs out. The Small Business Administration distributes money on a first come, first served basis. But there is a catch. During the first 21 days the agency gives grants to priority applicants only. *Id.* § 5003(c)(1). Priority applicants are restaurants that are at least 51% owned and controlled by women, veterans, or the "socially and economically disadvantaged." *Id.* § 5003(c)(3)(A); *see* 15 U.S.C. §§ 632(n), (q)(3), 637(a)(4)(A). Non-priority restaurants may apply during this time, but they will not receive a grant until the initial period expires. Pub. L. No. 117-2, § 5003(c)(3)(A). If the fund is depleted by then, the non-priority restaurants are out of luck; the Act does not provide for its replenishment.

Antonio Vitolo and his wife own a restaurant called Jake's Bar and Grill. Vitolo is white and his wife is Hispanic, and they each own 50% of the restaurant. Like many restaurants, Jake's Bar has struggled during the pandemic—it closed on weekdays and offered to-go orders on weekends. It lost workers and a considerable amount in sales. So on the first day that the Small Business Administration allowed applications, Vitolo submitted one.

Since the restaurant is not 51% owned by a woman or veteran, Vitolo had to qualify as "socially and economically disadvantaged" to get priority status. *Id.* § 5003(c)(3)(A). The relief bill defines social and economic disadvantage by reference to the Small Business Act. *See id.*

Under the Small Business Act, a person is considered "socially disadvantaged" if he has been "subjected to racial or ethnic prejudice" or "cultural bias" based solely on his immutable characteristics.   15 U.S.C. § 637(a)(5); 13 C.F.R. § 124.103(a).   A person is considered "economically disadvantaged" if (1) he is socially disadvantaged; and (2) he faces "diminished capital and credit opportunities" compared to non-socially disadvantaged people who operate in the same industry.  15 U.S.C. § 637(a)(6)(A).

The Small Business Administration has injected explicit racial and ethnic preferences into the priority process.  *See* 13 C.F.R. § 124.103.   Under a regulation that predates the pandemic, the agency presumes certain applicants are socially disadvantaged based solely on their race or ethnicity.  Groups that presumptively qualify as socially disadvantaged—and thus get to jump to the front of the line for priority consideration—include "Black Americans," "Hispanic Americans," "Asian Pacific Americans," "Native Americans," and "Subcontinent Asian Americans."[1]  *Id.* § 124.103(b)(1).  If you are in one of these groups, the Small Business Administration assumes you qualify as socially disadvantaged.   Indeed, the only way not to qualify is if someone comes forward "with credible evidence to the contrary."   *Id.* § 124.103(b)(3).

Applicants who do not get the presumption must prove they have experienced racial or ethnic discrimination or cultural bias by a preponderance of the evidence.  *Id.* § 124.103(c)(1). After reviewing that evidence, the Small Business Administration will consider an applicant a victim of "individual social disadvantage" if it determines that (i) the applicant suffered episodes of discrimination; (ii) *each* episode "negatively impacted the individual's entry or advancement

---

[1]Other than those considered black, Hispanic, or Native American, a person receives a rebuttable presumption of social disadvantage only if he or she has "origins from" a country identified by the Small Business Administration.  13 C.F.R. § 124.103(b)(1).  It is unclear what it means to have "origins from" a specific country, but the agency tells us that "[b]eing born in a country does not, by itself, suffice."  *Id.*

Asian Pacific Americans qualify only if they have origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, the Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru.  *Id.*

Subcontinent Asian Americans must have origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands, or Nepal.  *Id.*

in the business world"; and (iii) together, those episodes caused the applicant to suffer "chronic and substantial social disadvantage." *Id.* § 124.103(c)(6).

The added evidentiary burden faced by white men and other non-presumptively disadvantaged groups stands in marked contrast with lenient evidentiary standards set by the American Rescue Plan Act. Congress recognized the urgency of providing relief to small restaurants struggling to weather the pandemic. So it sought to cut as much red tape as possible. To avoid "imposing additional burdens on applicants," the Act requires the Small Business Administration to accept the applicant's "existing business identifiers" to show eligibility for a grant, rather than requiring "other forms of registration or identification that may not be common to their industry." Pub. L. No. 117-2, § 5003(c)(2)(B). The government relies on restaurant owners to self-certify that they meet these eligibility criteria when applying for a grant. *Id.* § 5003(c)(2)(A).

Vitolo sued to end the race and sex preferences in grant funding, claiming that they violated his constitutional rights. With the funds rapidly depleting, Vitolo asked for a temporary restraining order and ultimately a preliminary injunction that would prohibit the government from handing out grants based on the applicants' race or sex. The district court declined to issue a restraining order and said that Vitolo was unlikely to succeed on the merits of his claim. Vitolo filed a notice of appeal, and he asked the district court to enjoin the race and sex preferences until his appeal was decided. The district court denied that motion too. Finally, the district court denied the motion for a preliminary injunction.[2] Vitolo also appealed that order.

Vitolo has filed a motion to expedite the appeal, which we grant. Before turning to the merits of the preliminary injunction, we handle a couple issues the government has raised.

## II.

First, during the briefing for the preliminary injunction in the district court, the government argued that the plaintiffs lacked standing to challenge the Small Business

---

[2]While we ultimately disagree with the district court, we appreciate the district judge's diligence in handling this matter. District courts are extremely busy, and this judge is no exception. Yet he moved promptly at every turn and made sure to provide the parties with thorough rulings.

Administration's use of racial preferences because the plaintiffs may not ultimately succeed. But the district court correctly rejected that argument. The injury here is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993); *see also Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) ("[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." (citations omitted)). The government's use of racial preferences causes that injury. And that injury is redressable by a decision ordering the government not to grant priority consideration based on the race of applicants. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.33 250, 255 n.3 (6th Cir. 2018) (noting that at the preliminary injunction stage the plaintiff must show "a substantial likelihood of standing").

It does not matter that the plaintiffs might not otherwise qualify for priority consideration. For if the court enjoined use of "the race-based presumption of the SBA regulations or the race-conscious portions of the definition of 'socially disadvantaged,'. . . the playing field in qualifying for the priority period would be 'leveled.'" R. 32, Pg. ID 268. Why? Because the race of the applicant "would not factor into the order in which applications are processed by SBA." *Id.* That is enough to show a substantial likelihood of success on standing—and, indeed, the government has not claimed otherwise on appeal.

Second, the government argues that the plaintiffs' claim is moot. While this case was on appeal, the 21-day "priority" phase of the grant program ended. The statute now requires the Small Business Administration to begin processing grant requests in the order they were received, without regard to the applicants' race or sex. Thus, the government says, there is no use for a court order requiring it to do the same.

Mootness is a high hurdle. The government must show that a court could order no "effectual relief whatever" for the plaintiffs' injury. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted). What's more, the government must show that it has "completely and irrevocably eradicated the effects" of the program's race and sex preferences. *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979). But the government hasn't cleared the bar. Race and sex

preferences continue to bear on whether an applicant receives a grant before the money runs out. And a court order ending those preferences will relieve the plaintiffs' injury (and allow Vitolo's application to be considered sooner than it otherwise would).

Most fundamentally, the program's race and sex preferences did not end with the priority phase. That just marks when the Small Business Administration starts processing applications from non-priority restaurants. The agency says processing takes approximately 14 days. Miller Decl. ¶ 14. So all of the "priority" applications that were received in the 21-day window are still being processed first. And no application is paid out before going through the 14-day processing window. *Id.* ¶ 15. So with these preferences in place, the fund may be depleted before the plaintiffs' application has been processed. There is an obvious solution to this of course: The agency can simply fund grants in the order they were received—without regard to priority status, and without regard to the processing head start that many applications received on the basis of race and sex.

Turning to this case, plaintiffs continue to suffer a real and concrete injury by having their application considered behind the priority applications because of race and sex. Vitolo submitted his application on May 3. Restaurants that submitted "priority" applications on May 24 will likely receive their grants before the agency has time to finish processing Vitolo's application. Add to this the fact that over half the funds have been approved to be distributed as of May 25, 2021, to priority applicants. Miller Decl. ¶ 22. Since it normally takes 14 days to process an application, this means that the agency should be almost through priority applications received between May 3 and May 11. But that leaves all the priority applications received between May 12 and May 24, which have gotten a processing head start relative to Vitolo's application. There is a real risk that the funds will run out, unless the agency processes Vitolo's application before the May 12 to May 24 batch. For these reasons, the government has failed to show that the case is moot.

III.

We consider four factors in determining whether a preliminary injunction should issue: (1) whether the moving party has shown a likelihood of success on the merits; (2) whether the

moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009).  In constitutional cases, the first factor is typically dispositive.  *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020) (order) (per curiam).  That's because "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).  And no cognizable harm results from stopping unconstitutional conduct, so "it is always in the public interest to prevent violation of a party's constitutional rights."  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted).  We thus focus our analysis on the plaintiffs' likelihood of success on the merits.

Vitolo challenges the Small Business Administration's use of race and sex preferences when distributing Restaurant Revitalization Funds.  The government concedes that it uses race and sex to prioritize applications, but it contends that its policy is still constitutional.  We disagree.

## A.

We start with race.  Government policies that classify people by race are presumptively invalid.  U.S. Const. amend. XIV; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 234, 235 (1995) (applying equal-protection principles to federal policies that discriminate by race).  To overcome that presumption, the government must show that favoring one race over another is necessary to achieve a compelling state interest.  *Id.* at 235.  And even when the government can show that it has a compelling interest, it must narrowly tailor its remedy to advance that interest. This is a very demanding standard, which few programs will survive.  *See Parents Involved*, 551 U.S. at 720.

The government concedes that strict scrutiny applies to its method of distributing these funds.  And for good reason: The policy grants privileges to individuals based explicitly on their race.

*Compelling Interest.*  Because strict scrutiny applies, we must first consider whether the government has a compelling interest in giving some races priority access to the Restaurant

Revitalization Funds, and for presumptively sending men from non-favored racial groups (including whites, some Asians, and most Middle Easterners) to the back of the line. We hold that it does not.

The government says it has a compelling interest in remedying past societal discrimination against minority business owners. The Supreme Court has told us that remedial policies can *sometimes* justify preferential treatment based on race. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94 (1989) (plurality opinion); *Adarand*, 515 U.S. at 237. But the bar is a high one. The government has a compelling interest in remedying past discrimination only when three criteria are met:

First, the policy must target a specific episode of past discrimination. It cannot rest on a "generalized assertion that there has been past discrimination in an entire industry." *J.A. Croson Co.*, 488 U.S. at 498; *see also Adarand*, 515 U.S. at 226; *Aiken v. City of Memphis*, 37 F.3d 1155, 1162–63 (6th Cir. 1994) (en banc) (explaining that societal discrimination is not enough to justify racial classifications and that there must be prior discrimination by the governmental unit involved).

Second, there must be evidence of *intentional* discrimination in the past. *J.A. Croson Co.*, 488 U.S. at 503 (requiring an "inference of discriminatory exclusion"). Statistical disparities don't cut it, although they may be used as evidence to establish intentional discrimination. *See Aiken*, 37 F.3d at 1163; *United Black Firefighters Ass'n v. City of Akron*, 976 F.2d 999, 1011 (6th Cir. 1992).

Third, the government must have had a hand in the past discrimination it now seeks to remedy. So if the government "show[s] that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of [a] local . . . industry," then the government can act to undo the discrimination. *J.A. Croson Co.*, 488 U.S. at 492 (plurality opinion). But if the government cannot show that it actively or passively participated in this past discrimination, race-based remedial measures violate equal-protection principles.

The government's asserted compelling interest meets none of these requirements. First, the government points generally to societal discrimination against minority business owners.

But it does not identify specific incidents of past discrimination. And since "an effort to alleviate the effects of societal discrimination is not a compelling interest," the government's policy is not permissible. *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996); *see also Parents Involved*, 551 U.S. at 731 (plurality opinion) ("remedying past societal discrimination does not justify race-conscious government action").

Second, the government offers little evidence of past intentional discrimination against the many groups to whom it grants preferences. Indeed, the schedule of racial preferences detailed in the government's regulation—preferences for Pakistanis but not Afghans; Japanese but not Iraqis; Hispanics but not Middle Easterners—is not supported by any record evidence at all.

When the government promulgates race-based policies, it must operate with a scalpel. And its cuts must be informed by data that suggest intentional discrimination. The broad statistical disparities cited by the government are not nearly enough. For example, a witness testified before a congressional committee that 32% of Hispanic-owned small businesses and 41% of black-owned small businesses have gone under during the pandemic, compared to only 22% of white-owned small businesses. When there is a single decisionmaker behind the disparity, extreme differences among races may permit an inference of intentional discrimination—for example, when a city hires one race at a disproportionate rate. *See United Black Firefighters Ass'n*, 976 F.2d at 1011 (noting that "[w]here a gross disparity exists between the expected percentage of minorities selected and the actual percentage of minorities selected, then prima facie [but rebuttable] proof exists to demonstrate intentional discrimination in the selection of minorities to those particular positions"). But when it comes to general social disparities, there are simply too many variables to support inferences of intentional discrimination. *See J.A. Croson Co.*, 488 U.S. at 501–03; *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 736–37 (6th Cir. 2000).

Third, the government has not shown that it participated in the discrimination it seeks to remedy. When opposing the plaintiffs' motions at the district court, the government identified statements by members of Congress as evidence that race- and sex-based grant funding would remedy past discrimination. For example, the government points to a House subcommittee

hearing aimed at "understanding why aid to minority-owned businesses was delayed." R. 18, Pg. ID 109 (cleaned up). But rather than telling the court what Congress learned and how that supports its remedial policy, it said only that Congress identified a "theme" that "minority- and women-owned businesses" needed targeted relief from the pandemic because Congress's "prior relief programs had failed to reach" them. *Id.*, Pg. ID 108. A vague reference to a "theme" of governmental discrimination is not enough. To satisfy equal protection, the government must identify "prior discrimination by the governmental unit involved" or "passive participa[tion] in a system of racial exclusion." *J.A. Croson Co.*, 488 U.S. at 492 (plurality opinion) (cleaned up). An observation that prior, race-neutral relief efforts failed to reach minorities is no evidence at all that the government enacted or administered those policies in a discriminatory way.

For these reasons, we conclude that the government lacks a compelling interest in awarding Restaurant Revitalization Funds based on the race of the applicants. And as a result, the policy's use of race violates equal protection.

*Narrow Tailoring.* Even if the government had shown a compelling state interest in remedying some specific episode of discrimination, the discriminatory disbursement of Restaurant Revitalization Funds is not narrowly tailored to further that interest.

For a policy to survive narrow-tailoring analysis, the government must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003); *J.A. Croson Co.*, 488 U.S. at 507. This requires the government to engage in a genuine effort to determine whether alternative policies could address the alleged harm. And, in turn, a court must not uphold a race-conscious policy unless it is "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013). In addition, a policy is not narrowly tailored if it is either overbroad or underinclusive in its use of racial classifications. *J.A. Croson Co.*, 488 U.S. at 507–08; *Gratz v. Bollinger*, 539 U.S. 244, 273–75 (2003).

Here, the government could have used any number of alternative, nondiscriminatory policies. Yet it failed to do so. For example, the government contends that minority-owned businesses disproportionately struggled to obtain capital and credit during the pandemic. But an

obvious race-neutral alternative exists: The government could grant priority consideration to all business owners who were unable to obtain needed capital or credit during the pandemic.

Or consider another of the government's arguments. It contends that earlier coronavirus relief programs "disproportionately failed to reach minority-owned businesses." Gov't Resp. 15 (citation omitted). But a simple race-neutral alternative exists again: The government could simply grant priority consideration to all small business owners who have not yet received coronavirus relief funds. Indeed, the government already requires applicants to disclose what prior assistance they have received—it need only make that criterion dispositive.

Because these race-neutral alternatives exist, the government's use of race is unconstitutional. Aside from the existence of race-neutral alternatives, the government's use of racial preferences is both overbroad and underinclusive. This is also fatal to the policy. *Gratz*, 539 U.S. at 273–75.

The government argues its program is not underinclusive because people of all colors can count as suffering "social disadvantage." Gov't Resp. 17–18. But there is a critical difference between the designated races and the non-designated races. The designated races get a presumption that others do not. And that presumption can only be overcome if someone comes forward with written evidence that the applicant has not been "subjected to racial or ethnic prejudice or cultural bias." 13 C.F.R. § 124.103(a), (b)(3). Since proving someone else has *never* experienced racial or ethnic discrimination is virtually impossible, this "presumption" is dispositive.

The non-designated races start with a much higher hurdle. They must bring forward evidence that they suffered episodes of discrimination, which have "negatively impacted" their "advancement in the business world," and which caused them to suffer "chronic and substantial social disadvantage." *Id.* § 124.103(c)(6). Put this high hurdle against the rapid depletion of the money and the 21-day window, and the hurdle becomes a wall.

The government's policy is plagued with other forms of underinclusivity. Consider the requirement that a business must be at least 51% owned by women or minorities. How does that help remedy past discrimination? Black investors may have small shares in lots of restaurants,

none greater than 51%.  But does that mean those owners did not suffer economic harms from racial discrimination?  Indeed, the restaurant at issue, Jake's Bar, is 50% owned by a Hispanic female.  It is far from obvious why that 1% difference in ownership is relevant.  Yet the government fails to explain why that cutoff relates to its stated remedial purpose.

The dispositive presumption enjoyed by designated minorities bears strikingly little relation to the asserted problem the government is trying to fix.  For example, the government attempts to defend its policy by citing a study showing it was harder for black business owners to obtain loans from Washington, D.C., banks.  Gov't Resp. 15.  Rather than simply designating those owners as the harmed group, the government relied on the Small Business Administration's 2016 regulation granting racial preferences to vast swaths of the population.  For example, individuals who trace their ancestry to Pakistan and India qualify for special treatment.  But those from Afghanistan, Iran, and Iraq do not.  Those from China, Japan, and Hong Kong all qualify.  But those from Tunisia, Libya, and Morocco do not.  This scattershot approach does not conform to the narrow tailoring strict scrutiny requires.

The stark realities of the Small Business Administration's racial gerrymandering are inescapable.  Imagine two childhood friends—one Indian, one Afghan.  Both own restaurants, and both have suffered devastating losses during the pandemic.  If both apply to the Restaurant Revitalization Fund, the Indian applicant will presumptively receive priority consideration over his Afghan friend.  Why?  Because of his ethnic heritage.  It is indeed "a sordid business" to divide "us up by race."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (opinion of Roberts, C.J.).  And the government's attempt to do so here violates the Constitution.

### B.

The plaintiffs also challenge the government's prioritization of women-owned restaurants.  Like racial classifications, sex-based discrimination is presumptively invalid.  U.S. Const. amend. XIV; *United States v. Virginia*, 518 U.S. 515, 531 (1996).  Government policies that discriminate based on sex cannot stand unless the government provides an "exceedingly persuasive justification."  *Virginia*, 518 U.S. at 531.  To meet this burden, the government must prove that (1) a sex-based classification serves "important governmental objectives," and (2) the

classification is "substantially and directly related" to the government's objectives.  *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 730 (1982) (cleaned up).

The government fails to satisfy either prong.  For starters, it fails to show that prioritizing women-owned restaurants serves an important governmental interest.  The government claims an interest in "assisting with the economic recovery of women-owned businesses, which were 'disproportionately affected' by the COVID-19 pandemic."  Gov't Resp. 20.  But while remedying specific instances of past sex discrimination can serve as a valid governmental objective, general claims of societal discrimination are not enough.  *Hogan*, 458 U.S. at 727–29.

Instead, to have a legitimate interest in remedying sex discrimination, the government first needs proof that discrimination occurred.  Thus, the government must show that the sex being favored "actually suffer[ed] a disadvantage" as a result of discrimination in a specific industry or field.  *Id.* at 728; *see Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme."); *see also Craig v. Boren*, 429 U.S. 190, 200–04 (1976) (describing the high bar to using statistics as evidence of discrimination and concluding that "proving broad sociological propositions by statistics is a dubious business").  The government fails that burden here.  It gives only a few examples of statistical disparities between women-owned and male-owned businesses.  For just one:  The government cites a survey that purports to show that women who received Paycheck Protection Program loans asked for 40% less funding on average than their male counterparts.  Statements of this nature do nothing to support an inference of intentional discrimination.  Without proof of intentional discrimination against women, a policy that discriminates on the basis of sex cannot serve a valid governmental objective.

Additionally, the government's prioritization system is not "substantially related to" its purported remedial objective.  *See Wiesenfeld*, 420 U.S. at 651–53.  The priority system is designed to fast-track applicants hardest hit by the pandemic.  Yet under the Act, *all* women-owned restaurants are prioritized—even if they are not "economically disadvantaged."  Pub. L. No. 117-2, § 5003(c)(3)(A).  So whether a given restaurant did better or worse than a male-owned restaurant next door is of no matter—as long as the restaurant is at least 51% women-

owned and otherwise meets the statutory criteria, it receives priority status. Because the government made no effort to tailor its priority system, we cannot find that the sex-based distinction is "substantially related" to the objective of helping restaurants disproportionately affected by the pandemic.[3]

The government contends that women "struggled to receive pandemic relief from the Federal government" from prior aid programs. Gov't Resp. 20 (citation omitted). But as we previously discussed, the government has a ready alternative: Give priority to restaurant owners who did not receive prior aid. There is no need to use sex as a proxy when the government seeks to remedy a problem that is purely economic.

How does the government respond to all this? It faults the plaintiffs for offering "no meaningful argument that a priority period for women-owned businesses is not substantially related to the achievement of that objective." *Id.* (cleaned up). But that gets things backwards: It was the *government's* burden to show that its discriminatory policy passes the substantial-relation test. *Virginia*, 518 U.S. at 533 ("The burden of justification is demanding and it rests entirely on the State."). On this score, the plaintiffs did not need to say a word.

Thus, the government has failed to provide an exceedingly persuasive justification that would allow the classification to stand.

## C.

The plaintiffs are entitled to an injunction pending appeal. Since the government failed to justify its discriminatory policy, the plaintiffs will win on the merits of their constitutional claim. And like in most constitutional cases, that is dispositive here. *See Roberts*, 958 F.3d at 416; *Husted*, 697 F.3d at 436; *Deja Vu*, 274 F.3d at 400; *see also Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated.").

---

[3]Our court has previously applied strict scrutiny to sex-based affirmative-action programs. *Brunet v. City of Columbus*, 1 F.3d 390, 404 (6th Cir. 1993). A government program that cannot survive intermediate scrutiny surely could not survive strict scrutiny's more exacting standard. So assuming *Brunet* remains good law after *United States v. Virginia*, the policy would fail under that standard too.

IV.

It has been twenty-five years since the Supreme Court struck down the race-conscious policies in *Adarand*.  And it has been nearly twenty years since the Supreme Court struck down the racial preferences in *Gratz*.  As today's case shows once again, the "way to stop discrimination on the basis of race is to stop discriminating on the basis of race."  *Parents Involved*, 551 U.S. at 748 (plurality opinion).

The government shall fund the plaintiffs' grant application, if approved, before all later-filed applications, without regard to processing time or the applicants' race or sex.  The government, however, may continue to give veteran-owned restaurants priority in accordance with the law.  This preliminary injunction shall remain in place until this case is resolved on the merits and all appeals are exhausted.

————————————

## DISSENT

————————————

BERNICE BOUIE DONALD, Circuit Judge, dissenting.  It took nearly 200 years for the Supreme Court to firmly establish that our Constitution permits the government to use race-based classifications to remediate past discrimination.  *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).  It took only seven days for the majority to undermine that longstanding and enduring principle.

The majority's conclusion that Plaintiffs are entitled to injunctive relief requires us to make several assumptions.  The majority's reasoning suggests we live in a world in which centuries of intentional discrimination and oppression of racial minorities have been eradicated.  The majority's reasoning suggests we live in a world in which the COVID-19 pandemic did not exacerbate the disparities enabled by those centuries of discrimination.  The majority's reasoning suggests that we live in a world in which Congress passed the Restaurant Revitalization Fund ("RRF") not to aid the nation's economic recovery, but to arbitrarily provide special treatment to racial minorities and women.

The majority's reasoning leads it to a puzzling, if not predictable, conclusion that the twenty-one-day priority period in the RRF—a short-term, narrowly tailored, carefully calibrated measure designed to assist businesses most devastated by the pandemic—is unconstitutional.  Because I find that the RRF is a carefully targeted measure necessitated by an unparalleled pandemic, and because Plaintiffs have not demonstrated irreparable harm or a likelihood of success on the merits, I dissent.

## I.

The constitutional issues involved in this case are controversial, thorny, and unsettled.  However, I start by expressing my disappointment in our Court's use of the emergency appellate docket.  Last year, I opined on this issue in the context of a case involving the constitutionality of two COVID-19-related executive orders issued by the Governor of Kentucky.  *Pleasant View Baptist Church v. Beshear*, 838 F. App'x 936, 939-42 (6th Cir. 2020).  I warned against the "use

of the Court's emergency docket" as a "forum to advocate for abrupt and sweeping change to well-settled federal law." *Id.* My concern in that case was with the parties; today, my concern is focused on the Court.

Here, Plaintiffs unsuccessfully sought injunctive relief in the district court averring that the RRF's 21-day priority period was unconstitutional. During the priority period, the Small Business Administration ("SBA") provides grants to restaurants that are at least 51% owned and controlled by women, veterans, or "socially and economically disadvantaged" individuals. Pub. L. No. 117-2, § 5003(c)(3)(A); *see* 15 U.S.C. §§ 632(n), (q)(3), 637(a)(4)(A). The RRF—by way of SBA regulation—establishes rebuttable presumptions that individuals of certain races or ethnicities are "socially disadvantaged." 13 C.F.R. § 124.103. The district court denied Plaintiffs' request for a temporary restraining order that would have prohibited the government from prioritizing funding based on an applicant's race or sex. In doing so, the district court rejected Plaintiffs' claims that the applicable provisions of the RRF violate the Constitution.

This case initially came to us on appeal after Plaintiffs filed an "emergency motion," contending that they would be irreparably harmed absent immediate intervention from this Court because the pool of money in the RRF was shrinking every day.[1] Specifically, they argued that "[i]f this Court d[id] not promptly halt all payments from the [RRF], the limited available funds w[ould] be fully depleted before the disfavored groups (largely white males) ever have a shot at this much-needed relief." (Mot. at 23).

At the time of Plaintiffs' initial filing in this Court, Plaintiffs stated that, as of May 12, RRF applications amounted to a total of $29 billion in requests, which exceeded the $28.6 billion that Congress appropriated for the entire program. (Mot. at 9). Plaintiffs conceded, however, that the SBA had only depleted about 20 percent of the available funds. (*Id.* at 9-10). Plaintiffs effectively asked the Court to assume that the government would pay out every application currently pending, such that no funds would remain at the conclusion of the prioritization period. Plaintiffs did not cite to any provision in the American Rescue Plan Act of 2021 ("ARA"), nor any facts in the record, to suggest that such an outcome *was likely* to occur. In short, Plaintiffs

---

[1]As outlined above by the majority, the district court eventually also denied Plaintiffs' motion for a preliminary injunction, but that came several days later, after Plaintiffs had already filed their appeal in this Court.

had failed to meet their burden of showing irreparable harm. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical.") (internal quotation marks omitted).[2]

This Court asked the government for additional facts related to "the status of the [RRF], including but not limited to the amount of unallocated funds remaining, what the daily disbursements have been for the past week, and any projections as to when the fund will run out[.]" (Doc. No. 11). Of course, these facts would help the district court—and then this Court—better understand the priority program framework, and, in turn, whether Plaintiffs were truly at risk of not being able to receive funds. But by requesting that the government provide us with this information, we effectively shifted the burden *to the government* to prove that Plaintiffs *would not* suffer irreparable harm. This perverts the Rule 65 standard for injunctive relief. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423, 443 (1974) ("The burden was on employers to show that they were entitled to a preliminary injunction, *not on the Union to show that they were not*.") (emphasis added); *N. Am. Coal Corp. v. Loc. Union 2262, United Mine Workers of Am.*, 497 F.2d 459, 465 (6th Cir. 1974) ("[T]he burden of proof remains upon the party seeking the extraordinary relief […] until all necessary elements to the issuance of an injunction have been established.").[3]

Under such novel standards, plaintiffs seeking injunctive relief will only have to show that there is *some possibility* that they *might* suffer possible irreparable harm. Ostensibly, they could label their appeal as an "emergency," and the appellate court could hold the case

---

[2]We could have also dismissed this case on jurisdictional grounds. Plaintiffs' initial emergency motion addressed only the district court's denial of their request for a temporary restraining order. "As a general rule, we do not entertain appeals from a district court's decision to grant or deny a temporary restraining order. That's because temporary restraining orders are usually of short duration and usually terminate with a prompt ruling on a preliminary injunction, from which the losing party has an immediate right of appeal." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020) (internal quotation and citation omitted). Before the district court ruled on Plaintiffs' motion for a preliminary injunction, the government provided sworn testimony to us indicating that it was reserving the full amount of the money Plaintiffs requested. As such, even if we had dismissed Plaintiffs' initial emergency motion, it would not have affected their ability to obtain relief.

[3]The impropriety of the burden-shifting aside, it is improper to ask any party to "reinvent the evidentiary wheel and engage in unnecessarily duplicative, costly, and time-consuming factfinding[,]" when only the Court—and not the parties themselves—seeks that additional information. *City of Richmond v. JA Croson Co.*, 488 U.S. 469, 547 (1989) (Marshall, J., dissenting).

indefinitely until the facts develop to the point where imminent harm is discernable. We have never recognized such a low burden for such extraordinary relief; such a process is antithetical to Rule 65. To even consider issuing an injunction on pure speculation that a constitutional violation *might* arise in the future is inappropriate and beyond our role as a reviewing court.

I do not subscribe to new procedures that place this Court in a quasi-fact-finding role, especially where Plaintiffs themselves failed to ask for limited discovery or otherwise explain why any new facts were necessary to the resolution of their claims. They were the party asserting an emergency, and "our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (internal quotation and citation omitted). *See also Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued *by the parties before them*.") (emphasis added).

In any case, the record should be developed before the district court, not here. Simply put, Plaintiffs did not present any evidence with their initial emergency motion that they were at risk of irreparable harm, and it is not our role as a reviewing court to find merit in a claim when it is not apparent from the record.

## II.

Other aspects of this appeal concern me as well. If Plaintiffs' initial emergency motion was limited solely to their request for injunctive relief as to their individual claims, the appeal would have been limited in scope, "allow[ing] us to provide immediate resolution to factually unique circumstances[.]" *Pleasant View Baptist Church*, 838 F. App'x at 942. Moreover, Plaintiffs' appeal would now arguably be moot, in light of (1) the expiration of the priority period and (2) the SBA's sworn testimony indicating that the RRF funds are *not* depleted and that the government had set aside the full amount of money that Plaintiffs requested. (Doc. 13).[4]

---

[4]The majority contends that this case is not moot even with the expiration of the priority period. But that determination rests in part on the assumption that the RRF could be depleted before the SBA processes Plaintiffs'

But in their initial emergency motion, Plaintiffs asked us to go a step further—a big step further—specifically requesting an injunction "ordering Defendants to cease disbursing funds from [the RRF] until this Court or the District Court can rule on a preliminary injunction." (Mot. at 3). This request was extraordinary and would have had consequences reaching far beyond Plaintiffs' quest to obtain RRF funding for a single business. The majority properly declined to go that far. With a favorable ruling to Plaintiffs, all eligible restaurant owners within the Sixth Circuit who had already filed applications under the program would have had to wait indefinitely, if not permanently, to learn if they would receive desperately needed monetary aid. These restaurant owners are not parties to this case, and there was no need to subject them to potentially devastating consequences.[5] After all, courts are arbiters of disputes, not disrupters of emergency relief efforts. The potential nationwide public harm that could have resulted overwhelmingly outweighs any relief that might have inured to Plaintiffs had we granted their claim to freeze the RRF entirely.[6] For us to even consider granting that type of relief would have been irresponsible without "the careful deliberation that we would normally undertake in a traditional merits case." *Pleasant View Baptist Church*, 838 F. App'x at 942.

### III.

This case also presents dense and delicate issues of constitutional law regarding how courts should scrutinize race-based government action. We should not be addressing these issues

---

application. While that might be theoretically possible, it looks highly unlikely based on the SBA's sworn declaration that, as of May 23, 2021, the SBA had disbursed only approximately $11,345,177,844 of the total $28.6 billion that Congress appropriated for the RRF. (*See* Doc. 13 at 3). As we have explained, "[i]f after filing a complaint the claimant loses a personal stake in the action, 'making it impossible for the court to grant any effectual relief whatever,' the case must be dismissed as moot." *Hrivnak v. NCO Portfolio Mgmt., Inc.*, 719 F.3d 564, 567 (6th Cir. 2013) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). Here, the expiration of the priority period seems to "have completely and irrevocably eradicated the effects of [Plaintiffs'] alleged violation[s]." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979).

[5]Although not briefed extensively by the parties, I note that even if there were merit to Plaintiffs' claims, the Supreme Court has clearly stated that an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamaskai*, 442 U.S. 682, 702 (1979). Plaintiffs have not indicated that any other parties will join this case or that Plaintiffs have attempted to raise any claims on their behalf, so I am not convinced that Plaintiffs even have standing to ask us to declare the entire RRF unconstitutional or otherwise halt the processing of RRF payments. Nevertheless, I make my point above simply to underscore the appropriateness of the emergency motion mechanism for such relief.

[6]This consideration obviously goes to the merits of the case, not just the propriety of addressing the issue on an emergency motion, and, in any event, the majority limits injunctive relief to Plaintiffs' claims only.

on a whim, particularly when the Supreme Court has informed us that the strict scrutiny analysis as to race-based classifications is not subject to a rigid formula. As Justice O'Connor stated in *Grutter v. Bollinger*, "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause." 539 U.S. 306, 327 (2003). "Not every decision influenced by race is equally objectionable, and strict scrutiny is designed to provide a framework for *carefully examining* the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." *Id.* (emphasis added); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 268 (Souter, J., dissenting) ("[T]he Court's very recognition today that strict scrutiny can be compatible with the survival of a classification so reviewed demonstrates that our concepts of equal protection enjoy a greater elasticity than the standard categories might suggest."); *Croson*, 488 U.S. 469, 493 (1989) (plurality opinion) ("Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics."); Evan Gerstmann & Christopher Shortell, *The Many Faces of Strict Scrutiny: How the Supreme Court Changes the Rules in Race Cases*, 72 U. Pitt. L. Rev. 1, 34 (2010) (explaining different levels of "deferential scrutiny" applied by courts as to race-based government action).[7]

Here, context matters. The statutory and regulatory provisions at issue are complex, and the RRF is just one component of broad-based emergency legislation designed to fight business fallout that is uniquely and directly tied to the COVID-19 pandemic. In this sense, the RRF is not so much traditional legislation in which the government has sought to encourage a long-term change in public policy but rather a one-off monetary lifeline aimed at ameliorating short-term economic devastation. That distinction is important, and it might call for a different kind of deference to the legislature, even within the broader strict scrutiny framework. We must avoid hurried judicial decision-making under such circumstances.

---

[7]I also note that although courts have largely operated under the framework that strict scrutiny review applies to "all racial classifications," *Adarand*, 515 U.S. 200, 227 (1995), even that notion has been called into question. *See, e.g., Johnson v. California*, 543 U.S. 499, 516 (2005) (Ginsburg, J., concurring) (opining "that the same standard of review ought not to control judicial inspection of every official race classification"); *see also Gratz v. Bollinger*, 539 U.S. 244, 301 (2003) (Ginsburg, J., dissenting) ("Actions designed to burden groups long denied full citizenship stature are not sensibly ranked with measures taken to hasten the day when entrenched discrimination and its aftereffects have been extirpated.").

IV.

Despite my reservations as to whether we have jurisdiction to entertain this appeal—and, more generally, whether this kind of appeal warrants anything other than the narrowest of dispositions—I also conclude that Plaintiffs' appeal would likely fail on the merits.

Plaintiffs argue that the priority period amounts to impermissible race- and gender-based discrimination in violation of the Equal Protection Clause. "[T]he government has the burden of proving that racial classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson*, 543 U.S. at 505 (quoting *Adarand*, 515 U.S. at 227). The government asserted "a compelling interest in remedying the effects of past and present discrimination that led to socially and economically disadvantaged business owners having less access to capital and credit, including capital and credit provided through prior COVID relief efforts." The government also argued that it "has a compelling interest in supporting small businesses owned by socially and economically disadvantaged small business owners who have borne an outsized burden of the economic harms of [the] COVID-19 pandemic."

Congress heard significant testimony from restauranteurs, economists, experts in finance, and public interest advocates in the lead-up to the passage of the RRF. *See Supporting Small and Minority-Owned Businesses Through the Pandemic* (Feb. 4, 2021) ("*Supporting*"), *available at* https://www.congress.gov/117/chrg/CHRG-117hhrg43965/CHRG-117hhrg43965.pdf; *Long-Lasting Solutions for a Small Business Recovery* (July 15, 2020) ("*Solutions*"), *available at* https://www.congress.gov/116/chrg/CHRG-116hhrg41297/CHRG-116hhrg41297.pdf; *Paycheck Protection Program: Loan Forgiveness & Other Challenges: Hearing Before the House Committee on Small Business* (June 17, 2020) ("*Challenges*"), *available at* https://www.congress.gov/116/chrg/CHRG-116hhrg41293/CHRG-116hhrg41293.pdf.

Those experts offered evidence showing that minority-owned businesses were more vulnerable to economic distress than businesses owned by white entrepreneurs—they were more likely to operate in retail, accommodation, food services, and personal care services industries, which were hardest hit by government shut-down orders and a decrease in foot traffic.

*Supporting*, at 61.  Moreover, minority-owned businesses were more likely to be in areas with higher rates of COVID-19 infections.  *Id.*

The district court noted that Congress also considered testimony indicating that, within general historical discrimination in the banking industry, entrepreneurs of color have had specific difficulty in accessing business capital.  *Supporting*, at 38, 60-61, 78; *Solutions* at 10, *Challenges*, at 11, 18.  Witnesses testified that banks require more documentation from minority applicants but approve loans less often or for lower amounts.  *Supporting*, at 48, 60, 80.  In addition, witnesses testified that, because of historical difficulties in navigating the banking industry, minority entrepreneurs had lower familial and household incomes, decreasing access to private capital.  *Supporting*, at 39, 60.

Moreover, the district court highlighted testimony indicating that minority business owners lagged behind their white counterparts in access even to SBA programs.  *See Supporting*, at 62, 78; *Challenges*, at 11, 18.  Of particular note to members of Congress, *see, e.g.*, *Solutions*, at 3; 21; 30; *Challenges*, at 3, was the failure of the Paycheck Protection Program ("PPP")—in which commercial banks were tapped to distribute funds—to reach minority-owned businesses, *see Supporting*, at 8, 11, 38, 48–49, 61, 78–79, 80, 88; *Solutions*, at 10; *Challenges*, at 11.[8]

Taken together, that testimony was enough for the district court to conclude that Congress had a "strong basis in evidence for its conclusion that remedial action was necessary" to address specific past discrimination, particularly as it related to the pandemic.  *Associated Gen. Contractors of Oh., Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (quoting *Croson*, 488 U.S. at 500).

---

[8]In addition to the ample testimony presented to Congress, history itself speaks to a long tradition of intentional discrimination by the federal government in housing and banking.  For example, in 1934, the federal government established the Federal Housing Administration ("FHA"), a government agency that was intended to facilitate the purchase of affordable housing.  In practice though, African-American families and other people of color were excluded from the many benefits afforded by the FHA as a result of the discriminatory practice known as redlining.  *See generally Laufman v. Oakley Bldg. & Loan Co.*, 408 F. Supp. 489 (S.D. Ohio 1976).  Moreover, through the 1990s, the federal government persistently denied African-American farmers applications for farm loans, credit, and other benefit programs.  *See Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999).  These actions created generational wealth and stability for white families and generational poverty and instability for African-Americans and other people of color.

The majority mischaracterizes these asserted compelling interests as improper attempts to generally remediate past societal discrimination against minorities. In doing so, the majority overstates and mischaracterizes Congress' objectives in establishing the RRF. As the district court explained, the RRF was specifically targeted to provide aid to businesses who suffered dramatic losses *because of the pandemic*, not simply to provide aid in the abstract to certain minorities who have suffered past discrimination. The analysis does not change simply because some of the factors that might have contributed to general historical discrimination of certain minorities overlap to some degree with Congress' justifications for establishing the priority period.

The majority nevertheless contends that the priority period was overly broad in attempting to accomplish that purpose, because, in the majority's view, Congress did not effectively consider possible race-neutral alternatives to the program. To that end, the majority suggests that Congress could have "simply grant[ed] priority consideration to all small business owners who had not yet received coronavirus relief funds" or that Congress could have more effectively provided relief by "grant[ing] priority consideration to *all* business owners who were unable to obtain needed capital or credit during the pandemic." (emphasis added).

However, completely absent from the majority's analysis on these points is that the priority period was created expressly because the PPP—a prior, race-neutral attempt to assist restauranteurs—failed to reach minority business owners. Moreover, "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative." *Grutter*, 539 U.S. at 339. Legislation is not always perfect, but imperfection does not equate to unconstitutionality.

The majority's suggested alternatives presuppose that Congress had ample time to think of all possible ways in which it could distribute relief to small business owners. In normal times, there may be some force to the majority's position. But these are not normal times, and Congress deemed that it needed to act fast. The principal purpose of the RRF—and the ARA more generally—was to flood the nation with cash in order to keep economic activity moving along. The statute at issue here is benign and not restrictive, and when emergency legislation

meets that standard, we must afford special deference to the legislature, which is far better positioned than the Court to assess what is best for the nation during an emergency.[9]

Further, as the government argues, while the SBA presumes certain races of people qualify as "socially and economically disadvantaged," that definition does not preclude people of other races from qualifying as well—including white men like Vitolo. On the other hand, because the presumption is rebuttable, individuals who have not suffered the disadvantage targeted by the RRF may properly be excluded during the priority period.

Finally, the district court correctly noted that the twenty-one-day priority period was narrow in scope: it "is time-limited, fund-limited, not absolutely constrained by race" and "does not mean individuals like Vitolo cannot receive relief under this program." Plaintiffs have not, at this juncture, demonstrated that they are likely to succeed on their argument that the priority period fails strict scrutiny.

V.

Plaintiffs are also unlikely to succeed on the merits of their argument that the RRF's gender-based priority is unconstitutional. Gender-based discrimination must serve "important governmental objectives" and "the discriminatory means employed [must be] substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 524 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)).

Relevant here, "[s]ex classifications may be used to compensate women for particular economic disabilities [they have] suffered, to promot[e] equal employment opportunity, [and] to advance full development of the talent and capacities of our Nation's people." *Id.* at 533 (internal quotation marks and citations omitted) (first and last alterations added). Although the

---

[9]I am mindful that judicial recognition of race-based classifications based solely on an emergency rationale has, at times, produced unfortunate and unsavory results. *See, e.g.*, *Korematsu v. United States*, 323 U.S. 214, 216, 221, 223-24 (1944) (concluding that government's decision to "assembl[e] together and plac[e] under guard all those of Japanese ancestry" in "assembly centers" was constitutional based on "[p]ressing public necessity[,]" where "the need for action was great, and time was short."); *see also Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting) ("History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure . . . . [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it."). Had the RRF provision been part of legislation enacted prior to the pandemic, I agree that the analysis *might* be different.

congressional witnesses spent more time discussing how the history of discrimination against minorities led to the need for targeted financial assistance in the wake of the pandemic, they confirmed that much of what they told Congress about minority-owned businesses is also true of women-owned businesses.

Addressing those economic disadvantages by prioritizing access to government funds is a direct way to promote the important government interests of employment opportunities for women and more fully developing the talent and capacity of American businesswomen. *Virginia*, 518 U.S. at 533. Accordingly, Plaintiffs are unlikely to succeed on their argument that the priority for women-owned businesses cannot survive intermediate scrutiny.

Regarding the remaining injunction factors, Plaintiffs argue that they will be irreparably harmed absent the requested relief; they assert that the pool of money in the RRF is shrinking every day and if an injunction is not entered, there will be nothing left for non-prioritized applicants. The government responds that an injunction would delay disbursement of funds to approved applicants. The public interest favors getting relief funds into the hands of business owners as quickly as possible, especially where, as here, Plaintiffs are unlikely to succeed on the merits of their appeal. *City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430.

## VI.

The majority states that "[w]hen the government promulgates race-based policies, it must operate with a scalpel." But what good is a scalpel if the government is stripped of its other policymaking tools. In this case, the government was uniquely situated to identify a pattern of nationwide discrimination and created legislation designed to provide a temporary remedy. That is not unconstitutional; that is the government doing its job. We are not in the business of telling Congress what it cannot do except in the most extreme of circumstances.

For the foregoing reasons, I would hold that Plaintiffs are not entitled to injunctive relief, and that their emergency motions should have been dismissed.

On a final note, I reiterate that this case should have never come to this point. As I mentioned above, we should have disposed of the initial emergency motion on narrow

jurisdictional grounds.  But because of the Court's unusual procedure in handling this appeal, we are now left with a binding published opinion, etched in the stone of time.  I urge my colleagues on this Court to consider establishing clear procedures for emergency matters so that we are not again placed in a position where we must address constitutional questions of profound importance on a moment's notice without development of the record.

I dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 21-5517/5528

ANTONIO VITOLO; JAKE'S BAR AND GRILL, LLC,

      Plaintiffs - Appellants,

v.

ISABELLA CASILLAS GUZMAN, Administrator of the
Small Business Administration,

      Defendant - Appellee.

```
┌─────────────────────────────────┐
│            FILED                 │
│         May 27, 2021             │
│    DEBORAH S. HUNT, Clerk        │
└─────────────────────────────────┘
```

Before:  NORRIS, DONALD, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court, Plaintiffs' motions and reply, and Defendant's response.

IN CONSIDERATION THEREOF, it is ORDERED that the emergency motion for an injunction pending appeal is GRANTED. The preliminary injunction shall remain in place until this case is resolved on the merits and all appeals are exhausted.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk